Case No. 23-55276

In the United States Court of Appeals
for the Ninth Circuit

LANCE BOLAND; MARIO SANTELLAN; RENO MAY; JEROME SCHAMMEL AND
CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,
*Plaintiffs-Appellees*,

v.

ROB BONTA,
in his official capacity as Attorney General of the State of California,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
Case No. 22-cv-1421-CJC-ADS

**PLAINTIFFS-APPELLEES' OPPOSITION TO APPELLANT'S
EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A PARTIAL
STAY OF THE PRELIMINARY INJUNCTION PENDING APPEAL AND
FOR AN INTERIM ADMINISTRATIVE STAY ENTERED BEFORE
APRIL 3, 2023**

C.D. Michel
Anna M. Barvir
Alexander A. Frank
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

*Attorneys for Plaintiffs-Appellees*

March 30, 2023

# TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................................ i

Table of Authorities ........................................................................................... ii

Introduction ........................................................................................................ 1

Legal Standard .................................................................................................... 3

Argument ............................................................................................................ 4

I.    The State Has Not Shown a Likelihood of Success ................................... 4

    A.    The District Court Did Not Abuse Its Discretion in Holding that the CLI and MDM Requirements Implicate the Second Amendment .......... 4

    B.    The District Court Did Not Abuse Its Discretion in Holding that the CLI and MDM Requirements Have No Legitimate Historical Analogues ........................................................................................... 8

II.   The State Fails to Show That The Equitable Considerations Justify a Partial Stay ................................................................................................ 13

III.  The State Could Have Sought This Relief in the District Court But Did Not . 19

Conclusion ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Antonyuk v. Hochul*,
  No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965 (N.D.N.Y. Oct. 6,
  2022) ............................................................................................................ 12

*Benham v. Namba (In re Maria Vista Estates)*,
  No. 13-cv-05286, 2014 U.S. Dist. LEXIS 188139 (C.D. Cal. Sept. 30,
  2014) .............................................................................................................. 3

*Caetano v. Massachusetts*,
  577 U.S. 411 (Alito, J., concurring) ............................................................ 18

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ...........................................................................*passim*

*Elrod v. Burns*,
  427 U.S. 347 (1976) ..................................................................................... 18

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) ........................................................................ 4

*New York State Rifle & Pistol Assn. v. Bruen*,
  597 U.S. __, 142 S. Ct. 2111 (2022) ....................................................*passim*

*Nken v. Holder*,
  556 U.S. 418 (2009) ....................................................................................... 3

*Sports Form, Inc. v. United Press International, Inc.*,
  686 F.2d 750 (9th Cir. 1982) ........................................................................ 4

*Thalheimer v. City of San Diego*,
  645 F.3d 1109 (9th Cir. 2011) ...................................................................... 4

*Tribal Vill. of Akutan v. Hodel*,
  859 F.2d 662 (9th Cir. 1988) ........................................................................ 4

## Statutes

Cal. Penal Code § 27560 ................................................................................. 17

Cal. Penal Code § 28050 ............................................................... 16

Cal. Penal Code § 31910(b)(1)-(3) .................................................. 2

Cal. Penal Code § 31910(b)(4)-(6) .................................................. 1

Cal. Penal Code § 31910(b)(7) ...................................................... 18

Cal. Penal Code § 32000(b)(4) ...................................................... 16

Cal. Penal Code § 32030 ............................................................. 14

Cal. Penal Code § 32110(a) .......................................................... 16

**Other Authorities**

Federal Rules of Appellate Procedure Rule 8 ................................... 3

# INTRODUCTION

On March 20, 2023, the district court granted Plaintiffs-Appellees' motion to preliminarily enjoin enforcement of California Penal Code section 31910(b)(4)-(6). Those provisions, part of California's "Unsafe Handgun Act," require a semiautomatic handgun to have a chamber load indicator ("CLI"), a magazine disconnect mechanism ("MDM"), and microstamping capability to be eligible for admission to the State's roster of certified handguns (the "Roster"). A handgun can be sold in the retail market in California (meaning at a properly licensed dealer) only if it complies with the UHA's requirements and is consequently listed on the Roster.

