No. 23-55276

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

LANCE BOLAND; MARIO SANTELLAN; RENO MAY; JEROME SCHAMMEL; AND CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,
*Plaintiffs-Appellees,*

v.

ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,
*Defendant-Appellant.*

**On Appeal from the United States District Court for the Central District of California**
No. 22-cv-1421-CJC-ADS
The Honorable Cormac J. Carney, Judge

# REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A PARTIAL STAY OF THE PRELIMINARY INJUNCTION PENDING APPEAL AND FOR AN INTERIM ADMINISTRATIVE STAY ENTERED BEFORE APRIL 3, 2023

**IMMEDIATE RELIEF REQUESTED**

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
P. PATTY LI
Supervising Deputy Attorney General
MARK R. BECKINGTON
Supervising Deputy Attorney General

CHARLES J. SAROSY
Deputy Attorney General
State Bar No. 302439
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6356
Fax: (916) 731-2119
Email: Charles.Sarosy@doj.ca.gov
*Attorneys for Defendant-Appellant*

March 31, 2023

## TABLE OF CONTENTS

**Page**

Introduction ........ 1
Argument ........ 4
I. Equitable Considerations Support a Partial Stay ........ 4
II. Defendant Is Likely to Succeed on the Merits ........ 7
A. The Text of the Second Amendment Allows States to Impose Firearm Safety Requirements ........ 8
B. Firearm Safety Requirements Are Consistent with a Historical Tradition of Regulation ........ 10
Conclusion ........ 13
Certificate of Compliance ........ 14

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Caribbean Marine Servs. Co., Inc. v. Baldrige*
844 F.2d 668 (9th Cir. 1988) ....................5

*DISH Network Corp. v. F.C.C.*
653 F.3d 771 (9th Cir. 2011) ....................5

*Dist. of Columbia v. Heller*
554 U.S. 570 (2008)....................3, 8, 9

*Granata v. Healey*
603 F. Supp. 3d 8 (D. Mass. 2022)....................3

*Hohe v. Casey*
868 F.2d 69 (3d Cir. 1989) ....................5

*McDonald v. City of Chicago, Ill.*
561 U.S. 742 (2010)....................3, 9

*New York State Rifle & Pistol Assoc., Inc. v. Bruen*
142 S. Ct. 2111 (2022)....................*passim*

*Pena v. Lindley*
898 F.3d 969 (9th Cir. 2018) ....................3, 5

*Siegel v. LePore*
234 F.3d 1163 (11th Cir. 2000) ....................5

*United States v. Reyna*
2022 WL 17714376 (N.D. Ind. Dec. 15, 2022)....................8

**CONSTITUTIONAL PROVISIONS**

United States Constitution
First Amendment ....................5
Second Amendment....................*passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**STATUTES AND BILLS**

California Penal Code
§ 31910(b)(4) ....................13
§ 31910(b)(5) ....................13
§ 31910(b)(7) ....................6

Assembly Bill No. 2847, 2019-2020 Reg. Sess. (Cal. 2022)
§ 1(b) ....................5
§ 1(c) ....................5
§ 1(j) ....................6

**COURT RULES**

Ninth Circuit Rule 27-2 ....................4

## INTRODUCTION

Defendant seeks a partial stay of the district court's preliminary injunction to preserve two commonsense firearm safety requirements contained in the Unsafe Handgun Act (UHA): the chamber load indicator and magazine disconnect mechanism requirements. As explained in Defendant's emergency motion, the preliminary injunction would significantly disrupt the scheme that has governed the commercial sale of semiautomatic pistols in California for more than a decade; the chamber load indicator and magazine disconnect mechanism requirements have been proven to thwart the accidental discharge of firearms; and manufacturers can comply with those two requirements, as demonstrated by the 32 pistols that already appear on California's Roster of Certified Handguns (Roster). With respect to the merits, the challenged safety requirements do not prevent any Plaintiff from keeping or bearing arms—or even from purchasing semiautomatic pistols that are functionally identical to the ones they assert a desire to purchase (*see* Opp'n 2, 16)—and the requirements fall comfortably within a historical tradition of safety regulations.

Plaintiffs fail to rebut the Defendant's case for a partial stay. They do not identify any practical harm that they would suffer if this Court were to grant a partial stay. The two Plaintiffs who testified at the evidentiary hearing admitted that they currently own nearly 100 firearms between them, including 30

semiautomatic pistols. D.Ct. Dkt. 54 at 41-43, 53-57. And nothing in the UHA prevents any of the Plaintiffs from purchasing any of the 500 semiautomatic pistols approved for sale. Plaintiffs cannot contend that those arms are inadequate; in fact, they concede that "there is no material functionality difference between" the semiautomatic pistols approved for sale and others that they seek to purchase. Opp'n 16.