The district court simultaneously stayed the injunction for 14 days to accommodate the State's ability to appeal and seek a further stay from this Court pending appeal. The State has done so and Appellees oppose the State's request. But the State does not seek a stay of the injunction in full; it asks this Court to stay the injunction of the CLI and MDM requirements only (subdivisions (b)(4) and (b)(5) respectively), and not the microstamping requirement (subdivision (b)(6)).

This Court may stay an injunction pending appeal where the moving party establishes that the factors typically applied to the issuance of a preliminary injunction motion warrant a stay. The State has failed to meet its burden to establish that such extraordinary relief is warranted here. Indeed, the Second Amendment question at issue is not a close call. Appellees unquestionably demonstrated their likelihood of success on their claim that California's CLI, MDM, and microstamping requirements fail Second Amendment scrutiny. Moreover, this is one of the rare circumstances

1

where it is unmistakably clear that there is no risk of harm if the State is prevented from enforcing the CLI and MDM requirements pending appeal.

The reason is not difficult to grasp. The CLI and MDM requirements only apply to handguns manufactured after 2007, when the requirements took effect. But any handgun admitted to the Roster before then that lacks those features may be freely bought at any properly licensed gun store anywhere in the state in unlimited numbers. So all the district court's injunction really would do is allow unavailable, ergonomically unique handguns that technically function no differently than the roughly 500 semiautomatic firearms already on the Roster to be sold at gun stores. Thus there is no legitimacy to the argument that unless the injunction is stayed, a heretofore unknown class of firearms will pour into California and pose a threat of harm. Denying the State's stay request will merely allow California's semiautomatic handgun market to begin the long-overdue process of conforming to what the handgun market in 49 other states—even states with robust gun control and similar firearm roster regimes—currently allow.

These feature requirements that the district court enjoined are also not the only feature requirements for admission to the Roster. Appellees did not ask the district court to enjoin the requirements that handguns pass a firing reliability test, drop safety test, or have a positive manually operated safety device to be eligible for admission to the Roster. *See* Cal. Penal Code § 31910(b)(1)-(3). So firearms manufacturers will still have to comply with those operative consumer protection requirements despite the removal of the CLI, MDM, and microstamping obligations if this Court does not enter a stay pending appeal.

Thus, the State's request to stay the district court's injunction as to the CLI and MDM requirements should be denied because the State does not meet its burden to show a stay is warranted. There is little to no room to doubt the propriety of the district court's injunction ruling, and there is no colorable risk of harm if the CLI and MDM requirements are enjoined pending resolution on the full merits.

## LEGAL STANDARD

Rule 8 of the Federal Rules of Appellate Procedure allows this Court to suspend, modify, restore, or grant an injunction while an appeal in pending. "A stay is not a matter of right, even if irreparable injury might otherwise result," rather, a stay is "an exercise of judicial discretion" and the "propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34. This standard holds no matter how the applicant styles the stay application. *See Benham v. Namba* (*In re Maria Vista Estates*), No. 13-cv-05286, 2014 U.S. Dist. LEXIS 188139 (C.D. Cal. Sept. 30, 2014) (discussing the denial of a both a request for a stay pending appeal and administrative appeal).

In determining whether to issue a stay pending appeal, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434. The first two factors "are the most critical." *Id.* As for the first factor, this Court has

characterized a "strong showing" in various ways, including "reasonable probability,"
"fair prospect," "substantial case on the merits," and "serious legal questions . . . .
raised." *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011). When an applicant
relies on "serious legal questions," it must establish irreparable harm and that the
balance of harms tips sharply in his favor. *See id.* at 966; *Tribal Vill. of Akutan v. Hodel*,
859 F.2d 662, 663 (9th Cir. 1988).

## ARGUMENT

## I. THE STATE HAS NOT SHOWN A LIKELIHOOD OF SUCCESS

The State cannot establish that it is likely to overturn the district court's order
preliminarily enjoining the CLI and MDM requirements. The district court correctly
concluded that those requirements are likely unconstitutional. And there is no indicia
that the district court abused its discretion in doing so–the applicable standard of
review in motion for preliminary injunction appeals. *Sports Form, Inc. v. United Press
International, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982). Indeed, the district court's factual
and legal findings are based on unusually extensive pre-hearing and post-hearing
briefing from both sides, and after nearly two full days of evidentiary testimony from
parties, multiple expert witnesses, and lengthy oral argument. *Thalheimer v. City of San
Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011).