Plaintiffs' other equitable arguments are unpersuasive. They quibble with whether studies presented by Defendant, which they dismiss as "predictive models" (Opp'n 13-14), actually reflect that chamber load indicators and magazine disconnect mechanisms have caused a statistical decline in the number of accidental shootings in the State. But they do not (and cannot) concretely rebut the commonsense reality that these features help prevent accidental shootings. Instead, Plaintiffs point to the "grandfathering" of semiautomatic pistols as the "ultimate reason" to discount Defendant's equitable arguments. Opp'n 15. That argument is perplexing. Surely Plaintiffs would object even more vehemently if the Legislature had categorically and immediately banned the retail sale of all handguns that do not comply with every safety requirement of the UHA. The fact that the Legislature instead took an incremental approach, regulating in a manner that is more deferential to firearm dealers and consumers and that gradually removes unsafe handguns from the State's marketplace, should not be a

consideration weighing *against* a stay. Moreover, Plaintiffs' arguments also discount the administrative disruption that the preliminary injunction would impose as manufacturers predictably flood the Bureau of Firearms with requests to sell their semiautomatic pistols without safety features.

On the merits, Plaintiffs assert that "the Second Amendment question at issue is not a close call." Opp'n 1. But that argument ignores the repeated admonitions from the Supreme Court that the Constitution does not protect the right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010); *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022); *id.* at 2162 (Kavanaugh, J., concurring). It also ignores this Court's application of that principle in concluding that there is not "a constitutional right to purchase a particular handgun." *Pena v. Lindley*, 898 F.3d 969, 973 (9th Cir. 2018).[1] At a minimum, Defendant has presented a substantial case on the merits that supports a

[1] *See also* Sarosy Decl. ¶ 19 (citing *Granata v. Healey*, 603 F. Supp. 3d 8, 10-11 (D. Mass. 2022), and *Granata v. Campbell*, No. 22-1478 (1st Cir. Feb. 21, 2023) (argument scheduled for April 4, 2023)).

partial stay preserving the status quo with respect to the chamber load indicator and magazine disconnect mechanism requirements.[2]

## ARGUMENT

### I. EQUITABLE CONSIDERATIONS SUPPORT A PARTIAL STAY

Plaintiffs contend that Defendant's equitable arguments in favor of a partial stay are "completely hollow": in their view, the "clear injury" to their "constitutional liberty interest" outweighs any risk of harm to the public or the State. Opp'n 13. But the chamber load indicator and magazine disconnect mechanism requirements do not interfere with their interest in keeping and bearing firearms, or even in purchasing semiautomatic pistols with the functionality they prefer. Nor do Plaintiffs identify any practical harm they would suffer while the appeal of their preliminary injunction is litigated. Two Plaintiffs testified that they collectively own nearly 100 firearms (D.Ct. Dkt. 54 at 41-43, 53-57); Plaintiffs acknowledge that they "may purchase more on-Roster firearms" (Opp'n 18); and they acknowledge that the off-Roster pistols they seek to purchase "technically

[2] Plaintiffs contend that it would have been "practicable" to go back to the district court to renew a request for a stay after it issued its preliminary injunction. Opp'n 19. That is untrue. The district court outright rejected Defendant's request for a stay pending appeal, electing instead to stay its order for a brief 14-day period "to allow the government to file an appeal and seek a further stay of this preliminary injunction." D.Ct. Dkt. 61 at 2. The assertion also ignores that Defendant had only seven days after the district court's order to seek a stay here under this Court's Rule 27-2.

function no differently" than the pistols they own and can acquire (Opp'n 2). Even if those equitable considerations provide "no answer" (Opp'n 18) to the merits of the ultimate Second Amendment inquiry, they establish that a partial stay will cause Plaintiffs no real-world harm during this appeal.[3]

Plaintiffs also improperly discount the harms that the State and public would suffer if the chamber load indicator and magazine disconnect mechanism requirements were preliminarily enjoined. *See* Mot. 11-15. While Plaintiffs disregard Defendant's evidence as "predictive models" about the statistical effect the features have had on accidental shootings (Opp'n 13), they point to no evidence or studies that undermine the Legislature's commonsense conclusion that these safety features in fact prevent users from accidentally shooting themselves or others. *See* Assemb. B. 2847, 2019-2020 Reg. Sess. (Cal. 2022), § 1(b), (c); *see also Pena*, 898 F.3d at 980; *id.* at 988 (Bybee, J., concurring in part). Indeed, a federal study commissioned by Congress concluded that basic safety features,

---

[3] *See DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011) (even a likely First Amendment violation does not relieve the plaintiff from also showing a likelihood of irreparable injury); *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (irreparable harm requires "demonstrate[d] immediate threatened injury"); *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."); *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far.").

including a chamber load indicator, could prevent one third of all accidental gun deaths in the United States. D.Ct. Dkt. 48, Def.'s Ex. 12 at 3.