### A. The District Court Did Not Abuse Its Discretion in Holding that the CLI and MDM Requirements Implicate the Second Amendment

The core question here is whether California's requirement that semiautomatic
handguns be equipped with CLI, MDM, and microstamping to be sold in the retail

marketplace withstands Second Amendment scrutiny. In June 2022, the Supreme Court clarified how that scrutiny must be applied in *New York State Rifle & Pistol Assn. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111 (2022) ("*Bruen*"). *Bruen* rejected the means-end interest balancing test that courts applied in the wake of its seminal Second Amendment decision in *District of Columbia v. Heller*, and recapitulated *Heller*'s command to apply a text and history-based analysis to scope of the Second Amendment questions. *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Bruen* clarified that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2125. To rebut that presumption, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

Since *Bruen*, state defendants have stubbornly tried to flout it and shield gun control laws from historical scrutiny by arguing that the challenged law at issue does not implicate the plain Second Amendment text, no matter how fanciful and tenuous that argument may be. California did just that in the district court, where it argued that because the challenged feature requirements do not *prevent* any otherwise firearm-eligible person from obtaining *some* model handgun for self-defense, the requirements do not implicate the plain text. This is a frivolous argument that defies *Bruen*, *Heller*, and most Second Amendment jurisprudence since *Heller*. D.Ct. Dkt. No. 59 at 3-4.

Indeed, the argument that the Second Amendment does not protect acquiring arms, ammunition, and even accessories has no legal leg to stand on. Nor is it even remotely legally correct to argue that a firearm law must *destroy* the core Second Amendment right to possess a handgun for self-defense to implicate the Second

Amendment's text. *Heller* expressly says that the Second Amendment protects firearm related conduct beyond self-defense for other "traditionally lawful purposes." 554 U.S. at 625, 627; D.Ct. Dkt. No. 57 at 6-7. Indeed, even before *Bruen*, virtually every court in the Nation would grant without hesitation that a challenged law at least implicated the Second Amendment, before upholding it under the interest-balancing test that *Bruen* invalidated. *Bruen*, 142 S. Ct. at 2117.

Moreover, *Heller* established categorical protection for the *handgun* as the "quintessential" weapon of choice for the exercise of the "core" Second Amendment interest in self-defense. 554 U.S. at 630. And it established that virtually any weapon that Americans commonly possess for self-defense is covered by the Second Amendment. *Id.* at 582, 625, 627. Here, the challenged requirements, collectively, prevent Californians from purchasing in the retail marketplace *every* semiautomatic handgun model introduced to the broader U.S. national market since May 2013. Yet the State unbelievably argues this does not raise a Second Amendment question eligible for historical review. The State is wrong, and the district court properly rejected the argument. D.Ct. Dkt. No. 59 at 2.

Furthermore, this argument relies almost entirely on dicta from *Heller*, in which the Supreme Court said that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" and that nothing in the *Heller* decision should be taken to "cast doubt" on several categories of "presumptively lawful regulatory measures" such as "conditions and qualifications on the commercial sale of arms." 554 U.S. at 627. The State also relied on a couple of alarmingly aberrant post-*Bruen* district-court decisions which

depart from a national consensus extending Second Amendment protection to commercial activities necessary to exercise the Second Amendment right to self-defense. Indeed, the State's argument is that any law short of a total destruction or prevention of a person's right to own a firearm for self-defense is not only constitutional, but does not even implicate the Second Amendment, because there is no "penumbra" that protects the hermetically sealed off right to keep or bear a firearm. D.Ct. Dkt. No. 59 at 2-5.