Instead of disputing whether the two requirements actually enhance handgun safety, Plaintiffs argue that those safety benefits are illusory because the Legislature "'grandfathered' semiautomatic handguns that do not otherwise satisfy the currently operative Roster admission requirements." Opp'n 15-16. That argument misunderstands how the UHA operates. True, the Legislature adopted an incremental approach. But by recently including a provision that removes three semiautomatic pistols without public safety features for each new pistol that is added to the Roster, the Legislature set in motion a gradual phase-out of the retail sale of "grandfathered" semiautomatic pistols lacking these safety features. *See* Mot. 9, n.1; Cal. Penal Code § 31910(b)(7); Assemb. B. 2847, 2019-2020 Reg. Sess. (Cal. 2022), § 1(j). So it is not true that the "State does not really care whether Californians acquire off-Roster firearms that lack" the safety requirements. Opp'n 17. Swiftly and dramatically increasing the proportion of semiautomatic pistols without these two safety features available for retail sale, all during the relatively short period in which this Court considers this appeal, would unnecessarily compound the public safety risk that the Legislature sought to mitigate over time.

Plaintiffs' equitable argument seeks to penalize the Legislature for enacting a more incremental approach to addressing these important public safety issues. But the stay inquiry does not require an all-or-nothing approach to legislation. The Legislature's approach balanced public safety aims with the interests of firearm dealers and consumers in accessing a wider array of arms. That incremental approach weighs in favor of the partial stay, not against it.

Plaintiffs also ignore the significant disruption to the State's administrative scheme governing commercial sales of firearms that would result if the preliminary injunction took immediate effect. As Plaintiffs appear to acknowledge, manufacturers will predictably flood the State with hundreds of requests to sell every semiautomatic pistol that came to market elsewhere in the last decade. And while this influx would create bottlenecks at the two certified laboratories in Maryland and Illinois that are equipped to do certain required testing, Opp'n 17, it would also impose considerable burdens on the State by requiring the Bureau of Firearms, for example, to review the submitted arms and laboratory reports for compliance and process the required applications and fees. *See also* Mot. 13-14.

## II. DEFENDANT IS LIKELY TO SUCCEED ON THE MERITS

Plaintiffs' merits contentions underscore that Defendant has presented at least a substantial case on the merits, supporting a partial stay as this Court works through the important constitutional questions presented in this case.

### A. The Text of the Second Amendment Allows States to Impose Firearm Safety Requirements

*Bruen* directs courts to first assess "whether the plain text of the Second Amendment protects [the individual's] proposed course of conduct," 142 S. Ct. at 2134—*i.e.*, whether the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes. *See* Mot. 16-17. In conducting that textual analysis, "the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text." *United States v. Reyna*, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022). That ensures that the Second Amendment does not become a "regulatory straightjacket," *Bruen*, 142 S. Ct. at 2133, and gives effect to the Supreme Court's repeated recognition that the Second Amendment is subject to reasonable limits. *Supra* p. 3; Mot. 16-20.

As explained in the Motion, the chamber load indicator and magazine disconnect mechanism requirements simply impose safety requirements before a semiautomatic pistol may be offered for retail sale. *See Heller*, 554 U.S. at 627 (authorizing "conditions and qualifications on the commercial sale of arms").[4] It is

[4] Plaintiffs assert that "the challenged requirements, collectively, [have] prevent[ed] Californians from purchasing in the retail marketplace every semiautomatic handgun model introduced to the broader U.S. national market since May 2013." Opp'n 6. As they appear to recognize, that is because of the microstamping requirement, which is not a subject of this stay motion. Manufacturers could—and did—add semiautomatic pistols to the Roster after the chamber load indicator and magazine disconnect mechanism requirements took effect. Mot. 3, 9, 12.

telling that Plaintiffs did not seek an injunction of other "operative consumer protection requirements" contained in the UHA, including the "fire reliability test," the "drop safety test," or the requirement that a semiautomatic pistol "have a positive manually operated safety device." Opp'n 2. Plaintiffs identify no basis for concluding that those safety requirements do not implicate the text of the Second Amendment while the chamber load indicator or magazine disconnect mechanism requirements do.

While Plaintiffs accuse Defendant of "show[ing] remarkable disrespect for *Heller*," Opp'n 7, it is Plaintiffs who are ignoring the teachings of *Heller* and its progeny. The Supreme Court has repeatedly explained, in *Heller* and more recently, that the Second Amendment may not be construed to encompass a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Plaintiffs dismiss that as "dicta." Opp'n 6. But the Court repeated that instruction in *McDonald* and *Bruen*—and two Justices separately emphasized it in their concurrences accompanying the majority decision in *Bruen*. As Justice Kavanaugh explained, both *Heller* and *McDonald* made clear that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *id.* at 2157 (Alito, J., concurring). Plaintiffs' arguments disregard those principles.