But the district court did not buy that argument. Relying on a correct interpretation of *Heller* and *Bruen*, as well as common sense, the district court rejected the State's implausible argument that the challenged feature requirements do not implicate the Second Amendment because Appellees have access to other firearms. Decl. of Charles Sarosy ISO Emergency Mot. Under C.R. 27-3 Partial Stay Prelim. Inj. Pending App. ("C.S. Decl."), Ex. 1 at 9-11. And the district court correctly held that the Second Amendment's text covers Appellees' desire to purchase the most modern handguns available in the retail market. *Id.* Indeed, the State's argument that it is entitled to claw back an enormous portion of the marketplace for handguns—arms the Supreme Court has already expressly held are protected by the Second Amendment—by imposing arbitrary "safety" features requirements that are rarely incorporated on firearms (CLI and MDM) or in microstamping's case, never incorporated on firearms, shows remarkable disrespect for *Heller* and a desire to suppress the exercise of constitutional rights.

To its credit, the State does not try to discount or conceal the enormous effect on California's handgun market that the challenged feature requirements have

wrought. It acknowledges that should this Court reject its request to stay the CLI and MDM requirements, the number of firearms that manufacturers will submit to the State's firearm regulatory division for approval is so eye-watering that it amounts to an impermissible "administrative burden." Emergency Mot. Under C.R. 27-3 Partial Stay Prelim. Inj. Pending App. ("Emer. Mot.") at 5. Appellees are sure that the Jim Crow jurisdictions of the past felt the same way when forced to process voter registrations for Black Americans seeking to exercise their rights. But then, as now, the State cannot cite the burden that its own unconstitutional law created as a reason to let it keep enforcing it. Moreover, this admission cannot be squared with the State's argument that there is no Second Amendment question posed here. If the administrative burden the State faces is that significant, because a decade's worth of new firearms are lingering in the queue, there is surely a valid Second Amendment question at issue.

### B. The District Court Did Not Abuse Its Discretion in Holding that the CLI and MDM Requirements Have No Legitimate Historical Analogues

*Bruen*'s historical scrutiny test is not complicated. If the State can show evidence of an "enduring American tradition" of regulation that addresses the same concerns as the modern law in a substantially similar way, then the modern law does not violate the Second Amendment and is constitutional. The evidence cannot rely on "outlier" regulations and must show a genuinely "well-established and representative" tradition. *Bruen*, 142 S. Ct. at 2133. When the concern that the modern law addresses also existed in the past, the State must find a "distinctly similar historical regulation."

*Id.* at 2131. But if the modern law addresses an "unprecedented societal concern or dramatic technological change," *Bruen* authorizes a more "nuanced approach" that allows the State to present evidence of an analogically similar regulatory tradition instead of a distinctly similar one. *Id.* at 2132. "How and why the regulations burden a law-abiding citizen's right to armed self-defense" are two "metrics" for conducting the analogical analysis. *Id.* at 2133. And *Bruen* further cautioned "courts should not uphold every modern law that remotely resembles a historical analogue," thus requiring close inspection of any purported analogue and foreclosing a vague and rule-swallowing analogical standard. *Id.* (citations omitted). Indeed, analogues must be "relevantly similar." *Id.* at 2132.

Here, the State argued that the CLI and MDM requirements address the concern of accidental firearm discharge. Emer. Mot. at 4. Despite evidence that accidental discharge was a historical concern, the State argued for the "more nuanced approach" to "analogical reasoning" and then failed to meet its burden under that standard all the same.

The State presented evidence of three regulatory traditions purportedly analogous to CLI and MDM. The first category is "proving" (i.e., inspection) laws pertaining to firearm barrels and gunpowder. C.S. Decl., Ex. 1 at 12-15. The second is laws that restricted storing loaded firearms, and the third is laws that restricted storing large quantities of gunpowder. *Id.* The district court correctly reasoned that none were legitimately analogous.

As for proving laws, the district court reasoned:

> Whereas CLI and MDM requirements add additional features to and alter the operation off an otherwise well-manufactured handgun, proving laws focused only on confirming the basic operating features of a firearm. Whereas CLI and MDM requirements aim to prevent harm to others resulting from the user not knowing the firearm is loaded, proving laws targeted the firearm itself and aimed to protect the safety of the person using the firearm. Whereas CLI and MDM requirements are effectuated by checking only a few examples of a particular handgun model, proving laws were effectuated by examining each firearm manufactured. Whereas proving laws supported the use of firearms for self-defense by ensuring the weapon worked properly and safely, the MDM requirement can actually work against the use of a handgun for self-defense because it will not fire without the magazine.