### B. Firearm Safety Requirements Are Consistent with a Historical Tradition of Regulation

In any event, Defendant has identified a substantial body of founding- and ratification-era statutes that are relevantly similar to the chamber load indicator and magazine disconnect mechanism requirements. Mot. 21-24. Those historical analogues, like the two challenged requirements at issue here, sought to reduce the dangers arising from firearms and ammunition that do not function or are not used in line with their intended purpose. *Id.* Neither the historical laws nor the challenged UHA requirements impose any substantial burden on the right to keep or bear arms for lawful purposes. In the language of *Bruen*, the laws are "relevantly similar" according to the two key metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133.

Plaintiffs acknowledge that the historical analogues "aimed to protect the safety of the person using the firearm"; "ensur[ed] the weapon worked properly and safely"; and, in the case of Massachusetts, required the inspection of every single firearm manufactured for sale. Opp'n 10. Even so, Plaintiffs contend that those laws are not relevantly similar, and fault Defendant for "fail[ing] to identify a single statute . . . requiring an arms maker to equip a firearm with features meant to decrease the chance of accidental discharge." Opp'n 12. But bullets were not retained in arms in the same way in the founding era, when buck-and-ball muskets

and flintlock pistols were the modern firearms of the day; thus, chamber load indicators were not even technologically feasible in 1791, let alone needed when firearms were typically stored unloaded because of gunpowder's corrosive nature; and semiautomatic weapons (which can "chamber" a modern-day ammunition cartridge and thereby create the risk of accidental discharge even when a magazine is not inserted) did not become common until after World War I. D.Ct. Dkts. 56-3 ¶¶ 26-28, & 58 at 5. It is easy to understand why a founding-era government would not have required arms makers to equip a firearm with safety features that would not operate in arms in common circulation at the time, or with technological advancements that did not exist at the time.

The degree of similarity demanded by Plaintiffs' rigid understanding of the *Bruen* standard is not only inconsistent with the Supreme Court's decision, but it would effectively prohibit any modern firearm regulation designed to mitigate the safety problems presented by modern firearms technology or to take advantage of the substantial benefits of modern safety features. In application, California's safety requirements and the historical analogues alike were designed to prevent firearms from being improperly discharged and unintentionally injuring or killing individuals—whether those individuals may be the firearm users themselves or any innocent bystander. By demanding a precise match between the means used in 1791 to establish a firearm's safety and the means used to assure safety today,

Plaintiffs would have courts limit the types of laws that States may enact to the laws that existed centuries ago. Neither the Second Amendment nor *Bruen* requires that result. Governments are not required to identify a "historical *twin*," and need only identify a "well-established and representative historical *analogue*." *Bruen*, 142 S. Ct. at 2133 (emphasis in original). A modern-day regulation need not be a "dead ringer for historical precursors" to pass constitutional muster. *Id.* Rather, the regulation need only satisfy *Bruen*'s "how and why" standard, which those at issue here do, or at an absolute minimum, raise serious legal questions. *Id.* Combined with the other stay factors, a partial stay is warranted while the Court considers those questions on appeal.

## CONCLUSION

The Court should enter a partial stay of the district court's order, with respect to the chamber load indicator and magazine disconnect mechanism requirements in California Penal Code section 31910, subdivisions (b)(4) and (b)(5).

Dated: March 31, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
P. PATTY LI
Supervising Deputy Attorney General
MARK R. BECKINGTON
Supervising Deputy Attorney General

s/ *Charles J. Sarosy*

CHARLES J. SAROSY
Deputy Attorney General
*Attorneys for Defendant-Appellant*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing emergency motion complies with the type-volume limitation of Ninth Circuit Rules 27-1 and 32-3(2) because it consists of 2,738 words, excluding the documents listed at Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f). This emergency motion complies with the typeface and the type style requirements of Federal Rule of Appellate Procedure 27 because it has been prepared in a proportionally spaced typeface using 14-point font.

Dated: March 31, 2023 s/ *Charles J. Sarosy*

## CERTIFICATE OF SERVICE

Case Name: ***Lance Boland, et al. v. Rob Bonta, et al.*** Case No. **23-55276**

I hereby certify that on March 31, 2023, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A PARTIAL STAY OF THE PRELIMINARY INJUNCTION PENDING APPEAL AND FOR AN INTERIM ADMINISTRATIVE STAY ENTERED BEFORE APRIL 3, 2023**

I certify that **all** participants in the case are registered CM/ECF users and that service will be electronically accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on March 31, 2023, at San Francisco, California.

| Vanessa Jordan | *s/ Vanessa Jordan* |
|---|---|
| Declarant | Signature |