C.S. Decl., Ex. 1 at 14.

The district court also held that "CLI and MDM requirements do not impose a comparable burden as proving laws on the right of armed self-defense." *Id.* "Whereas proving laws kept out of the hands of law-abiding citizens only firearms with manufacturing defects, CLI and MDM requirements keep out of their hands virtually all new, state-of-the-art handguns." *Id.* Indeed, proving laws are not legitimate analogues to the CLI or MDM requirements for many reasons. Laws meant to verify that a firearm's barrel or a quantity of gunpowder is of good and safe merchantable quality are simply not like California's requirement that firearms bear unusual added technologies to potentially prevent accidental discharge.

The district court then rejected the State's claim that gunpowder storage laws are CLI and MDM analogues, stating that "the goals of gunpowder storage laws and the means used to achieve those goals are very different from those of the UHA's CLI and MDM requirements." *Id.*, Ex. 1 at 15. "The main goal of the gunpowder storage laws was to prevent fire." *Id.* "In contrast, the CLI and MDM requirements

10

are meant to prevent inadvertent discharge or firing of the firearm." *Id.*, Ex. 1 at 16. The district court held, "[h]ow and why these regulations burden a law-abiding citizen's right to armed self-defense are too different to pass constitutional muster." *Id.*

Although the district court did not analyze the State's loaded firearm storage argument, it did not need to because a law that requires a person to store a firearm in unloaded condition is invalid. *Heller* held that such a law destroys the core right and is unconstitutional. 554 U.S. at 630. Moreover, the State did not show that such laws were sufficiently well subscribed and would thus fail on that basis as well.

The State also argues that its proposed analogues share the same regulatory "how" with MDM and CLI requirements because they all impose "conditions on commercial gun sales." Emer. Mot. at 22. This attempt to exploit *Heller*'s dicta is unpersuasive not just because it relies on dicta, but because such an expansive "how" comparison would allow virtually any commercial regulation short of a ban on the sale of all arms to not only stand, but to bypass scrutiny entirely. The State appears to think it can force arms makers to add any "feature" it commands, no matter how unpopular or unfeasible, pass that off as a commercial regulatory measure, and therefore exercise veto power over the Supreme Court's categorial protection of handguns.

And though *Bruen* may not demand "historical twins," it also forbids "regulatory blank checks," which is what the State effectively argues it is entitled to. 142 S. Ct. at 2133. But historical laws must be similar enough to qualify as analogues. As one New York district court put it, "generally, a historical statute cannot earn the

11

title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *20 (N.D.N.Y. Oct. 6, 2022). Laws that regulated how to store gunpowder and laws that required inspecting the quality of a firearm's barrel to ensure it would not explode in the user's hand when fired are clearly more distinguishable than they are similar to the MDM and CLI requirements, which force manufacturers to add features to firearms that *might* decrease the risk of negligent user discharge.

Moreover, the *Bruen* court anticipated that states would try to pass off superficially similar historical laws as "relevantly similar." That is why the Court emphasized that when conducting the "how" and "why" analysis, courts must also look to whether modern and historical regulations impose a "comparable burden." *Bruen*, 142 S. Ct. at 2133. The storage laws and proving laws do not impose anywhere near the same burden on the commercial sale of firearms that the CLI and MDM requirements do. Laws governing how to safely store volatile gunpowder regulated personal behavior not commercial behavior, and proving laws regulated barrel quality.

Thus, there is no room to argue that the State is likely to succeed at overturning the district court's preliminary injunction ruling. The State failed to identify a single statute, let alone a well-subscribed regulatory tradition, requiring an arms maker to equip a firearm with features meant to decrease the chance of accidental discharge. The district court's dissection of the stark differences between the State's purported analogues and the CLI and MDM requirements is simply beyond reproach. It did not apply an "overly narrow view of how to conduct the analogical inquiry"; it performed the analogical inquiry exactly how the Supreme Court requires it to. Emer Mot. at 22.

Moreover, the fact that the district court invalidated the CLI and MDM requirements under the "more nuanced" analogical standard, and not under the higher *distinctly* similar standard which it could have applied given that the modern and historical concerns about accidental discharge are the same, means that the district court extended the courtesy of a more deferential review standard to the State than it deserved. That makes the district court's injunction all the more unlikely to be reversed under the abuse of discretion standard.

## II. THE STATE FAILS TO SHOW THAT THE EQUITABLE CONSIDERATIONS JUSTIFY A PARTIAL STAY

The State argues that the equitable considerations weigh in its favor. Emer. Mot. at 11. This argument is completely hollow. There is no genuine risk of harm here to the public or to the State's interests at all to balance against the clear injury to Appellees' constitutional liberty interest.

The State contends that preserving CLI and MDM during the appeal "will prevent firearm dealers from selling additional semiautomatic pistol models that lack commonsense safety mechanisms to prevent accidental shootings and save lives." Emer. Mot. at 7, 11. But the evidence that the State relied on to support its argument that these features have saved any lives is very questionable. Emer. Mot. at 3-4. That evidence is several *prospective* looking studies which essentially speculated that CLI and MDM could theoretically prevent certain types of accidents. *Id.* Those predictions, however, presume widespread proliferation of handguns equipped with CLI and MDM in lieu of those without them. Thus without knowing the actual proliferation of CLI and MDM equipped handguns, any predictive model hypothesizing what

percentage of accidents might be prevented is pure speculation. And in response, Appellees presented a UC Davis study that concluded that for the 2005-2015 period, unintentional non-fatal firearm "injuries remained relatively stable."[1] D.Ct. Dkt. No. 57-1, Decl. of Alexander A. Frank, Ex. 1 at 1.

Nor is that surprising, given that the State's representation that there are 34 CLI and MDM equipped firearms on the Roster to choose from is deceptive. California treats models of the same handgun that differ in minor cosmetic ways as distinct models. Cal. Penal Code § 32030. So there are not 34 distinct models on the Roster; there are about 5 distinct models with roughly 34 SKU variations that account for differences in color of finish, grip material, or any other "purely cosmetic feature." *Id.*; D.Ct. Dkt. No. 57 at 20, n.12; C.S. Decl. Ex. 5 at 232. This hardly demonstrates the public's desire for such firearms or the firearm industry's purportedly robust ability to incorporate CLI and MDM into pistol designs. It attests to the opposite. That from 2007 to 2013 only 5 distinct models with both CLI and MDM were admitted to the Roster—less than one per year—shows that these features are simply not widespread at all, because neither the arms manufacturers nor their customers prefer them. C.S Decl., Ex. 5 at 38, 72. Moreover, allowing the CLI and MDM requirements to be enjoined will not alter the availability of these 34 SKUs that have

---

[1] Furthermore, while interest-balancing arguments citing the rate of accidental shooting deaths are not relevant to the Second Amendment analysis under *Bruen*, it is worth noting that the State's claim that accidental shooting deaths decreased by two-thirds between 1996 and 2018 is misleading. Emer. Mot. at 3-4. While California did see such a reduction, so did the nation as a whole. According to CDC data, the rate of accidental gun deaths in 1999 was 0.3 per 100,000, but had fallen to 0.1 per 100,000 by 2018. The State is trying to credit its unconstitutional law for it benefitting from a national trend. See Appellees' Request for Judicial Notice ISO Opposition to Appellant's Emergency Stay Motion, Ex. 1.

both CLI and MDM. They will remain available as long as manufacturers choose to keep offering them, no matter how many new semiautomatics might be added to the Roster if this Court denies the State's request to extend the stay. Indeed, this case does not affect the Roster status of those CLI and MDM equipped pistols at all.

But the ultimate reason why the equitable factors do not favor the State here is "grandfathering." As the State acknowledges,

> Rather than prohibit the sale of any pistol that does not meet the UHA's requirements, the Legislature elected to impose those requirements on a prospective basis. Under the UHA, semiautomatic pistols that were already on the Roster when the chamber load indicator, magazine disconnect mechanism, and microstamping requirements took effect could remain on the Roster so long as the manufacturers continued to pay the annual Roster listing fee.

Emer. Mot. at 8. In other words, as the legislature created new requirements for Roster admission over time, firearms that would no longer meet the operative safety requirements could continue to be sold in unlimited numbers. *Id.* at 2. So it is a gross understatement for the State to say that there some "semiautomatic pistols on the Roster that currently do not satisfy the chamber load indicator and magazine disconnect mechanism requirements," when nearly *all* of the roughly 500 semiautomatic handguns on the Roster lack CLI and MDM, except for the 34 previously mentioned SKUs that do have those features. Indeed, the Roster consists entirely of "grandfathered" semiautomatic handguns that do not otherwise satisfy the currently operative Roster admission requirements for semiautomatic handguns.

That is the grand irony of this ill-conceived gun control experiment. The grandfathering ensures that handguns that do not meet the State's operative "safety"

requirements are allowed to be sold, and indeed are sold, without limitation. And that is why there is no risk of harm to the status quo—nothing material changes if currently off-roster handguns (that can otherwise satisfy the remaining Roster admission requirements) are added to the Roster and thus become eligible for retail sale. Aside from ergonomics, there is no material functionality difference between any currently off-Roster handgun that lacks CLI and MDM and any currently on-Roster handgun that lacks CLI and MDM (which is close to 500 of them), other than the year that handgun was first brought to market. The Roster bans the *retail* sale of the newest and most ergonomically modern firearms, and nothing more. It makes handguns in California what automobiles are in Cuba.

Further proof that the harm the State fears is illusory is that California law does not prohibit *possession* or even lawful private-party transfer of handguns that lack CLI and MDM. It only prohibits *retail* transfer of them. So ordinary Californians may freely try to acquire off-Roster handguns in the used secondary market, which ironically, is predominately furnished by a large class of people exempt from the Roster's limitations: law enforcement officers. See Cal. Penal Code §§ 32000(b)(4), 28050, 32110(a). The president of the Peace Officers Research Association of California, which represents the interests of over 70,000 sworn peace officers in Sacramento, submitted a declaration in support of Appellees urging the district court to enjoin the CLI, MDM, and microstamping requirements, citing the unfairness of the double standard and the absurdity of labeling the firearms that most police officers in the U.S. carry on duty "unsafe." D.Ct. Dkt. No. 57-2 at ¶¶ 5-6. People who move into California may also bring their off-Roster firearms with them, and may

16

freely transfer them to Californians who are willing to pay the egregious price markups that are the norm in the secondary marketplace. C.S. Decl., Ex. 5 at 37; Cal. Penal Code § 27560.

So the State does not really care whether Californians acquire off-Roster firearms that lack CLI and MDM. If it did, and if these firearms were truly "unsafe," there would be no avenue for the public to acquire them at all. Nor would the State issue such "unsafe" handguns to its law enforcement officers to use in the line of duty, like it did to the State's witness, DOJ special agent Salvador Gonzalez. Agent Gonzalez testified that his duty weapon, a fourth generation Glock model 23, is an off-Roster handgun which does not have CLI or MDM, and thus is "unsafe" under California law. C.S. Decl. Ex. 5 at 243. Thus, it is evident that the State's fear of harm is not sincere.

Nor is the State's claim of looming "administrative disruption" posed by the likely "flood" of off-Roster admission processing obligations availing. Emer. Mot. at 5. This claim is hard to countenance, as the State does not do the actual heavy lifting. Although the State says that it must "review the arm for compliance," the State does not conduct the firing reliability and drop safety test. Those tests are administered at third-party laboratories in Maryland and Illinois. Emer. Mot. at 14; C.S. Decl. Ex. 5 at 184. So there is not much more for the State to do other than collect an administrative fee and enter data. Indeed, the real bottleneck will not be at the State's administrative office in Sacramento, but at the laboratories.

On the other hand, while the harms the State describes are illusory and insincere, the harm that Appellees face is real. Appellees have shown a strong

likelihood that the State's CLI and MDM requirements violate their Second Amendment rights, and as the district court found, injuries to constitutional rights constitute irreparable harm. C.S. Decl., Ex. 1 at 19. Indeed, injury to a fundamental right is irreparable—even if for a moment. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This ongoing constitutional injury is no less severe simply because, as the State argues, Appellees possess firearms they may use for self-defense and may purchase more on-Roster firearms. Indeed, "[i]t is no answer to say…that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller*, 554 U.S. at 629. "The right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Caetano v. Massachusetts*, 577 U.S. 411 at 421(2016) (Alito, J., concurring).

Moreover, another equitable consideration counseling against the State's request is that the State's decision to seek a further stay of the CLI and MDM provisions only and not of the microstamping provision may be due to its anticipation that if arms makers successfully add new CLI and MDM equipped semiautomatic handguns to the Roster, that will trigger the provision that requires the DOJ to remove three semiautomatic handguns that lack one of those features from the Roster for every new semiautomatic added. Cal. Penal Code § 31910(b)(7). Plaintiffs asked the district court to preliminarily enjoin subdivision (b)(7), but the preliminary injunction order does not expressly do so. D.Ct. Dkt No. 57 at 21. Although the district court likely reasoned that subdivision (b)(7) would become unenforceable essentially by operation of law given the enjoinment of subdivisions (b)(4) through

(b)(6), the district court likely did not foresee the State seeking a partial stay of the preliminary injunction order.

## III.  THE STATE COULD HAVE SOUGHT THIS RELIEF IN THE DISTRICT COURT BUT DID NOT

Contrary to its representation to this Court, the State never gave the district court an opportunity to entertain the request it presents to this Court, which is different from the request it nestled into a footnote in its district court briefing. Emer. Mot. App. at 8-9. A footnote in a brief is hardly the equivalent of a motion brought for that express purpose. Indeed, that footnote reads: "If the Court were to grant Plaintiffs' Motion in any form, Defendant again asks the Court to immediately stay the order pending appeal." D.Ct. Dkt. No. 58 at 10, n.7. That's it. Such a broad request, devoid of any discussion of the reasons the State should be entitled to a stay, does not give either the opposing party or the court sufficient notice of the grounds for the request to either effectively oppose it or rule on it.

What's more, the district court generously gave the state 14 days to act, providing plenty of time for the State to bring an ex parte motion asking the district court to enter the unique stay it requests here. And given that the State's request for relief from this Court reveals a surprising amount of deference to the district court's reasoning and temporary acceptance of its injunction order as to microstamping, it is not at all a foregone conclusion that the district court would have rejected this request out of hand. Thus it was practicable for the State to seek this relief in the district court rather than leapfrog its authority by taking it straight into this Court.

19

## CONCLUSION

The State fails to satisfy the burden it must meet to obtain a stay of the CLI and MDM requirements pending appeal of the district court's preliminary injunction order. Allowing the district court's injunction to become wholly operative will not pose any harm to any person in California or to the State's interests at all. It will merely allow the long-overdue process of allowing law-abiding Californians the opportunity to purchase the full range of handguns that Americans in every other state are currently able to buy to begin. Thus, Appellees respectfully request that this Court deny the State's requested relief, both as to a stay pending appeal and administratively.

Dated: March 30, 2023        Respectfully submitted,

                                 **MICHEL & ASSOCIATES, P.C.**

                                 s/Alexander A. Frank
                                 Alexander A. Frank
                                 *Attorneys for Plaintiffs-Appellees Lance Boland;*
                                 *Mario Santellan; Reno May; Jerome Schammel*
                                 *And California Rifle & Pistol Association,*
                                 *Incorporated*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55276

I am the attorney or self-represented party.

**This brief contains** 5,594 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Alexander Frank **Date** March 30, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2023, an electronic PDF of APPELLANTS' OPENING BRIEF was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

Dated: March 30, 2023

Respectfully submitted,

**MICHEL & ASSOCIATES, P.C.**

s/Alexander Frank
Alexander Frank
*Attorneys for Plaintiffs-Appellees*