No. 23-55276

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

LANCE BOLAND; MARIO SANTELLAN; RENO MAY; JEROME SCHAMMEL; AND
CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,
*Plaintiffs-Appellees*,

V.

ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,
*Defendant-Appellant.*

———————————

**On Appeal from the United States District Court
for the Central District of California
No. 22-cv-1421-CJC-ADS
The Honorable Cormac J. Carney, Judge**

———————————

### APPELLANT'S OPENING BRIEF
### (PRELIMINARY INJUNCTION APPEAL –
### NINTH CIRCUIT RULE 3-3)

———————————

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
P. PATTY LI
MARK R. BECKINGTON
ANTHONY R. HAKL
Supervising Deputy Attorneys General

CHARLES J. SAROSY
Deputy Attorney General
State Bar No. 302439
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6356
  Fax: (916) 731-2119
  Email: Charles.Sarosy@doj.ca.gov
  *Attorneys for Defendant-Appellant*

April 28, 2023

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................. 1

Jurisdictional Statement .............................................................. 4

Issues Presented .......................................................................... 4

Statement Regarding Circuit Rule 28-2.7 Addendum ................... 4

Statement of the Case .................................................................. 4

    I.    The Unsafe Handgun Act ....................................................... 4

        A.    The Legislature Responds to the Spread of Low
Quality Handguns ............................................................. 4

        B.    The Legislature Requires, on a Prospective Basis,
Three Additional Features for New Semiautomatic
Pistols ............................................................................. 6

        C.    This Court Rejected a Second Amendment
Challenge to the Three Public Safety Features ............. 10

    II.    Procedural History ............................................................... 11

        A.    Plaintiffs' Second Amendment Challenge and
Motion for Preliminary Injunction ............................... 11

        B.    The District Court Issued a Preliminary Injunction,
Which This Court Partially Stayed ............................... 12

Summary of Argument ................................................................ 15

Standard of Review ..................................................................... 16

Argument .................................................................................... 17

    I.    There Is No Likelihood of Success on the Merits of the
Second Amendment Challenge to the UHA's
Requirements ....................................................................... 17

        A.    The Text-and-History Standard for Analyzing
Second Amendment Claims Under *Bruen* ................... 18

i

# TABLE OF CONTENTS
## (continued)

Page

B.    Plaintiffs Failed to Establish that the Second Amendment's Plain Text Covers Requirements that Enhance a Firearm's Safety and the Ability to Trace a Firearm Used in a Crime .................................. 19

     1.    Plaintiffs bear the burden of establishing that the Second Amendment's plain text covers their proposed conduct ...................................... 20

     2.    The Second Amendment allows States to impose the firearm safety and public safety requirements at issue here ................................. 21

     3.    The district court erroneously applied *Bruen*'s plain text analysis ................................ 24

C.    The Challenged UHA Requirements Are Presumptively Lawful Qualifications on the Commercial Sale of Firearms ....................................... 28

D.    Requirements that Enhance a Firearm's Safety and the Ability to Trace a Firearm Used in a Crime Are Consistent with a Historical Tradition of Regulation ................................................................ 31

     1.    The chamber load indicator and magazine disconnect mechanism requirements are consistent with this Nation's history of regulating the safety of firearms and gunpowder to protect consumers ........................ 33

     2.    The microstamping requirement is consistent with this Nation's history of controlling and tracing the sale of firearms ........ 40

II.    Plaintiffs Cannot Meet Their Burden to Demonstrate Irreparable Harm, or Demonstrate that the Balance of Harms Tips in Their Favor ..................................................... 44

# TABLE OF CONTENTS
## (continued)

Page

    A.    The District Court Erroneously Disregarded the Equitable Winter Factors and Failed to Apply the Heightened Standard for Mandatory Injunctions ........ 44

    B.    There is No Irreparable Harm Because Plaintiffs Already Possess and Have Access to Numerous Handguns ................................................. 48

    C.    Based on the Public Safety Benefits of the Challenged Requirements, the Balance of Equities Weigh in Favor of Defendant ...................................... 50

Conclusion ........................................................................ 56

Statement of Related Cases ............................................... 57

Certificate of Compliance ................................................. 59

Circuit Rule 28-2.7 Addendum to Appellant's Opening Brief ................... A1

# TABLE OF AUTHORITIES

**Page**

CASES

*Am. Freedom Def. Initiative v. King Cty.*
796 F.3d 1165 (9th Cir. 2015) ................................................................ 47

*Am., Inc. v. Skechers USA, Inc.*
890 F.3d 747 (9th Cir. 2018) .................................................................. 16

*Benisek v. Lamone*
138 S. Ct. 1942 (2018) ........................................................................... 45

*Caribbean Marine Servs. Co., Inc. v. Baldrige*
844 F.2d 668 (9th Cir. 1988) .................................................................. 49

*Coal. for Econ. Equity v. Wilson*
122 F.3d 718 (9th Cir. 1997) .................................................................. 51

*Def. Distributed v. Bonta*
No. CV 22-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21,
2022) .............................................................................................. 20, 25

*DISH Network Corp. v. F.C.C.*
653 F.3d 771 (9th Cir. 2011) .................................................................. 46

*Dist. of Columbia v. Heller*
554 U.S. 570 (2008) ........................................................................ *passim*

*Doe v. Harris*
772 F.3d 563 (9th Cir. 2014) .................................................................. 46

*Doe v. Snyder*
28 F.4th 103 (9th Cir. 2022) ................................................................... 48

*Elrod v. Burns*
427 U.S. 347 (1976) ................................................................................ 49

*Fiscal v. City and Cty. of San Francisco*
158 Cal. App. 4th 895 (2008) .......................................................... 1, 5, 7

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Garcia v. Google, Inc.*
    786 F.3d 733 (9th Cir. 2015) ............................................................ 47, 48

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*
    512 F.3d 1112 (9th Cir. 2008) ................................................................ 51

*Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*
    739 F.2d 466 (9th Cir. 1984) .................................................................. 50

*Granata v. Campbell*
    No. 22-1478 (1st Cir. Jan. 30, 2023), 2023 WL 1794480 ................. 34, 36

*Granata v. Campbell*
    No. 22-1478 (1st Cir. Jan. 30, 2023), 2023 WL 2062850 ........... 34, 35, 36

*Granata v. Healey*
    603 F. Supp. 3d 8 (D. Mass. 2022) ..................................................... 22, 52

*Klein v. City of San Clemente*
    584 F.3d 1196 (9th Cir. 2009) ................................................................ 46

*Maryland v. King*
    567 U.S. 1301 (2012) ............................................................................. 51

*McDonald v. City of Chicago, Ill.*
    561 U.S. 742 (2010) ............................................................................... 29

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012) ................................................................. 50

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
    2022 WL 3083715 (N.D. Cal. Aug. 3, 2022) ......................................... 20

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*
    434 U.S. 1345 (1977) ............................................................................. 51

## TABLE OF AUTHORITIES
## (continued)

Page

*New York State Rifle & Pistol Association, Inc. v. Bruen*
142 S. Ct. 2111 (2022).................................................................. *passim*

*Oakland Tactical Supply, LLC v. Howell Twp.*
No. 18-cv-13443, 2023 WL 2074298 (E.D. Mich. Feb. 17, 2023) .................................................................................................. 25

*Or. Firearms Fed'n, Inc. v. Brown*
No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ................................................................................ 20, 49, 50

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*
636 F.3d 1150 (9th Cir. 2011) .................................................. 47

*Pena v. Lindley*
898 F.3d 969 (9th Cir. 2018) ........................................... *passim*

*Pimental v. Dreyfus*
670 F.3d 1096 (9th Cir. 2012) .................................................. 17

*Ramirez v. Collier*
142 S. Ct. 1264 (2022)............................................................... 45

*Silvester v. Harris*
843 F.3d 816 (9th Cir. 2016) .................................................... 30

*Teixeira v. Cty. of Alameda*
873 F.3d 670 (9th Cir. 2017) .............................................. 30, 41

*Tracy Rifle & Pistol LLC v. Harris*
118 F. Supp. 3d 1182 (E.D. Cal. 2015) .................................... 47

*Tracy Rifle & Pistol LLC v. Harris*
637 Fed.App'x 401 (9th Cir. 2016) .......................................... 46

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Holton*
No. 3:21-CR-0482, __F. Supp. 3d __ (N.D. Tex. Nov. 3, 2022) ................................................................ 23, 40, 41, 42

*United States v. Perez-Garcia*
No. 22-CR-1581, 2022 WL 17477918 (S.D. Cal. Dec. 6, 2022) ..................................................................... 29

*United States v. Price*
No. 2:22-cr-00097, __F. Supp. 3d __ (S.D. W. Va. Oct. 12, 2022) ................................................................... 23, 31

*United States v. Reyna*
No. 3:21-CR-41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ................................................................... 20, 25

*Warsoldier v. Woodford*
418 F.3d 989 (9th Cir. 2005) ................................................. 50

*Winter v. Natural Resources Defense Council, Inc.*
555 U.S. 7 (2008) ......................................................... *passim*

## STATUTES

United States Code, Title 15
§ 2051(b)(1) ........................................................... 30
§ 2052(a)(5)(E) ........................................................ 30

United States Code, Title 26
§ 4181 ................................................................ 30

United States Code, Title 28
§ 1292(a)(1) ........................................................... 4
§ 1331 ................................................................ 4

## TABLE OF AUTHORITIES
### (continued)

Page

California Penal Code

§ 16380 ........................................................................................6

§ 16900 ........................................................................................7

§ 31900 ...........................................................................6, 9, 38

§§ 31900, *et seq.* ......................................................................5

§ 31905 ...........................................................................6, 9, 38

§ 31910(a) .............................................................6, 13, 26, 27

§ 31910(a)(1) ............................................................................6

§ 31910(b) .................................................................................6

§ 31910(b)(1) ............................................................................6

§ 31910(b)(4)-(5) ...............................................................6, 14

§ 31910(b)(4)-(6) ...............................................................8, 30

§ 31910(b)(6) .....................................................................7, 23

§ 31910(b)(6)(A) ....................................................................55

§ 31910(b)(7) ............................................................................8

§ 32000(a) ..........................................................................5, 30

§ 32000(b)(4) ............................................................................9

§ 32000(b)(6)–(7) .....................................................................9

§ 32005 ....................................................................................31

§ 32010 .............................................................................9, 38

§ 32010(d) ..........................................................................6, 8

§ 32015(a) ..................................................................................5

§ 32015(b) ..................................................................................8

§ 32030 ......................................................................................9

§ 32110 ....................................................................................31

§ 32110(a) ..................................................................................9

Hawaii Rev. Stat.

§ 134-15(a) ............................................................................. 21

Illinois Comp. Stat., Chapter 720

§§ 5/24-3(A)(h) ..................................................................... 21

# TABLE OF AUTHORITIES
## (continued)

Page

Massachusetts Gen. Laws, Chapter 140
  § 123 ............................................................................... 21
  § 131½ ............................................................................. 21
  § 131¾ ............................................................................. 21

Minnesota Stat.
  § 624.712(4) .................................................................... 21
  § 624.716 ........................................................................ 21

New York Penal Law
  § 400.00(12-a) ................................................................ 21

CONSTITUTIONAL PROVISIONS

United States Constitution, Amendment II ...................................... 15, 20, 22

COURT RULES

Ninth Circuit Rule 28-2.7 ........................................................4

OTHER AUTHORITIES

Assemb. B. 1471, 2007–2008 Reg. Sess. (Cal. 2007), § 2 ............................7

Assemb. B. 2847, 2019–2020 Reg. Sess. (Cal. 2020) ..................................8

Assemb. B. 2847, 2019-2020 Reg. Sess. (Cal. 2020) § 1(h) ................... 8, 56

Assemb. B. 2847, 2019-2020 Reg. Sess. (Cal. 2020), § 1(i) ....................... 55

California Code of Regulations, Title 11
  § 4049(j) ............................................................... 23, 27, 42
  § 4049(p) .........................................................................5
  § 4049(t) .........................................................................5
  § 4060 ............................................................................9
  § 5471(hh) ........................................................................5

ix

## TABLE OF AUTHORITIES
### (continued)

**Page**

Massachusetts Code of Regulations, Title 501
    §§ 7.01–7.16 .......................................................................... 21

Massachusetts Code of Regulations, Title 940
    §§ 16.01–16.09 ..................................................................... 21
    § 16.05(3), (4) ....................................................................... 22

New York Comp. Codes R. & Regs. Title 9
    §§ 482.1–482.7 ..................................................................... 21

S.B. 15, 1999–2000 Reg. Sess. (Cal. 1999) ....................................... 6

S.B. 489, 2003–2004 Reg. Sess. (Cal. 2007) ..................................... 6

## INTRODUCTION

California's Unsafe Handgun Act imposes public safety and quality assurance requirements that pistols and revolvers must meet before they can be commercially sold or manufactured in California. The law was first enacted in 1999, in response to the proliferation of poorly made and cheap handguns known as Saturday Night Specials, which could explode in the user's hand or fire without pulling the trigger. *See Fiscal v. City and Cty. of San Francisco*, 158 Cal. App. 4th 895, 912 (2008). The Unsafe Handgun Act ("UHA") identifies approved handguns through a Roster of Certified Handguns (the "Roster"), which the California Department of Justice maintains.

To appear on the Roster, a handgun must pass certain firing and drop-safety tests in an independent laboratory. Semiautomatic pistols, a subset of handguns, cannot be added to the Roster unless they contain three additional public safety features designed to guard against accidental discharge or to aid law enforcement in tracing pistols used in crimes. First, since 2007, the UHA requires newly added semiautomatic pistols to include a chamber load indicator, a display on the pistol that indicates it is loaded. Second, also since 2007, the UHA requires a magazine disconnect mechanism for any newly added semiautomatic pistols with detachable magazines, which prevents the pistol from firing when no magazine is inserted but a round remains in the chamber. And third, since 2013, the UHA requires that any

1

semiautomatic pistols added the Roster must have microstamping capability, which allows law enforcement to trace a shell casing to the pistol that fired it.  The UHA, "[a]s its name implies . . . seeks to reduce the number of firearm deaths in the state."  *Pena v. Lindley*, 898 F.3d 969, 973 (9th Cir. 2018).

This appeal involves a Second Amendment challenge to the chamber load indicator, magazine disconnect mechanism, and microstamping capability requirements.  The district court preliminarily enjoined Defendant from enforcing each of those UHA requirements, reasoning that the Second Amendment protects an "attendant right" to purchase "state-of-the-art" handguns that do not meet a state's safety requirements.  1-ER-14.  In granting preliminary injunctive relief, the lower court also concluded that the UHA's requirements interfered with Plaintiffs' access to such "state-of-the-art" handguns, which it viewed as adequate to establish the irreparable harm necessary to support a preliminary injunction—even though two of the four individual Plaintiffs concede that they currently own nearly 100 firearms, over 800 handguns approved for retail sale on the Roster, and Plaintiffs acknowledge that off-Roster handguns are "essentially the same" in "functionality" as on-Roster pistols.  2-ER-136.

This Court should reverse.  The Second Amendment's plain text does not encompass a right, let alone some "attendant right" (1-ER-14), to "purchase a particular handgun" that does not satisfy consumer safety requirements.  *Pena*, 898

2

F.3d at 973.  Commonsense public safety requirements, which leave hundreds of handguns available for retail purchase, do not interfere with the Second Amendment's textual right to "keep" or "bear" arms.  And they are otherwise consistent with the historical tradition of regulations aimed at reducing the likelihood of malfunctioning firearms and tracing firearms used in crimes.

The equitable factors also weigh heavily against a preliminary injunction. The Plaintiffs can defend themselves with the semiautomatic pistols they already possess, or any of the hundreds of handguns, including semiautomatic pistols, currently on the Roster.  Plaintiffs thus cannot identify any practical harm that they will suffer while the district court considers the important Second Amendment issues raised in this case, the district court abused its discretion in concluding that a likelihood of success on the merits establishes the irreparable injury necessary to support a preliminary injunction.  Moreover, a preliminary injunction against these three requirements disrupts a consumer safety regime that has governed the primary commercial market for semiautomatic pistols for more than a decade.  The district court's order would require Defendant to allow the retail sale of a significantly expanded pool of semiautomatic pistols lacking safety features that can save lives, all while it considers the merits of Plaintiffs' claims.  Neither the Second Amendment, the relevant Supreme Court's decisions, nor the standards governing preliminary injunctive relief supports that outcome.

3

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the federal questions in this case under 28 U.S.C. § 1331. This Court has jurisdiction over the interlocutory appeal of the district court's order granting a preliminary injunction. *See* 28 U.S.C. § 1292(a)(1). The district court entered its order on March 20, 2023. 1-ER-4–25. Defendant timely appealed on March 27, 2023. 7-ER-1437–1439.

## ISSUES PRESENTED

Whether the district court abused its discretion in granting Plaintiffs' motion for a preliminary injunction against the enforcement of three public safety requirements that new semiautomatic pistols must satisfy to be available for retail sale—a chamber load indicator, magazine disconnect mechanism, and microstamping capability.

## STATEMENT REGARDING CIRCUIT RULE 28-2.7 ADDENDUM

All pertinent constitutional, statutory, and regulatory provisions are set forth in the addendum to this brief. Ninth Circuit Rule 28-2.7.

## STATEMENT OF THE CASE

### I.    THE UNSAFE HANDGUN ACT

#### A.    The Legislature Responds to the Spread of Low Quality Handguns

California enacted the UHA in 1999, in response to the proliferation of "low cost, cheaply made handguns known as 'Saturday Night Specials'" that discharged

without being fired or caused inadvertent injury to the user.  *See Fiscal*, 158 Cal. App. 4th at 912.  The UHA generally prohibits the manufacture or retail sale of any "unsafe handgun" in California, making a violation punishable by imprisonment in a county jail for not more than one year.  Cal. Penal Code § 32000(a).  The UHA does not prohibit the possession of any handgun or other firearm.  *See id.* §§ 31900, *et seq*.  Under the UHA, the California Department of Justice must maintain a Roster of Certified Handguns that have been tested by a certified independent laboratory and meet other public safety requirements.  *Id.* § 32015(a).  There are approximately 829 handguns on the Roster, of which about 315 are revolvers, nearly 500 are semiautomatic pistols, and the rest are non-semiautomatic pistols.[1][2]  3-ER-450–51.  Handguns that do not appear on the Roster are deemed "unsafe handguns" under the UHA.  Cal. Penal Code § 32015(a).

As with many consumer safety measures, the California Legislature gave manufacturers time to comply with the UHA's safety requirements after they became law.  Enacted in 1999, the UHA did not take effect until January 2001.

---

[1] These numbers are based on the state of the Roster in January 2023.

[2] A revolver is "a handgun with a cylinder having several chambers so arranged as to rotate around an axis and be discharged successively by the same firing mechanism through a common barrel."  Cal. Code Regs., tit. 11, § 4049(t). A pistol is "a handgun in which the chamber is part of the barrel," and can "either be semiautomatic or non-semiautomatic."  *Id.* § 4049(p).  A semiautomatic pistol is one that is "functionally able to fire a single cartridge, eject the empty case, and reload the chamber each time the trigger is pulled and released."  *Id.* § 5471(hh).

S.B. 15, 1999–2000 Reg. Sess. (Cal. 1999). From 2001 until present, to be added

to the Roster, a handgun—whether a revolver or pistol—must have a "safety

device" and pass firing and drop-safety tests in an independent laboratory.[3] Cal.

Penal Code §§ 31910(a), (b). The firing test assesses whether the handgun

malfunctions or cracks while firing 600 rounds of ammunition. *Id.* § 31905. The

drop-safety test evaluates whether the handgun fires when dropped in six different

ways. *Id.* § 31900.

### B. The Legislature Requires, on a Prospective Basis, Three Additional Features for New Semiautomatic Pistols

Since enacting the UHA, the Legislature has imposed additional public safety

requirements for new semiautomatic pistols, which are the subject of this litigation.

Since 2007, a new semiautomatic pistol must have both a chamber load indicator

and a magazine disconnect mechanism, in order to be added to the Roster.[4] Cal.

Penal Code §§ 31910(b)(4)–(5), 32010(d). A chamber load indicator is "a device

that plainly indicates that a cartridge is in the firing chamber" using readily visible

text or graphics. Cal. Penal Code § 16380. A magazine disconnect mechanism

---

[3] For revolvers, a "safety device" is one that "causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge." Cal. Penal Code § 31910(a)(1). For pistols, a "safety device" is a "positive manually operated safety device, as determined by standards relating to imported guns promulgated by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives." *Id.* § 31910(b)(1).

[4] These requirements were signed into law in 2003. S.B. 489, 2003–2004 Reg. Sess. (Cal. 2007).

"prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol." *Id.* § 16900. Chamber load indicators and magazine disconnect mechanisms are "safety features designed to limit accidental discharges that occur when someone mistakenly believes no round is in the chamber." *Pena*, 898 F.3d at 974; *see also* 6-ER-1238–41 (sample photographs of these devices).

Since May 2013, to qualify for the Roster, a new semiautomatic pistol must also have microstamping capability, meaning that it can imprint a "microscopic array[] of characters that identify the make, model, and serial number of the pistol onto the cartridge or shell casing of each fired round." *Pena*, 898 F.3d at 974; Cal. Penal Code § 31910(b)(6).[5] Microstamping is intended to "provide important investigative leads in solving gun-related crimes by allowing law enforcement personnel to quickly identify information about the handgun from spent cartridge casings found at the crime scene." *Fiscal*, 158 Cal. App. 4th at 914. Initially, the UHA required microstamping in two places on each cartridge; the Legislature recently amended the law to require microstamping in one place on each cartridge.

---

[5] The microstamping requirement was signed into law in 2007, though it did not take effect until the Department of Justice certified in 2013 that microstamping technology was "available to more than one manufacturer unencumbered by any patent restrictions." Assemb. B. 1471, 2007–2008 Reg. Sess. (Cal. 2007), § 2; 1-ER-8.

Assemb. B. 2847, 2019–2020 Reg. Sess. (Cal. 2020). The Legislature made this change in response to firearm manufacturers' recognition that single-location microstamping is feasible. *Id.* § 1(h).

The Legislature did not immediately prohibit the retail sale of any semiautomatic pistol that did not meet these three requirements. Rather, the Legislature elected to impose the requirements on a prospective basis. Under the UHA, semiautomatic pistols that were already on the Roster when these requirements took effect could generally remain on the Roster. Cal. Penal Code §§ 31910(b)(4)–(6), 32010(d), 32015(b); *Pena*, 898 F.3d at 983.[6] From the time that the chamber load indicator and magazine disconnect mechanism requirements took effect to May 2013, five manufacturers added a total of 34 semiautomatic pistols to the Roster with those two safety features. 2-ER-211–13. Today, 32 such pistols from four manufacturers remain on the Roster. 2-ER-211.[7] Since the

---

[6] The Legislature recently added a provision that for each new semiautomatic pistol added to the Roster, three semiautomatic pistols without a chamber load indicator, magazine disconnect mechanism, or microstamping capability would be removed from the Roster. Assemb. B. 2847, 2019–2020 Reg. Sess. (Cal. 2020); Cal. Penal Code § 31910(b)(7). This is designed to assure that over time, pistols meeting these requirements become a proportionally larger share of the pistols available for commercial sale.

[7] There were additional semiautomatic pistols with a chamber load indicator and magazine disconnect mechanism on the Roster, but they were removed when manufacturers failed to pay the annual listing fee. 2-ER-212.

microstamping requirement took effect in 2013, no new semiautomatic pistols have been added to the Roster.  1-ER-13.

To be added to the Roster, a firearm manufacturer must send three samples of a handgun to a certified independent laboratory, which performs the required firing and drop-safety tests and checks that the handgun meets the other UHA requirements.  Cal. Penal Code §§ 31900, 31905, 32010; *see also* Cal. Code Regs., tit. 11, § 4060  If the three samples pass these tests, the laboratory sends one of the tested samples to the Department of Justice, which verifies that the sample handgun meets the requirements to be added to the Roster.  Cal. Penal Code § 32010.  Handguns with purely cosmetic differences (including a difference in finish, grip material, or shape or texture of the grip) from a handgun already on the Roster need not be tested by a laboratory and need only be reviewed by the Department of Justice before being added to the Roster.  *Id.* § 32030.

Handguns not listed on the Roster may be purchased by certain law enforcement agencies and officers under specified circumstances, and California residents who are not law enforcement officers may acquire such off-Roster handguns through private party transactions.  Cal. Penal Code §§ 32000(b)(4), (6)–(7), 32110(a).

### C. This Court Rejected a Second Amendment Challenge to the Three Public Safety Features

In 2018, this Court rejected a Second Amendment challenge to the chamber load indicator, magazine disconnect mechanism, and microstamping requirements, reasoning that there is no "constitutional right to purchase a particular handgun." *Pena*, 898 F.3d at 973. Using the then-prevailing two-step inquiry for Second Amendment claims, this Court "assume[d] without deciding that the challenged UHA provisions burden conduct protected by the Second Amendment." *Id.* at 976. This Court then applied intermediate scrutiny, noting that the three public safety features "place almost no burden on the physical exercise of Second Amendment rights," and concluded that the chamber load indicator, magazine disconnect mechanism, and microstamping requirements each satisfied intermediate scrutiny. *Id.* at 978, 980–86. The chamber load indicator requirement sensibly "lets someone know that a gun is loaded without even having to pick it up to check; it acts as a red flag for those handling the gun who may have forgotten that it was loaded," *id.* at 980; the magazine disconnect mechanism "prevents a firearm from shooting unless a magazine is inserted," *id.*; and the microstamping requirement "is an extension of identification methods long used in imprinting serial numbers on guns," *id.* at 985. Understood in light of the fact that the law "only regulates commercial sales, not possession, and does so in a way that does not impose a

substantial burden on Purchasers," this Court held the UHA constitutional under the Second Amendment. *Id.* at 973.

## II. PROCEDURAL HISTORY

### A. Plaintiffs' Second Amendment Challenge and Motion for Preliminary Injunction

In June 2022, the Supreme Court issued its decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), announcing a new standard for Second Amendment claims, one "centered on constitutional text and history," *id.* at 2128–29. In September 2022, Plaintiffs filed the operative complaint, challenging the UHA under the Second Amendment. 5-ER-813–34. In November 2022, Plaintiffs moved for a preliminary injunction. 7-ER-1444. The motion originally sought to enjoin the entire UHA, but Plaintiffs clarified in their reply brief that they sought to enjoin only the chamber load indicator, magazine disconnect mechanism, and microstamping requirements. D.Ct. Dkt. 34 at 7.

After briefing on the motion was completed, the court held an evidentiary hearing on the motion in January 2023. 5-ER-763–64. Defendant presented two expert witnesses at the hearing: an expert on the Roster and the challenged UHA requirements (a Special Agent Supervisor with the California Department of Justice, Salvador Gonzalez); and a historical expert to address *Bruen*'s historical inquiry (Professor Saul Cornell). 3-ER-428–525; 4-ER-528–614. Plaintiffs presented six witnesses: two of the individual Plaintiffs (Lance Boland and Reno

11

May); a former California Department of Justice employee who left the Department before the UHA was enacted (Stephen Helsley); a research manager for a firearm industry trade association (Salam Fatohi); a forensic firearms examiner who helped conduct a microstamping study in 2005 (Michael Beddow); and a historical expert (Clayton Cramer). 3-ER-280–427.

After the evidentiary hearing, the district court ordered the parties to submit supplemental briefing. 2-ER-269–70. Defendant submitted additional declarations from its two experts to support its supplemental briefing, as well as a request for judicial notice the district court did not rule upon. 2-ER-141–268. Plaintiffs submitted a declaration from the president of a peace officer lobbying association, to which Defendant objected because the witness was not presented at the evidentiary hearing and thus was not subject to cross-examination. 2-ER-134–40; D.Ct. Dkt. 58-1. Supplemental briefing concluded on March 10, 2023. D.Ct. Dkt. 58–59.

### B. The District Court Issued a Preliminary Injunction, Which This Court Partially Stayed

On March 20, 2023, the district court granted the motion for a preliminary injunction, enjoining the UHA's chamber load indicator, magazine disconnect mechanism, and microstamping requirements. 1-ER-4–25. The order focused on the likelihood of success on the merits, with minimal discussion of the other three factors required for injunctive relief under *Winter v. Natural Resources Defense*

*Council, Inc.*, 555 U.S. 7, 20 (2008). 1-ER-6; 1-ER-25; 1-ER-11–21. In analyzing the likelihood of success on the merits, the district court invoked the new framework for Second Amendment claims outlined in *Bruen*, 142 S. Ct. at 2129–30. 1-ER-11–21. Beginning with the plain text inquiry, the district court held that the Second Amendment includes the "attendant right[] to acquire state-of-the-art handguns for self-defense." 1-ER-14. The district court stated that the "UHA prevents" Plaintiffs from engaging in their proposed conduct of "purchasing state-of-the-art handguns on the primary market." 1-ER-12.[8] Because the "UHA provisions implicate conduct protected by the Second Amendment," the court concluded the "Constitution presumptively protects Plaintiffs' proposed conduct." 1-ER-15. The court explained that the burden thus shifted to Defendant to show that the challenged UHA requirements were consistent with a historical tradition of firearm regulation, and held that Defendant failed to meet this burden. 1-ER-15–21. The court concluded that the historical analogues for the chamber load indicator and magazine disconnect mechanism requirements were not "sufficiently analogous," because "manufacturers are simply not making handguns with these features" (though, in fact, dozens of such handguns have actually been added to the

---

[8] The district court mistakenly overstated the number of semiautomatic pistols on the Roster without a chamber load indicator or magazine disconnect mechanism, including in the sum over 300 revolvers that are not required to have these safety features. 1-ER-8; 1-ER-13; 1-ER-17; 1-ER-23; *see also* Cal. Penal Code § 31910(a).

Roster), opining that the challenged requirements therefore placed a heavier burden on the Second Amendment right. 1-ER-15–18. The court took a similar approach with respect to the historical analogues for microstamping. 1-ER-19–21.

Based on its determination that Plaintiffs had demonstrated a likelihood of success on the merits of their constitutional claim, the district court found a sufficient showing of irreparable harm. 1-ER-21–22. In considering the balance of equities and the public interest, the court also concluded that the likely harm to Plaintiffs' Second Amendment rights outweighed the harm from enjoining the challenged requirements. 1-ER-22–24.

The preliminary injunction barred Defendant from "implementing or enforcing" the chamber load indicator, magazine disconnect mechanism, and microstamping requirements, and from "otherwise preventing the retail sale of handguns that do not" have these public safety features but meet other UHA requirements. 1-ER-2–3. The district court stayed the injunction for fourteen days to allow Defendant to appeal and seek a further stay. 1-ER-2–3. Defendant filed this appeal and a motion to partially stay the injunction pending appeal, on March 27, 2023. 7-ER-1437–39; C.A. Dkt. 2. This Court granted the motion, staying the injunction as to the chamber load indicator and magazine disconnect mechanism requirements in California Penal Code section 31910(b)(4)–(5). C.A. Dkt. 7. The

preliminary injunction of the microstamping requirement took effect on April 3, 2023.

## SUMMARY OF ARGUMENT

The Second Amendment does not inhibit States from imposing reasonable safety requirements before firearms may be mass produced and made commercially available for retail sale. The district court abused its discretion in granting the preliminary injunction, erring on the merits in both its textual analysis and examination of history. Plaintiffs failed to demonstrate how proven safety requirements that manufacturers acknowledge they can meet—the chamber load indicator and magazine disconnect mechanism—and a requirement that is an extension of adding serial numbers to firearms—microstamping—infringe any textual right to "keep" and "bear" protected "Arms." U.S. Const. amend. II. And the district court's textual analysis strayed from the Second Amendment's text by identifying a purported right to acquire so-called "state-of-the-art handguns" (without meeting safety requirements) based on an "attendant right" to purchase firearms. 1-ER-14. Turning to history, the district court also erred by conducting an overly narrow and constrained historical analysis, which, contrary to *Bruen*, effectively required that Defendant identify a historical twin instead of a historical analogue. Properly analyzed, the historical record reflects that the three UHA

requirements are consistent with a tradition of regulations that aimed to address the accidental discharge of firearms and to trace firearms used in crimes.

The district court also erred in its evaluation of *Winter*'s equitable factors. The district court effectively collapsed its assessment of the merits into its analysis of the equitable factors. For example, the court concluded that Plaintiffs had established irreparable harm based solely on the existence of purported constitutional harm, even though Plaintiffs had not introduced any evidence of practical harm that they would suffer while the court considered their claims. In contrast, the record established that Plaintiffs possess numerous arms to defend themselves and they conceded that they could purchase any one of the nearly 500 semiautomatic pistols on the Roster. Moreover, the district court erred in balancing the hardships and assessing the public interest, elevating Plaintiffs' asserted constitutional harm over the public safety benefits achieved by the UHA's requirements. The lack of any harm to Plaintiffs beyond the alleged constitutional violation, considered against Defendant's evidence of the public safety harms resulting from an injunction, weighed heavily against preliminary injunctive relief.

## STANDARD OF REVIEW

This Court reviews a district court's order granting a motion for a preliminary injunction for abuse of discretion. *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018). An abuse of discretion exists if the district court based its

decision on an erroneous legal standard or clearly erroneous finding of fact.
*Pimental v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012).  Conclusions of law are
reviewed de novo.  *Id.*

## ARGUMENT

### I. THERE IS NO LIKELIHOOD OF SUCCESS ON THE MERITS OF THE SECOND AMENDMENT CHALLENGE TO THE UHA'S REQUIREMENTS

The Second Amendment does not insulate firearm manufacturers from
commonsense public safety requirements.  When this Court first evaluated the
constitutionality of the challenged UHA requirements, the Court observed that "the
Second Amendment says nothing about modern technology adopted to prevent
accidental firearm discharges or trace handguns via serial numbers microstamped
onto fired shell casings."  *Pena*, 898 F.3d at 973.  That observation remains
accurate today:  Plaintiffs did not establish that their proposed conduct falls within
the plain text of the Second Amendment.  142 S. Ct. at 2129–30.  Even if Plaintiffs
had carried this burden, the challenged requirements are constitutional because
they fall within the presumptively lawful category of "laws imposing conditions
and qualifications on the commercial sale of arms" *id.* at 2162 (Kavanaugh, J.,
concurring) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008)), and
are also "consistent with the Nation's historical tradition of firearm regulation," *id.*
at 2130.

17

### A. The Text-and-History Standard for Analyzing Second Amendment Claims Under *Bruen*

In *Bruen*, the Supreme Court announced a new standard for considering Second Amendment claims, one "centered on constitutional text and history." *Bruen*, 142 S. Ct. at 2128–29. Under this text-and-history approach, courts must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129–30. If so, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. To satisfy this burden, a government must identify a "well-established and representative historical *analogue*"—not a "historical *twin*" or "dead ringer"—to the challenged law that is "relevantly similar" according to "two metrics": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Thus, the historical comparator must have "impose[d] a comparable burden on the right of armed self-defense" that is also "comparably justified." *Id*.

The Court was careful to note that *Bruen* did not purport to overturn or call into question any aspect of the Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). To the contrary, the Court described the analytical approach articulated in *Bruen* as the same "test . . . set forth in *Heller*." *Bruen*, 142 S. Ct. at 2131; *see also id.* at 2134 ("Having made the constitutional standard endorsed in

18

*Heller* more explicit, we now apply that standard [here].").  Consistent with this approach, the Court reaffirmed that the Second Amendment is not a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133.  The Court also reiterated that the Second Amendment right "is not unlimited" and is not a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626).  Indeed, *Bruen* did not "decide anything about the kinds of weapons that people may possess." *Id.* at 2157 (Alito, J., concurring).  Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately to underscore the "limits of the Court's decision," explaining that the Second Amendment "allows a 'variety' of gun regulations," and reiterating *Heller*'s pronouncement that one of the presumptively lawful category of laws includes those "imposing conditions and qualifications on the commercial sale of arms." *Bruen*, 142 S. Ct. at 2161–62 (Kavanaugh, J., concurring).

**B.    Plaintiffs Failed to Establish that the Second Amendment's Plain Text Covers Requirements that Enhance a Firearm's Safety and the Ability to Trace a Firearm Used in a Crime**

Under *Bruen*'s text-and-history approach, the Second Amendment does not prevent States from imposing the firearm safety and public safety regulations at issue here.  This is because these safety features do not fall within "the Second Amendment's plain text." *Bruen*, 142 S. Ct. at 2129–30.

19

**1.    Plaintiffs bear the burden of establishing that the Second Amendment's plain text covers their proposed conduct**

*Bruen* directs courts to first assess "whether the plain text of the Second Amendment protects [the individual's] proposed course of conduct," 142 S. Ct. at 2134—*i.e.*, whether the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes, U.S. Const. amend. II. *See Nat'l Ass'n for Gun Rights*, *Inc. v. City of San Jose*, 2022 WL 3083715, at *8 (N.D. Cal. Aug. 3, 2022) ("*Bruen* conducted a textual analysis of the words 'bear' and 'keep' to determine whether the conduct of publicly carrying a firearm fell within the language of the Second Amendment.").

It is a plaintiff's burden to demonstrate that the plain text covers the proposed course of conduct, *Bruen*, 142 S. Ct. at 2134, and courts that have applied the *Bruen* framework have held plaintiffs to that burden. *See, e.g.*, *Def. Distributed v. Bonta*, No. CV 22-6200, 2022 WL 15524977, at *4–5 (C.D. Cal. Oct. 21, 2022); *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829, at *10–11 (D. Or. Dec. 6, 2022), *appeal voluntarily dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022). In conducting that textual analysis, "the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text." *United States v. Reyna*, No. 3:21-CR-41, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022). That ensures that the Second Amendment does not become a "regulatory straightjacket," *Bruen*,

20

142 S. Ct. at 2133, and gives effect to the Supreme Court's repeated recognition that the Second Amendment is subject to reasonable limits. *Id.* at 2128; *id.* at 2157 (Alito, J., concurring); *id.* at 2161–62 (Kavanaugh, J., concurring).

### 2. The Second Amendment allows States to impose the firearm safety and public safety requirements at issue here

Plaintiffs failed to establish that the Second Amendment's plain text covers their proposed course of conduct. First, with respect to the chamber load indicator and magazine disconnect mechanism requirements, *Bruen* does not prohibit States from imposing reasonable firearm safety regulations because nothing in "the Second Amendment's plain text" guarantees the commercial availability of firearms without features that enhance the safety of what is ultimately a consumer product. 142 S. Ct. at 2129. Like a host of laws imposing handgun design safety requirements enacted in other States,[9] the chamber load indicator and magazine disconnect mechanism requirements are merely safety features that a semiautomatic pistol must have before it can be sold by a firearms dealer. Because these two safety features "are designed to limit accidental firearm discharges,"

---

[9] *See, e.g.*, Mass. Gen. Laws ch. 140, §§ 123, 131½, 131¾, 501 Mass. Code Regs §§ 7.01–7.16, & 940 Mass. Code Regs. 16.01–16.09 (drop safety, firing, and melting point testing, and a chamber load indicator or magazine disconnect mechanism); N.Y. Penal Law § 400.00(12-a), & N.Y. Comp. Codes R. & Regs. tit. 9, §§ 482.1–482.7 (drop safety, firing, and melting point testing); Haw. Rev. Stat. § 134-15(a) (melting point testing); 720 Ill. Comp. Stat. 5/24-3(A)(h) (melting point testing); Minn. Stat. §§ 624.712(4), 624.716 (melting point testing).

*Pena*, 898 F.3d at 973—and have been proven to help do so, *infra* at pp. 54–55—they are similar to the UHA's drop-safety testing and firing testing requirements, which help to ensure a handgun does not accidentally discharge or explode and thereby injure the user or nearby bystanders. Moreover, manufacturers have demonstrated that they can make semiautomatic pistols satisfying the chamber load indicator and magazine disconnect mechanism requirements, as reflected in the nearly three dozen semiautomatic pistols with these safety features added to the Roster between 2007 to 2013, and the continued listing of 32 such pistols on the Roster. 2-ER-211–13.[10]

Imposing safety requirements that manufacturers acknowledge they can meet does not restrict conduct protected by the Second Amendment's textual right to "keep" and "bear" protected "Arms," U.S. Const. amend. II. *See Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592). The chamber load indicator and magazine disconnect mechanism requirements do not impede any person's ability to purchase or possess a handgun. *Pena*, 898 F.3d at 977–78. Indeed, there are nearly 500 semiautomatic pistols, about 315 revolvers, and several non-

---

[10] Massachusetts also has a roster of handguns and requires that any semiautomatic pistol sold by a licensed dealer have either a chamber load indicator or magazine disconnect mechanism. 940 Mass. Code Regs. 16.05(3), (4); *see also Granata v. Healey*, 603 F. Supp. 3d 8, 10–11 (D. Mass. 2022), *vacated and remanded*, *Granata v. Campbell*, No. 22-1478 (1st Cir. Apr. 7, 2023).

semiautomatic pistols that Plaintiffs may currently purchase from firearm dealers. 3-ER-450–51.

Plaintiffs also failed to establish that the Second Amendment's plain text protects a right to access a subset of handguns that lack microstamping capability. Microstamping, which stamps an array of alphanumeric characters on each cartridge ejected from a pistol to identify the pistol that fired the cartridge (Cal. Penal Code § 31910(b)(6); Cal. Code Regs., tit. 11, § 4049(j); 7-ER-1435–36), "is an extension of identification methods long used in imprinting serial numbers on guns." *Pena*, 898 F.3d at 985. And several courts, post-*Bruen*, have upheld such serial number requirements, concluding that they do not "infringe[] on the right to keep and bear arms" and so does not fall within the Second Amendment's plain text. As one court explained, a serial number "does not impair the use or functioning of a weapon in any way." *United States v. Holton*, No. 3:21-CR-0482, __F. Supp. 3d __, 2022 WL 16701935, at *4 (N.D. Tex. Nov. 3, 2022) (citation omitted).[11] Similarly, there "is no evidence that . . . microstamping interferes with

---

[11] Another district court concluded that the criminal prohibition on possession of a firearm without a serial number was unconstitutional, but distinguished that prohibition from the federal "commercial regulation that requires manufacturers to place serial numbers on firearms," which the court found constitutionally permissible. *United States v. Price*, No. 2:22-cr-00097, __F. Supp. 3d __, 2022 WL 6968457, at *3 (S.D. W. Va. Oct. 12, 2022).

the functioning of any arms," *Pena*, 898 F.3d at 978, and Plaintiff's own witness conceded that microstamping is feasible, *supra* at p. 27.

### 3. The district court erroneously applied *Bruen*'s plain text analysis

The district court concluded that the challenged UHA requirements do intrude on the rights protected by the plain text of the Second Amendment, but it failed to properly conduct the textual inquiry required under *Bruen*. The court began by defining Plaintiffs' proposed conduct as "purchasing state-of-the-art handguns on the primary market," and reasoned that the Second Amendment includes an "attendant right[]" to "acquire state-of-the-art handguns for self-defense." 1-ER-14. In the district court's view, the three challenged requirements inhibit the retail purchase of such handguns and thus infringe the right to keep and bear arms. 1-ER-12.

That is not the textual inquiry *Bruen* contemplates. Relying on *Heller*, this Court previously recognized that there is no "constitutional right to purchase a particular handgun." *Pena*, 898 F.3d at 973; *see also Heller*, 554 U.S. at 626. This remains true after *Bruen*. Although *Pena* applied the former two-step analysis, its analysis about the scope of the Second Amendment remains persuasive because *Bruen* reiterated *Heller*'s central point that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626). This

24

limitation "comes from the text of the Second Amendment" and thus informs the plain text analysis. *Reyna*, 2022 WL 17714376, at *4. Moreover, the district court did not locate the purported right to acquire so-called state-of-the-art handguns that lack public safety features within the Second Amendment's plain text, but rather held that Plaintiffs' proposed conduct falls within some "attendant right[]" to purchase firearms. 1-ER-14. Thus, the district court "seemingly perceive[d] a penumbra" of rights captured by the Second Amendment, which is "quite-clearly not a 'plain text' analysis." *Def. Distributed*, 2022 WL 15524977, at *4; *Oakland Tactical Supply, LLC v. Howell Twp.*, No. 18-cv-13443, 2023 WL 2074298, at *4 (E.D. Mich. Feb. 17, 2023) (declining to "read into the" Second Amendment any "ancillary or corollary protection"), *appeal docketed*, No. 23-1179 (6th Cir. Mar. 1, 2023).

Even if the Second Amendment's plain text included some right to acquire "state-of-the-art handguns" without certain safety features, the district court erred in concluding that the challenged UHA requirements interfere with access to such handguns. Embedded in the district court's reasoning is the assumption that the chamber load indicator and magazine disconnect mechanism requirements have collectively prevented the retail sale of "state-of-the-art handguns" in the State. 1-ER-5;1-ER-12. As an initial matter, the district court did not define what it meant by "state-of-the-art handgun" in defining the course of conduct purportedly

infringed by the UHA.   Moreover, the district court assumed, without pointing to any evidence in the record, that off-Roster "state-of-the-art" semiautomatic pistols are more "durable, reliable, affordable, and possibly safer" than those on the Roster.  1-ER-21.  This is contrary to Plaintiffs' own concession that off-Roster pistols have "primarily ergonomic[]" enhancements and that their "size and functionality . . . is essentially the same" as on-Roster pistols.  4-ER-658; 2-ER-136.

In any event, the district court's assumption about the effect that the chamber load indicator and magazine disconnect mechanism have had on the availability of new semiautomatic pistols is categorically unsupported by the record.  First, revolvers, another type of handgun on the Roster, are not subject to these two requirements.  Cal. Penal Code § 31910(a).  More importantly, several manufacturers in fact added semiautomatic pistols to the Roster after the chamber load indicator and magazine disconnect mechanism requirements took effect.  2-ER-211–12.  The district court acknowledged this fact but discounted it.  1-ER-13. Instead, the district court relied on the fact that new semiautomatic pistols have not been added to the Roster since the separate *microstamping* requirement took effect. But whatever that fact reflects, it does not establish that the chamber load indicator and magazine disconnect mechanisms interfere with any person's ability to acquire "state-of-the-art handguns."

26

It is true, as the district court observed, that semiautomatic pistols with microstamping capability have not been added to the Roster.[12] 1-ER-13. But even that fact does not reflect that it is the microstamping capability requirement itself, as opposed to gun manufacturer reluctance to abide by it, that has affected the Roster. As this Court previously explained, "[s]imply because no gun manufacturer is 'even considering trying' to implement the technology, it does not follow that microstamping is technologically infeasible." *Pena*, 898 F.3d at 983. That conclusion is further supported by admissions from the Plaintiffs' witness in this case that microstamping with alphanumeric characters—the method contemplated under California law (Cal. Code Regs., tit. 11, section 4049(j))—was "feasible," "physically possible," "proved to be capable of withstanding repeated firing," and had the best chance at being adopted on a wide scale. 3-ER-360–61; 3-ER-382–83; 3-ER-386–87; 3-ER-396.

It is firearm manufacturers' choice not to comply with the microstamping requirement—and not the requirement itself—that delays the addition of pistols to the Roster with microstamping capability. *See Pena*, 898 F.3d at 982–83; *id.* at 983 ("We thus find it odd, indeed, that the manufacturers indirectly assert a right to sell new models of—modern—semiautomatic handguns, but refuse to modernize

---

[12] The microstamping requirement does not apply to revolvers. *See* Cal. Penal Code § 31910(a).

27

their firearms by installing microstamping features."). Manufacturers complied with the safety device, firing testing, and drop-safety testing requirements that took effect in 2001; then they complied with the chamber load indicator and magazine disconnect mechanism requirements that took effect in 2007. Plaintiffs, none of whom are firearm manufacturers, presented no evidence as to why manufacturers have not complied with the microstamping requirement for the past ten years. Notwithstanding manufacturers' decisions not to comply, the Legislature's prospective application of the microstamping requirement has allowed for the continued availability of semiautomatic pistols on the Roster since the requirement took effect.

The district court's plain text analysis in effect allows firearm manufacturers to dictate what safety features they will tolerate, which in turn allows manufacturers to define the scope of conduct covered by the Second Amendment. The Second Amendment does not outsource such decisions to private firearm manufacturers and their supporters, nor does anything in the Second Amendment requires industry practices to define its scope.

### C. The Challenged UHA Requirements Are Presumptively Lawful Qualifications on the Commercial Sale of Firearms

The district court also erred by failing to consider whether the challenged requirements fall within the presumptively lawful category of "laws imposing conditions and qualifications on the commercial sale of arms." *Bruen*, 142 S. Ct.

28

at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626). The Supreme Court has now expressed in its three most recent Second Amendment opinions, including in *Bruen* itself, that its decisions "should [not] be taken to cast doubt" on the presumptive lawfulness of these conditions and qualifications. *See Heller*, 554 U.S. at 626–27; *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 787 (2010); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *see also United States v. Perez-Garcia*, No. 22-CR-1581, 2022 WL 17477918, at *4 (S.D. Cal. Dec. 6, 2022) ("*Heller*'s 'presumptively lawful' regulations are consistent with *Bruen*'s reasoning and survive in the post-*Bruen* era because the presumptively lawful exceptions are themselves based on 'historical justifications.'") (quoting *Heller*, 554 U.S. at 635).

The Second Amendment thus allows States to impose "conditions and qualifications on the commercial sale of arms." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626). Requirements that a subset of handguns, before being made available for retail sale, have two features that can prevent accidental shootings and one feature that assists in tracing firearms used for unlawful purposes, are basic consumer protection and public safety measures that qualify as presumptively lawful conditions and qualifications on the commercial sale of firearms, similar to other public safety measures that this Court has placed in the category of presumptively lawful conditions and qualifications.

*See Teixeira v. Cty. of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017) (en banc) (Owens, J., concurring) (county zoning ordinance that prohibited firearm retailers near residences, schools, daycares, and liquor stores fell within the presumptively lawful category of "laws imposing conditions and qualifications on the commercial sale of arms," quoting *Heller*, 554 U.S. at 626–27); *Silvester v. Harris*, 843 F.3d 816, 830–31 (9th Cir. 2016) (Thomas, J., concurring) (same, as to a ten-day waiting period for recurrent firearm purchasers that allowed a cooling-off period to impede impulsive uses of a firearm against oneself or others). And the UHA represents California's attempt to fill the consumer protection void left in the absence of federal statutory authority to regulate firearms in the way that other consumer products are regulated. *See* 15 U.S.C. § 2052(a)(5)(E) & 26 U.S.C. § 4181 (exempting firearms from the definition of a "consumer product" that can be regulated by the federal Consumer Product Safety Commission); *id.* § 2051(b)(1) (one purpose in creating the Consumer Product Safety Commission was "to protect the public against unreasonable risks of injury associated with consumer products").

Consistent with this consumer protection function, the chamber load indicator, magazine disconnect mechanism, and microstamping requirements operate as regulations on the commercial sale of handguns. *See* Cal. Penal Code §§ 31910(b)(4)–(6), 32000(a). The three requirements are used to define when a

30

semiautomatic pistol is considered an "unsafe handgun," and the UHA prohibits the manufacture or commercial sale of an unsafe handgun. *Id.*; *see also id.* § 32005. And, private transactions are exempted from these requirements. *Id.* § 32110. The three public safety requirements thus pertain only to semiautomatic pistols sold and offered for sale in commerce by firearm dealers, not to transactions between individual firearm owners. The structure and function of the UHA's provisions make clear that they are consumer product regulations requiring that semiautomatic pistols commercially sold in the State are not defective and contain features that enhance public safety. Because the challenged UHA requirements "apply only to manufacturers and sellers [and] do not implicate an individual's right of possession," *Price*, 2022 WL 6968457, at *2, they are "presumptively lawful" as "conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27 & n.26.

### D. Requirements that Enhance a Firearm's Safety and the Ability to Trace a Firearm Used in a Crime Are Consistent with a Historical Tradition of Regulation

In any event, regulations that improve the safety of a firearm and the tracing of a firearm used in a crime are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. This historical inquiry is based on analogical reasoning, but can be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the

31

18th century," or can be "more nuanced," such as when a challenged law addresses "unprecedented societal concerns or dramatic technological changes." *Id.* at 2131–32. The "more nuanced approach" is appropriate here because the three challenged requirements address "unprecedented societal concerns" and "dramatic technological changes." *Id.* at 2132. The UHA addresses "regulatory challenges posed by firearms today [that] are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.*

When the Second Amendment was adopted, "over 90% of the weapons owned by Americans were long guns, not pistols." 2-ER-229–30. Such firearms were muzzle-loading and not semiautomatic, and were typically stored unloaded because of gunpowder's corrosive nature. 2-ER-229–30. Semiautomatic weapons, which can "chamber" a modern-day ammunition cartridge and thereby create the risk of accidental discharge even when a magazine is not inserted, were not developed until the early 1900s and did not become common until after World War I. D.Ct. Dkts. 56 at 12, 58 at 5. Although there is a long history of enacting firearm regulations to protect the public from defective or poorly manufactured firearms, 2-ER-227–32, the dangers posed by an accidental discharge from a semiautomatic pistol that the user did not know was loaded—the dangers addressed by chamber load indicators and magazine disconnect mechanisms—are a more recent phenomenon.

32

Moreover, both sides' historical experts agreed that gun violence and homicides were not a nationwide problem at the time of the Second Amendment to the same extent as they are today, in part because muzzle-loading weapons were not kept loaded and took too long to load. *See* 2-ER-228–31; 4-ER-628. There was thus far less, if any, need to trace firearms used in homicides at the time of the founding, and technology like microstamping was not feasible then either. *See* 3-ER-419.

As Defendant's historical expert explained, when cheaper and more easily concealable handguns began to proliferate, States responded to the "changes in technology and consumer behavior, as well as novel threats to public safety" with "laws to address these problems." 2-ER-235–36. This is precisely what California sought to do through the UHA.

The district court did not consider these issues, nor did it specify whether it was applying the "fairly straightforward" or "more nuanced" historical analysis. *See generally* 1-ER-15–21. Nevertheless, the district court applied an overly narrow and constrained view of how to conduct the analogical inquiry.

**1. The chamber load indicator and magazine disconnect mechanism requirements are consistent with this Nation's history of regulating the safety of firearms and gunpowder to protect consumers**

There is a long history of enacting firearm regulations to protect the public from defective or poorly manufactured firearms or gunpowder, and the chamber

33

load indicator and magazine disconnect mechanism requirements are part of that well-established tradition. 2-ER-227; 2-ER-232. Defendant identified firearm and ammunition inspection (or "proving") laws, as well as firearm and gunpowder safe storage laws, as particularly relevant examples of historical safety laws that sought to protect firearm users and nearby bystanders. D.Ct. Dkt. 56 at 13–15. Those laws were part of a broader tradition, which began around the founding and persisted throughout the nineteenth century, of "Government-imposed safety standards on the firearms industry" that helped the industry to avoid the "danger posed by defective arms, or poorly manufactured ones." 2-ER-232. Those historical laws "impose[d] a comparable burden on the right of armed self-defense" that is also "comparably justified" to the challenged UHA requirements. *Id*.

In the late 1700s and early 1800s, six states adopted firearm and/or ammunition inspection laws. 2-ER-232–33; 2-ER-240; *see generally* Br. of Defs.-Appellees, *Granata v. Campbell*, No. 22-1478 (1st Cir. Jan. 30, 2023), 2023 WL 1794480, at *37–51 (collecting historical analogues for Massachusetts' unsafe handgun law and describing these inspection laws); Br. of Giffords Law Ctr. to Prevent Gun Violence as Amicus Curiae Supporting Defs.-Appellees, *Granata v. Campbell*, No. 22-1478 (1st Cir. Jan. 30, 2023), 2023 WL 2062850, at *21–28 (same). Massachusetts—the "leading small arms producer in America on the eve of the War of 1812"—adopted both types of inspection laws, while Maine adopted

one for firearms, and Rhode Island, New Jersey, New Hampshire, and Pennsylvania adopted laws concerning gunpowder. 2-ER-232–33; 2-ER-240. The enactment of these consumer protection laws followed the adoption of similar resolutions in Maryland, Pennsylvania, and New Hampshire in 1775, which required that firearms meet certain manufacturing and inspection specifications prior to purchase. 2-ER-255; *see also*, Br. of Giffords Law Ctr., *Granata*, 2023 WL 2062850, at *22–23.

The Massachusetts firearm inspection law, enacted in 1805, required that a government inspector test and inspect all musket and pistol barrels before they could be sold to the public. 2-ER-232. The inspector would examine the barrel, ensure the barrel did not explode upon firing, and test the firing distance. *Id.* Only if the firearm passed such inspection, and was stamped with the inspector's initials and year of inspection, could the firearm be sold. *Id.* Maine adopted a similar inspection law in 1821, and both laws lasted well into the nineteenth century. 2-ER-232–33.

The ammunition inspection laws adopted by Massachusetts, Rhode Island, New Jersey, New Hampshire, and Pennsylvania generally required government inspectors to inspect gunpowder to ensure it met certain quality standards. 2-ER-240. If the gunpowder passed such inspection, then it was placed in a cask marked

35

with the inspector's initials and, only then, was made available for sale.  *Id.*; *see also* Br. of Defs.-Appellees, *Granata*, 2023 WL 1794480, at *41–42.

In addition to these inspection laws, several laws in Massachusetts, Maine, other states, and in some localities separately regulated the storage of weapons and gunpowder to reduce harm to the public and decrease the risks of fire, accidental discharge, and explosion arising from the corrosive nature of gunpowder.  2-ER-229–30; 2-ER-238–43; *see also* Br. of Defs.-Appellees, *Granata*, 2023 WL 1794480, at *43–46.  For example, a 1783 Massachusetts law prohibited the storage of a weapon loaded with gunpowder in Boston homes, and a 1792 New York City law and 1821 Maine law allowed government officials to search for gunpowder in any building.  2-ER-238–39, 242.  Several other state and local governments enacted laws regulating how gunpowder was stored and sold.  2-ER-239–40.

These historical safety laws are "comparably justified" to the chamber load indicator and magazine disconnect mechanism requirements.  *Bruen*, 142 S. Ct. at 2133.  The inspection and safe storage laws tried to reduce the dangers arising from firearms and ammunition that did not function or were not used in line with their intended purpose.  Similarly, the chamber load indicator and magazine disconnect mechanism requirements, which "are designed to limit accidental

36

firearm discharges," *Pena*, 898 F.3d at 973, work together to prevent a semiautomatic pistol from firing when the user does not intend it to do so.

The district court rejected these analogies, reasoning that the inspection requirements were intended only to ensure "that a firearm was adequately manufactured" and to "protect the safety of the person using the firearm." 1-ER-17. The court concluded that the justification for the chamber load indicator and magazine disconnect mechanism requirements were different, characterizing them as "alter[ing] the operation of an otherwise well-manufactured handgun" to protect bystanders near the pistol user. *Id.* This analysis is factually erroneous and reflects a misunderstanding of how these safety features function. Indeed, both features *are* part of the "basic operating features of a firearm," *id.*, because both are involved in the pistol's loading process—the chamber load indicator notifies the user the pistol is loaded and the magazine disconnect mechanism prevents the pistol from firing when a magazine is not inserted. These features can and do prevent injury to the pistol user as well as to others. *See, e.g.*, 6-ER-1264–66 (federal study commissioned by Congress highlighting two cases in which minors killed a *sibling or themselves* because they thought the firearm was not loaded). The district court's narrow view of the safe storage laws' purpose as being to "prevent fire" was also erroneous. 1-ER-18. The firearm and gunpowder storage laws were intended to prevent accidental and premature ignition, just like the

37

chamber load indicator and magazine disconnect mechanism requirements prevent a pistol from firing accidentally.

More fundamentally, the district court's analysis improperly allows manufacturers to dictate when and whether a firearm is "adequately manufactured." 1-ER-17. The fact that Massachusetts did not impose safety requirements beyond the ones manufacturers voluntarily built into a firearm does not prevent States from doing so now. The fact that Massachusetts inspected arms for safety purposes is adequate to support modern-day regulations imposing reasonable safety requirements.

The district court's "comparable burden" analysis was also flawed. *See Bruen*, 142 S. Ct. at 2133. The burden on the right of armed self-defense from the inspection and safe storage historical laws was actually greater than the burden imposed by the chamber load indicator and magazine disconnect mechanism requirements. The firearm and ammunition inspection laws required an inspection and stamp for *every* firearm and *every* cask of ammunition that was to be sold, whereas the UHA requires that only three handguns be tested by a laboratory and one of those three be sent to the Department of Justice before being added to the Roster. Cal. Penal Code §§ 31900, 31905, 32010. Thus, consumers do not need to wait for a handgun to pass an inspection so long as the handgun is already on the Roster. The historical gunpowder storage laws authorized government officials to

search any building for gunpowder, burdening consumers and manufacturers alike, whereas the safety feature requirements do not impose any burdens on consumers.

The district court also emphasized perceived differences in how the historical laws operate from the chamber load indicator and magazine disconnect mechanism requirements, even though those differences actually reflect that the modern laws impose lesser burdens than the historical laws. 1-ER-17–19. For example, the district court noted that the inspection laws required examination of every manufactured firearm whereas the UHA requires inspection of only three samples. But that reflects that the chamber load indicator and magazine disconnect mechanism impose significantly reduced burdens on the right of armed self-defense by allowing ready access to pistols that have been approved (as a class) for sale. 1-ER-17. Under the district court's logic, the UHA would have to require inspection of *every* semiautomatic pistol before it is sold in the State to be considered an extension of historical laws. That surely cannot be what *Bruen* contemplated when it warned that governments need not identify a "historical *twin*." 142 S. Ct. at 2133 (emphasis in original).

The district court also erred in its burden analysis by assuming that the chamber load indicators or magazine disconnect mechanisms restrict access to "state-of-the-art" handguns. 1-ER-18. That assumption is rebutted by the record. Five manufacturers had nearly three dozen of these pistols with these requirements

39

added to the Roster after they took effect. 2-ER-211–12. The district court's order also wholly failed to address this Court's prior conclusion that the chamber load indicator and magazine disconnect mechanism requirements "place almost no burden on the physical exercise of Second Amendment rights." *Pena*, 898 F.3d at 978.

At bottom, historical evidence demonstrates that States may impose practicable safety requirements to protect the public from accidental shootings. The district court misinterpreted and overlooked this evidence.

### 2. The microstamping requirement is consistent with this Nation's history of controlling and tracing the sale of firearms

The district court's historical analysis concerning the microstamping requirement was similarly flawed. This Court has held that "microstamping is an extension of identification methods long used in imprinting serial numbers on guns," and that the "California legislature considered microstamping to be a modification on the federal serial number law." *Pena*, 898 F.3d at 985. Accordingly, historical analogues supporting federal requirements for serial numbers are sufficient to support the microstamping requirement.

For example, a district court has held that laws regulating the registration and sale of firearms are sufficient historical analogues to support the federal prohibition on firearms with obliterated serial numbers. *United States v. Holton*,

40

2022 WL 16701935, at *4–5 (N.D. Tex. Nov. 3, 2022). Specifically, *Holton* highlighted commercial firearm regulations reviewed by this Court, which demonstrated that "colonial governments substantially controlled the firearms trade" by providing and storing guns, as well as restricting "where and to whom individuals could sell guns." *Id.* at *5 (quoting and citing *Teixeira*, 873 F.3d at 685 (reviewing historical laws that regulated a commercial actor's ability to enter the firearms market)).[13] *Holton* also pointed to registration and taxation requirements that applied to gun owners. *Id.* *Holton* concluded these historical analogues address goals similar to those of the modern serial number requirement, that is, to control and trace the sale of firearms and to ensure dangerous individuals did not obtain firearms.[14] *Id.* The serial number law "was intended to assist law enforcement in tracing and identifying the owner and source of firearms used in

---

[13] This is consistent with the observations of Defendant's historical expert that after the adoption of the Second Amendment, "individual states exercised their police powers to address longstanding issues and novel problems created by firearms in American society," and after the adoption of the Fourteenth Amendment, 17 state constitutions employed "expansive language" providing that the right to keep and bear arms was subject to state regulation." 2-ER-220; 2-ER-245–46.

[14] An early effort to trace firearms with numbers and letters was demonstrated in 1776, when George Washington ordered all Continental Army firearms be stamped with an alphanumeric insignia to prevent illegal trafficking of military firearms. 2-ER-233–34. But the widespread use of serial numbers did not seem necessary when local gunsmiths, who "dominated" firearms production "effectively vetted and monitored [] their neighbors in ways that share little with the largely anonymous world of modern firearms commerce." 2-ER-234–35.

41

crimes." *Id.* That is true for microstamping, which is "comparably justified" to those historical analogues.

Like the serial number requirement, the microstamping requirement itself places no burden on the right of armed self-defense and imposes a "comparable burden" to the historical analogues discussed above. *Compare id.* at *4 *with Pena*, 898 F.3d at 978. The district court viewed the burdens imposed by the microstamping requirement to be severe. To be sure, no new semiautomatic pistols have been made available for retail sale since the microstamping requirement took effect. But any burden from the microstamping requirement arises from firearm manufacturers' reluctance to adopt microstamping, not the requirement itself. *Pena*, 898 F.3d at 982–83; *supra* at pp. 27–28.

The district court's contrary conclusion that microstamping is "not commercially available or even feasible to implement on a mass scale" is not supported by the record. 1-ER-19. The district court relied on a study that was conducted in 2005 by one of Plaintiffs' witnesses, Michael Beddow. 1-ER-19–20. But Mr. Beddow admitted that the study found that microstamping with alphanumeric characters—the method required by California law (Cal. Code Regs., tit. 11, section 4049(j))—was "feasible," "physically possible," "proved to be capable of withstanding repeated firing," and had the best chance at being adopted on a widescale. 3-ER-360–61; 3-ER-382–83; 3-ER-386–87; 3-ER-396; 3-ER-402.

42

The study reached these conclusions after testing microstamping in centerfire semiautomatic pistols from five different manufacturers, by firing hundreds of rounds with each pistol.  3-ER-389–96.

The district court placed too much weight on the study, quoting Mr. Beddow as stating that microstamping "was not suitable for mass implementation," leaving out the end of his sentence where he qualified the response with "*at that time*."  1-ER-20, quoting 3-ER-369.  This is significant because the study was conducted in 2005 and published in 2008, more than five years before the microstamping requirement took effect in 2013.  3-ER-368; 3-ER-378.  The study actually concluded that more research was needed to develop a "viable commercial implementation strategy" that "must be completed in collaboration with officials from the state of California [and] firearms manufacturers," but Mr. Beddow was not aware of efforts by manufacturers to implement microstamping, and no manufacturer ever inquired with Mr. Beddow about his recommendation that manufacturers work collaboratively with State officials.  7-ER-1382; 3-ER-385–86; 3-ER-402–03.  The study does not stand for the proposition that manufacturers are currently incapable of implementing the microstamping requirement.  Rather, the study and the manufacturers' subsequent inaction demonstrate there was an opportunity for manufacturers to implement microstamping but they failed to even try to do so. The district court also failed to address this Court's reasoning that

43

"[s]imply because no gun manufacturer is 'even considering trying' to implement the technology, it does not follow that microstamping is technologically infeasible." *Pena*, 898 F.3d at 983 (citation omitted).

## II. PLAINTIFFS CANNOT MEET THEIR BURDEN TO DEMONSTRATE IRREPARABLE HARM, OR DEMONSTRATE THAT THE BALANCE OF HARMS TIPS IN THEIR FAVOR

### A. The District Court Erroneously Disregarded the Equitable *Winter* Factors and Failed to Apply the Heightened Standard for Mandatory Injunctions

Throughout the district court's proceedings, Plaintiffs argued that they needed to establish only a likelihood of success on the merits to obtain a preliminary injunction, asserting that "in a fundamental rights context," the remaining *Winter* factors are meaningless if the merits factor is established. D.Ct. Dkt. 57 at 19; *see also* D.Ct. Dkt. 34 at 8; 4-ER-736. Plaintiffs pointed to *Bruen* for this proposition, contending that the Supreme Court's rejection of interest-balancing for evaluating the merits of a Second Amendment claim in turn nullified the need to consider *Winter*'s equitable factors when seeking preliminary injunctive relief based on a Second Amendment claim. *See, e.g.*, D.Ct. Dkt. 34 at 8. But *Bruen* did not overrule *Winter*. And, Plaintiffs cited nothing to demonstrate that they are released from having to satisfy *Winter*'s requirements simply because they seek a preliminary injunction based on a constitutional right. Nor could they, because pre- and post-*Bruen* precedent demonstrates that *Winter* applies in this context.

44

Plaintiffs chose to seek a preliminary injunction and thus had to meet the equitable requirements to justify such a remedy.

The district court effectively adopted Plaintiffs' approach by collapsing the equitable *Winter* factors into the likelihood of success on the merits factor. This is evident from the court's summary of its reasoning for granting the motion at the outset and end of the order, which addressed only the merits. 1-ER-6; 1-ER-25. The sole harm to Plaintiffs identified by the district court—and by Plaintiffs themselves—was the alleged constitutional violation. 1-ER-21–22. The district court's approach eliminated consideration of *Winter*'s equitable factors, contrary to established precedent.

The Supreme Court has relied on equitable considerations in reviewing the disposition of preliminary injunction requests. *See, e.g.*, *Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) (noting, in the consideration of a preliminary injunction, that the Court's conclusion that the plaintiff was likely to prevail on his claim "does not end the matter" because the plaintiff must also establish that the equitable factors weigh in favor of an injunction); *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (preliminary injunctions are not imposed "as a matter of course from a plaintiff's showing of a likelihood of success on the merits" because the equitable factors must also be considered).

In the context of another constitutional right, the First Amendment's right to free speech, this Court has also made clear that a plaintiff must demonstrate the remaining *Winter* factors even after showing a likelihood of success on the merits. *Doe v. Harris*, 772 F.3d 563, 582 (9th Cir. 2014). This Court warned that district courts cannot "simply assume" the remaining factors collapse into the likelihood of success factor, which is effectively what the district court did here. *Doe*, 772 F.3d at 582–83; *see also DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011) (rejecting the argument that showing a likelihood of success on a First Amendment claim relieves the need to satisfy the other *Winter* factors); *Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir. 2009) (requiring a showing of the remaining *Winter* factors even when the plaintiff was likely to succeed on the merits of his First Amendment claim); *Tracy Rifle & Pistol LLC v. Harris*, 637 Fed.App'x 401, 402 (9th Cir. 2016) (affirming denial of preliminary injunction for a First Amendment claim even though likelihood of success was established).

The district court's failure to hold Plaintiffs to their burden is especially problematic given the mandatory nature of the injunction they sought. The injunction bars Defendant from "implementing or enforcing" the chamber load indicator and magazine disconnect mechanism requirements that have been in effect for 16 years, and the microstamping requirement that has been in effect for 10 years. 1-ER-3. By enjoining Defendant from "preventing the retail sale of

handguns" that lack these public safety requirements, the injunction would alter the status quo by requiring Defendant to permit the retail sale of hundreds of semiautomatic pistols that are not currently available for retail sale in the State.  1-ER-3.[15]  The preliminary injunction was thus akin to a mandatory injunction.  *See Am. Freedom Def. Initiative v. King Cty.*, 796 F.3d 1165, 1173 (9th Cir. 2015) (mandatory injunction when plaintiffs sought to "alter the status quo ante by obtaining an order requiring [a public transit agency] to publish an ad previously unpublished"); *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160–61 (9th Cir. 2011) (same: an apartment complex owner enjoined to enter into contracts with the local housing authority); *see also Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1194–95 (E.D. Cal. 2015) (injunction that would have prevented enforcement of a law relating to firearm dealers was a mandatory injunction because it would "alter the status quo by requiring California to alter its regulatory scheme and practices as they pertain to firearms"), *aff'd* 637 Fed.App'x 401, 402 (9th Cir. 2016).

This Court has made clear that mandatory injunctions are "particularly disfavored" because they "go[] well beyond" maintaining the status quo.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  Since mandatory

---

[15] Indeed, preventing a substantial disruption of the status quo was one of the primary reasons Defendant sought, and obtained, a partial stay of the injunction pending appeal.  *See* C.A. Dkt. 2 at 1–2, 12, 25; C.A. Dkt. 7.

injunctions should not be granted in "doubtful cases," Plaintiffs had to establish "that the law and facts clearly favor[ed]" their position. *Id.* (internal quotation marks omitted). Plaintiffs also had to demonstrate that "extreme or very serious damage" would result in the absence of an injunction. *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022).

Defendant urged the district court to hold Plaintiffs to this heightened burden. *See, e.g.*, 4-ER-709; D.Ct. Dkt. 56 at 17; D.Ct. Dkt. 58 at 9. But the district court did not do so, thereby applying the incorrect legal rule. *See* 1-ER-10–11.

### B. There is No Irreparable Harm Because Plaintiffs Already Possess and Have Access to Numerous Handguns

The district court's conclusion that Plaintiffs would suffer irreparable harm absent an injunction is wrong. The record shows that two of the four individual Plaintiffs own nearly 100 firearms between them, including nearly 50 handguns, of which about 30 are semiautomatic pistols. 3-ER-313–15; 3-ER-325–29. The record further showed that these firearms were operable and that these two Plaintiffs, who each have a license to carry a concealed firearm in public, can use them to defend themselves at home or in public. 3-ER-313–15; 3-ER-325–29.[16] The remaining Plaintiffs have never disputed that they own or may acquire arms. And beyond a claimed constitutional injury, Plaintiffs did not allege or provide

---

[16] There is no indication in the amended complaint or in their declarations that the other two Plaintiffs do not own firearms.

evidence of any immediate, practical harm that they would suffer in the absence of a preliminary injunction.

Under *Winter*, irreparable harm must be likely, not just possible, in the absence of an injunction. 555 U.S. at 22. In other words, there must be a non-speculative "*demonstrate*[*d*] immediate threatened injury" to constitute irreparable harm. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Yet, the district court found irreparable harm based solely on the likelihood that the challenged UHA requirements violate Plaintiffs' Second Amendment rights. 1-ER-21–22. The district court analogized to cases in the First Amendment context, in which the alleged deprivation of that particular constitutional right has been recognized to constitute irreparable harm. 1-ER-21–22. Neither the Supreme Court nor this Court have yet extended that principle to Second Amendment claims. *See, e.g.*, *Or. Firearms Fed'n*, 2022 WL 17454829, at *18 (noting the Supreme Court and this Court have not explicitly extended this principle to the Second Amendment).

Even if it were appropriate to apply this principle to Second Amendment claims, the cases relied upon by the district court are distinguishable. *See* 1-ER-21–22. In each of those cases, the alleged constitutional violation was coupled with a non-speculative threat of immediate future harm, such as: employment termination due to political affiliation (*Elrod v. Burns*, 427 U.S. 347, 373 (1976));

choosing between cutting one's hair contrary to religious beliefs or the continued loss of various prison inmate privileges (*Warsoldier v. Woodford*, 418 F.3d 989, 992, 1001 (9th Cir. 2005)); or an unlawful detention based on immigration status alone (*Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).[17]  Plaintiffs did not identify any such threat of immediate future harm here.  Nor could they, given the numerous arms that Plaintiffs collectively already own and Plaintiffs' ability to purchase any of the handguns currently on the Roster.  1-ER-9; 3-ER-450–51.  The court failed to explain why such arms "would be so ineffective for use in self-defense as to constitute immediate and irreparable harm."  *Or. Firearms Fed'n*, 2022 WL 17454829, at *19.  Nor could it, in light of Plaintiffs' repeated concession that the "size and functionality" of the off-Roster pistols they wanted to purchase at retail were "essentially the same" as the ones they already own and can acquire at retail.  3-ER-313–15; 3-ER-325–29; 2-ER-136.

### C. Based on the Public Safety Benefits of the Challenged Requirements, the Balance of Equities Weigh in Favor of Defendant

The district court's remaining equitable analysis was erroneous, again relying on the existence of purported constitutional injury when balancing the equities.

---

[17] In the fourth case relied upon by the district court, this Court reversed the finding of irreparable harm because the "constitutional claim [was] too tenuous" to "sustain a finding or irreparable injury on [F]irst [A]mendment grounds."  *Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984); *see* 1-ER-21–22.

As a general matter, the "public interest" is harmed where, as here, a lower court invalidates and enjoins a duly enacted statute. *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) ("The public interest may be declared in the form of a statute" (internal quotation marks omitted)). As the Supreme Court and this Court have often recognized, a State necessarily "suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997); *see also New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). This is especially significant here, because the district court enjoined two requirements that have been in effect for 16 years, and one requirement in effect for 10 years. *See Pena*, 898 F.3d at 973.

The district court also discounted Defendant's evidence regarding the public safety benefits of the chamber load indicator, magazine disconnect mechanism, and microstamping requirements. 1-ER-23–24. The district court concluded that Defendant's "safety concern rings hollow" because of the number of semiautomatic pistols on the Roster without the three challenged public safety features. 1-ER-23. It is true that the Roster allows the sale of semiautomatic pistols that lack the challenged UHA features. But that is only because the Legislature elected to apply those requirements on a prospective basis in

51

recognition of the need to ensure that additional pistols remained available to consumers while pistols with these safety features came on the market.[18]  And, such pistols did indeed become available for retail sale after five manufacturers added 34 semiautomatic pistols with a chamber load indicator and magazine disconnect mechanism to the Roster between 2007 and 2013.  2-ER-211–13.[19] While the remaining semiautomatic pistols on the Roster lack these commonsense safety features, the injunction—without the partial stay granted by this Court— would have significantly expanded the proportion of firearms available for retail purchase without these features.

Moreover, it cannot be seriously disputed that chamber load indicators and magazine disconnect mechanisms improve the safety of firearms.  *Pena*, 898 F.3d at 988 (Bybee, J., concurring in part and dissenting in part) ("Both mechanisms help prevent accidental handgun discharges by decreasing the likelihood that a person will mistakenly believe that the firing chamber is empty."); *see also id.* at 980 (majority opinion).  As described below, Defendant presented evidence demonstrating these safety benefits to the district court.

---

[18] When the chamber load indicator and magazine disconnect mechanism requirements were enacted in 2003, "between eleven and fourteen percent of handguns in the United States were available with a [chamber load indicator] and [magazine disconnect mechanism]."  *Pena*, 898 F.3d at 974, n.4.

[19] Manufacturers make semiautomatic pistols with a chamber load indicator or magazine disconnect mechanism to comply with similar requirements in Massachusetts.  *Granata*, 603 F. Supp. 3d at 16-17.

The safety benefit of a chamber load indicator is obvious from its name; the device "lets someone know that a gun is loaded without even having to pick it up to check; it acts as a red flag for those handling the gun who may have forgotten that it was loaded." *Pena*, 898 F.3d at 980. Defendant presented two studies showing how this device could prevent accidental shooting deaths and injuries to the firearm user and nearby bystanders. One was a federal study commissioned by Congress which concluded that a chamber load indicator could have prevented 23 percent of the studied accidental shooting deaths across 110 urban and rural jurisdictions, including two cases where minors killed a sibling or themselves. 6-ER-1257; 6-ER-1264–66. A published Johns Hopkins School of Public Health study concluded that a chamber load indicator could have prevented 20 percent of the studied accidental shooting deaths in Maryland and Milwaukee County, Wisconsin. 7-ER-1309–10; 3-ER-475–77.

A magazine disconnect mechanism also helps to prevent accidental shootings by "prevent[ing] a firearm from shooting unless a magazine is inserted" because without this device, "a magazine-equipped pistol can be fired if there is a bullet in the chamber, even if the magazine has not been inserted." *Pena*, 898 F.3d at 980. The Johns Hopkins School of Public Health study concluded that a magazine disconnect mechanism could have prevented four percent of the studied accidental shooting deaths. 7-ER-1309; 3-ER-476–77. And, a published Emory University

study concluded that magazine disconnect mechanisms, chamber load indicators, and firing pin blocks could have prevented one third of the studied accidental shootings in Atlanta, Georgia. 7-ER-1301–02; 7-ER-1306; 3-ER-474–75.

Notwithstanding these studies, and this Court's recognition of the safety benefits of these devices, the district court found the idea that these devices prevent accidental shootings to be "entirely speculative." 1-ER-24. The district court determined that the studies were "unhelpful" because they showed that chamber load indicators and magazine disconnect mechanisms could prevent unintentional shootings "*in the past*." 1-ER-24. But it is unclear why that undercuts the importance of these studies' findings that chamber load indicators and magazine disconnect mechanisms can save lives. The district court did not find fault with the methodology or conclusions of the studies. The district court erroneously discounted this evidence.[20]

The district court's order also did not discuss the public safety benefits of microstamping. Defendant's expert witness testified that microstamping would

---

[20] The district court's assertion that these safety devices do not "truly increase[] the overall safety of a firearm" because certain law enforcement entities and officers purchase Off-Roster handguns is also speculative. 1-ER-24. Law enforcement officers receive far more training in the handling and safe storage of firearms than the average civilian, a fact this Court recognized when it rejected an equal protection challenge to the law enforcement officer exception. *Pena*, 898 F.3d at 987. The district court also did not rule on Defendant's numerous objections to the declaration relied upon for this conclusion. *See* D.Ct. Dkt. 58-1.

help law enforcement to more quickly identify a semiautomatic pistol used in a shooting compared to current investigative methods, which require locating the pistol and not just the cartridges. 3-ER-480–82. For example, prompt identification could identify a serial shooter more quickly, thereby saving lives. 3-ER-481. This testimony is consistent with *Pena*, which credited legislative history reflecting that of all California homicides, more than 60 percent are committed with handguns and no arrests are made in about 45 percent. 889 F.3d at 982. Because the "only evidence at the crime scene may be spent cartridges," this Court called microstamping a "real-world solution" to a "real-world problem." *Id.*

It is true that there are currently no semiautomatic pistols on the Roster with microstamping capability, but this Court has already observed that the "reality is not that manufacturers cannot meet the standard but rather that they have chosen not to." *Pena*, 898 at 982; *id.* at 983 n.11 (noting that, similar to car manufacturer claims about the infeasibility of installing air bags in every vehicle, "it may be that protests about technical ability to comply reflect a reluctance to comply"). Nevertheless, the Legislature has tried to accommodate manufacturers' unsubstantiated claims of infeasibility by reducing the number of places where microstamping is required from two places on each cartridge to one place. Assemb. B. 2847, 2019-2020 Reg. Sess. (Cal. 2020), § 1(i); Cal. Penal Code § 31910(b)(6)(A). In doing so, the Legislature noted that the firearm

manufacturers trade association conceded in litigation that microstamping on one location per cartridge is feasible.  Assemb. B. 2847, § 1(h); *see also* 7-ER-1358; 7-ER-1361.

In light of that record—with Plaintiffs identifying no harm beyond the alleged constitutional violation, while Defendant presented robust evidence of the public safety harms that would result from an injunction—the balance of equities weighed against preliminary injunctive relief.

## CONCLUSION

The Court should reverse the district court's order granting the preliminary injunction motion.

Dated:  April 28, 2023          Respectfully submitted,

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
P. PATTY LI
Supervising Deputy Attorney General
MARK R. BECKINGTON
Supervising Deputy Attorney General
ANTHONY R. HAKL
Supervising Deputy Attorney General

s/ *Charles J. Sarosy*

CHARLES J. SAROSY
Deputy Attorney General
*Attorneys for Defendant-Appellant*

56

No. 23-55276

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

LANCE BOLAND; MARIO SANTELLAN; RENO MAY; JEROME SCHAMMEL; AND
CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,
*Plaintiffs-Appellees*,

v.

ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,
*Defendant-Appellant.*

———————————

## On Appeal from the United States District Court
## for the Central District of California
No. 22-cv-1421-CJC-ADS
The Honorable Cormac J. Carney, Judge

———————————

## STATEMENT OF RELATED CASES

———————————

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
P. PATTY LI
MARK R. BECKINGTON
ANTHONY R. HAKL
Supervising Deputy Attorneys General

CHARLES J. SAROSY
Deputy Attorney General
State Bar No. 302439
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6356
  Fax:  (916) 731-2119
  Email:  Charles.Sarosy@doj.ca.gov
*Attorneys for Defendant-Appellant*

The following related case is pending before this Court: *Renna, et al. v.*

*Bonta, et al.*, Case No. 23-55367.  *Renna* is also a preliminary injunction appeal.

The *Renna* district court granted plaintiffs' motion for preliminary injunction on

the same three requirements enjoined by the district court here: the chamber load indicator, magazine disconnect mechanism, and microstamping requirements in Penal Code section 31910(b)(4)–(6). *Renna, et al. v. Bonta, et al.*, No. 20-cv-2190-DMS-DEB, 2023 WL 2756981 (S.D. Cal. Mar. 31, 2023), at *2. The *Renna* district court also enjoined the "three-for-one" removal provision in Penal Code section 31910(b)(7). *Id.* The district court stayed its order granting the preliminary injunction pending appeal. *Id.* at *16.

Dated:  April 28, 2023

Respectfully submitted,

Rob Bonta
Attorney General of California
Thomas S. Patterson
Senior Assistant Attorney General
P. Patty Li
Supervising Deputy Attorney General
Mark R. Beckington
Supervising Deputy Attorney General
Anthony R. Hakl
Supervising Deputy Attorney General

s/ *Charles J. Sarosy*

Charles J. Sarosy
Deputy Attorney General
*Attorneys for Defendant-Appellant*

58

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s) 23-55276**_____

I am the attorney or self-represented party.

**This brief contains 13,979 words,** including ____-0-___ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** */s/ Charles J. Sarosy*_____ **Date** April 28, 2023_____
*(use "s/[typed name]" to sign electronically-filed documents)*

59

No. 23-55276

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————————

LANCE BOLAND; MARIO SANTELLAN; RENO MAY; JEROME SCHAMMEL; AND
CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,
*Plaintiffs-Appellees*,

v.

ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,
*Defendant-Appellant.*

—————————————

**On Appeal from the United States District Court
for the Central District of California**
No. 22-cv-1421-CJC-ADS
The Honorable Cormac J. Carney, Judge

—————————————

**CIRCUIT RULE 28-2.7 ADDENDUM
TO APPELLANT'S OPENING BRIEF**

—————————————

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
P. PATTY LI
MARK R. BECKINGTON
ANTHONY R. HAKL
Supervising Deputy Attorneys General

CHARLES J. SAROSY
Deputy Attorney General
State Bar No. 302439
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6356
 Fax:  (916) 731-2119
 Email:  Charles.Sarosy@doj.ca.gov
*Attorneys for Defendant-Appellant*

April 28, 2023

# <u>CIRCUIT RULE 28-2.7 ADDENDUM TABLE OF CONTENTS</u>

**United States Constitution**

Second Amendment ......................................................................A2

**California Penal Code**

Section 16380 .............................................................................A3

Section 16900 .............................................................................A4

Section 31910(b)(4)–(6) .............................................................A5

Section 32000 .............................................................................A7

Section 32010 ...........................................................................A13

Section 32015 ...........................................................................A15

**California Code of Regulations**

Title 11, Section 4049................................................................A17

Title 11, Section 4060................................................................A20

## **United States Constitution**

Second Amendment

A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

## California Penal Code § 16380

Part 6. Control of Deadly Weapons
Title 1. Preliminary Provisions
Division 2. Definitions
§ 16380. Chamber load indicator defined.

As used in this part, "chamber load indicator" means a device that plainly indicates that a cartridge is in the firing chamber. A device satisfies this definition if it is readily visible, has incorporated or adjacent explanatory text or graphics, or both, and is designed and intended to indicate to a reasonably foreseeable adult user of the pistol, without requiring the user to refer to a user's manual or any other resource other than the pistol itself, whether a cartridge is in the firing chamber.

## <u>California Penal Code § 16900</u>

Part 6. Control of Deadly Weapons
Title 1. Preliminary Provisions
Division 2. Definitions
§ 16900. Magazine disconnect mechanism defined

As used in this part, "magazine disconnect mechanism" means a mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol.

<u>**California Penal Code § 31910**</u>

Part 6. Control of Deadly Weapons
Title 4. Firearms
Division 10. Special Rules Relating to Particular Types of Firearms or Firearm Equipment
Chapter 4. Handguns and Firearm Safety
Article 4. "Unsafe Handgun" and Related Definitions
§ 31910. "Unsafe handgun" defined

As used in this part, "unsafe handgun" means any pistol, revolver, or other firearm capable of being concealed upon the person, for which any of the following is true:

(a) For a revolver:

(1) It does not have a safety device that, either automatically in the case of a double-action firing mechanism, or by manual operation in the case of a single-action firing mechanism, causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge.

(2) It does not meet the firing requirement for handguns.

(3) It does not meet the drop safety requirement for handguns.

(b) For a pistol:

(1) It does not have a positive manually operated safety device, as determined by standards relating to imported guns promulgated by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives.

(2) It does not meet the firing requirement for handguns.

(3) It does not meet the drop safety requirement for handguns.

**(4) Commencing July 1, 2022, for all centerfire semiautomatic pistols that are not already listed on the roster pursuant to Section 32015, it does not have a chamber load indicator.**

**(5) Commencing July 1, 2022, for all centerfire or rimfire semiautomatic pistols that are not already listed on the roster pursuant to Section 32015, it**

A5

**does not have a magazine disconnect mechanism if it has a detachable magazine.**

**(6) (A) Commencing July 1, 2022, for all semiautomatic pistols that are not already listed on the roster pursuant to Section 32015, it is not designed and equipped with a microscopic array of characters used to identify the make, model, and serial number of the pistol, etched or otherwise imprinted in one or more places on the interior surface or internal working parts of the pistol, and that are transferred by imprinting on each cartridge case when the firearm is fired.**

**(B) The Attorney General may also approve a method of equal or greater reliability and effectiveness in identifying the specific serial number of a firearm from spent cartridge casings discharged by that firearm than that which is set forth in this paragraph, to be thereafter required as otherwise set forth by this paragraph where the Attorney General certifies that this new method is also unencumbered by any patent restrictions. Approval by the Attorney General shall include notice of that fact via regulations adopted by the Attorney General for purposes of implementing that method for purposes of this paragraph.**

**(C) The microscopic array of characters required by this section shall not be considered the name of the maker, model, manufacturer's number, or other mark of identification, including any distinguishing number or mark assigned by the Department of Justice, within the meaning of Sections 23900 and 23920.**

(7) The Department of Justice shall, for each semiautomatic pistol newly added to the roster pursuant to Section 32015, remove from the roster exactly three semiautomatic pistols lacking one or more of the applicable features described in paragraphs (4), (5), and (6) of subdivision (b) and added to the roster before July 1, 2022. Notwithstanding those paragraphs, each semiautomatic pistol removed from the roster pursuant to this subdivision shall be considered an unsafe handgun. The Attorney General shall remove semiautomatic pistols from the roster pursuant to this subdivision in reverse order of their dates of addition to the roster, beginning with the semiautomatic pistol added to the roster on the earliest date and continuing until each semiautomatic pistol on the roster includes each of the applicable features described in those paragraphs.

A6

## <u>California Penal Code § 32000</u>

Part 6. Control of Deadly Weapons
Title 4. Firearms
Division 10. Special Rules Relating to Particular Types of Firearms or Firearm Equipment
§ 32000. Manufacture, importation, sale, gift, or loan of unsafe handgun; failure to report sale or transfer of unsafe handgun; penalties; exemptions

(a)(1) A person in this state who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends an unsafe handgun shall be punished by imprisonment in a county jail not exceeding one year.

(2) The failure to report to the Department of Justice in accordance with the provisions of paragraph (2) of subdivision (e) the sale or transfer of an unsafe handgun obtained pursuant to paragraph (4), (6), or (7) of subdivision (b) may be subject to a civil penalty not to exceed ten thousand dollars ($10,000).

(3) In addition to any criminal penalty provided in paragraph (1), the unlawful sale or transfer of an unsafe handgun obtained pursuant to paragraph (4), (6), or (7) of subdivision (b) may be subject to a civil penalty not to exceed ten thousand dollars ($10,000).

(b) This section shall not apply to any of the following:

(1) The manufacture in this state, or importation into this state, of a prototype handgun when the manufacture or importation is for the sole purpose of allowing an independent laboratory certified by the Department of Justice pursuant to Section 32010 to conduct an independent test to determine whether that handgun is prohibited by Sections 31900 to 32110, inclusive, and, if not, allowing the department to add the firearm to the roster of handguns that may be sold in this state pursuant to Section 32015.

(2) The importation or lending of a handgun by employees or authorized agents of entities determining whether the weapon is prohibited by this section.

(3) Firearms listed as curios or relics, as defined in Section 478.11 of Title 27 of the Code of Federal Regulations.

(4) The sale or purchase of a handgun, if the handgun is sold to, or purchased by, the Department of Justice, a police department, a sheriff's official, a marshal's office, the Department of Corrections and Rehabilitation, the Department of the California Highway Patrol, any district attorney's office, any federal law enforcement agency, or the military or naval forces of this state or of the United States for use in the discharge of their official duties. This section does not prohibit the sale to, or purchase by, sworn members of these agencies of a handgun.

(5) The sale, purchase, or delivery of a handgun, if the sale, purchase, or delivery of the handgun is made pursuant to subdivision (d) of Section 10334 of the Public Contract Code.

(6) Subject to the limitations set forth in subdivision (c), the sale or purchase of a handgun for use as a service weapon, if the handgun is sold to, or purchased by, any of the following entities for use by, or sold to or purchased by, sworn members of these entities who have satisfactorily completed the POST basic course or, before January 1, 2021, have satisfactorily completed the firearms portion of a training course prescribed by the Commission on Peace Officer Standards and Training (POST) pursuant to Section 832, and who, as a condition of carrying that handgun, complete a live-fire qualification prescribed by their employing entity at least once every six months:

(A) The Department of Parks and Recreation.

(B) The Department of Alcoholic Beverage Control.

(C) The Division of Investigation of the Department of Consumer Affairs.

(D) The Department of Motor Vehicles.

(E) The Fraud Division of the Department of Insurance.

(F) The State Department of State Hospitals.

(G) The Department of Fish and Wildlife.

(H) The State Department of Developmental Services.

(I) The Department of Forestry and Fire Protection.

A8

(J) A county probation department.

(K) The Los Angeles World Airports, as defined in Section 830.15.

(L) A K-12 public school district for use by a school police officer, as described in Section 830.32.

(M) A municipal water district for use by a park ranger, as described in Section 830.34.

(N) A county for use by a welfare fraud investigator or inspector, as described in Section 830.35.

(O) A county for use by the coroner or the deputy coroner, as described in Section 830.35.

(P) The Supreme Court and the courts of appeal for use by marshals of the Supreme Court and bailiffs of the courts of appeal, and coordinators of security for the judicial branch, as described in Section 830.36.

(Q) A fire department or fire protection agency of a county, city, city and county, district, or the state for use by either of the following:

(i) A member of an arson-investigating unit, regularly paid and employed in that capacity pursuant to Section 830.37.

(ii) A member other than a member of an arson-investigating unit, regularly paid and employed in that capacity pursuant to Section 830.37.

(R) The University of California Police Department, or the California State University Police Departments, as described in Section 830.2.

(S) A California Community College police department, as described in Section 830.32.

(T) A harbor or port district or other entity employing peace officers described in subdivision (b) of Section 830.33, the San Diego Unified Port District Harbor Police, and the Harbor Department of the City of Los Angeles.

A9

(U) A local agency employing park rangers described in subdivision (b) of Section 830.31.

(V) The Department of Cannabis Control.

(7)(A) Subject to the limitations set forth in subdivision (c), the sale or purchase of a handgun, if the handgun is sold to, or purchased by, any of the following entities for use as a service weapon by the sworn members of these entities who have satisfactorily completed the POST basic course or, before January 1, 2021, have satisfactorily completed the firearms portion of a training course prescribed by the POST pursuant to Section 832, and who, as a condition of carrying that handgun, complete a live-fire qualification prescribed by their employing entity at least once every six months:

(i) The California Horse Racing Board.

(ii) The State Department of Health Care Services.

(iii) The State Department of Public Health.

(iv) The State Department of Social Services.

(v) The Department of Toxic Substances Control.

(vi) The Office of Statewide Health Planning and Development.

(vii) The Public Employees' Retirement System.

(viii) The Department of Housing and Community Development.

(ix) Investigators of the Department of Financial Protection and Innovation.

(x) The Law Enforcement Branch of the Office of Emergency Services.

(xi) The California State Lottery.

(xii) The Franchise Tax Board.

(B) This paragraph does not authorize the sale to, or purchase by, sworn members of the entities specified in subparagraph (A) in a personal capacity.

A10

(c)(1) Notwithstanding Section 26825, a person licensed pursuant to Sections 26700 to 26915, inclusive, shall not process the sale or transfer of an unsafe handgun between a person who has obtained an unsafe handgun pursuant to an exemption specified in paragraph (6) or (7) of subdivision (b) and a person who is not exempt from the requirements of this section.

(2)(A) A person who obtains or has use of an unsafe handgun pursuant to paragraph (6) or (7) of subdivision (b) shall, when leaving the handgun in an unattended vehicle, lock the handgun in the vehicle's trunk, lock the handgun in a locked container and place the container out of plain view, or lock the handgun in a locked container that is permanently affixed to the vehicle's interior and not in plain view.

(B) A violation of subparagraph (A) is an infraction punishable by a fine not exceeding one thousand dollars ($1,000).

(C) For purposes of this paragraph, the following definitions shall apply:

(i) "Vehicle" has the same meaning as defined in Section 670 of the Vehicle Code.

(ii) A vehicle is "unattended" when a person who is lawfully carrying or transporting a handgun in the vehicle is not within close proximity to the vehicle to reasonably prevent unauthorized access to the vehicle or its contents.

(iii) "Locked container" has the same meaning as defined in Section 16850.

(D) Subparagraph (A) does not apply to a peace officer during circumstances requiring immediate aid or action that are within the course of their official duties.

(E) This paragraph does not supersede any local ordinance that regulates the storage of handguns in unattended vehicles if the ordinance was in effect before January 1, 2017.

(d) Violations of subdivision (a) are cumulative with respect to each handgun and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by this section and other provisions of law shall not be punished under more than one provision, but the penalty to be imposed shall be determined as set forth in Section 654.

A11

(e)(1) The Department of Justice shall maintain a database of unsafe handguns obtained pursuant to paragraph (4), (6), or (7) of subdivision (b). This requirement shall apply retroactively to include information in the department's possession. The department may satisfy this requirement by maintaining this information in any existing firearm database that reasonably facilitates compliance with this subdivision.

(2) A person or entity that is in possession of an unsafe handgun obtained pursuant to paragraph (4), (6), or (7) of subdivision (b), shall notify the department of any sale or transfer of that handgun within 72 hours of the sale or transfer in a manner and format prescribed by the department. This requirement shall be deemed satisfied if the sale or transfer is processed through a licensed firearms dealer pursuant to Section 27545. A sale or transfer accomplished through an exception to Section 27545 is not exempt from this reporting requirement.

(3) By no later than March 1, 2021, the department shall provide a notification to persons or entities possessing an unsafe handgun pursuant to paragraph (4), (6), or (7) of subdivision (b) regarding the prohibitions on the sale or transfer of that handgun contained in this section. Thereafter, the department shall, upon notification of sale or transfer, provide the same notification to the purchaser or transferee of any unsafe handgun sold or transferred pursuant to those provisions.

## <u>California Penal Code § 32010</u>

Part 6. Control of Deadly Weapons
Title 4. Firearms
Division 10. Special Rules Relating to Particular Types of Firearms or Firearm Equipment
Chapter 4. Handguns and Firearm Safety
Article 5. Rules Governing Unsafe Handguns
§ 32010. Standards testing of concealable firearms manufactured, imported, or offered for sale in California; certification of testing laboratories; fees; prerequisites for submitting specified handgun types

(a) Any pistol, revolver, or other firearm capable of being concealed upon the person manufactured in this state, imported into the state for sale, kept for sale, or offered or exposed for sale, shall be tested within a reasonable period of time by an independent laboratory certified pursuant to subdivision (b) to determine whether that pistol, revolver, or other firearm capable of being concealed upon the person meets or exceeds the standards defined in Section 31910.

(b) On or before October 1, 2000, the Department of Justice shall certify laboratories to verify compliance with the standards defined in Section 31910. The department may charge a fee to certify a laboratory to test any pistol, revolver, or other firearm capable of being concealed upon the person pursuant to Sections 31900 to 32110, inclusive. The fee shall not exceed the costs of certification.

(c) The certified testing laboratory shall, at the manufacturer's or importer's expense, test the firearm and submit a copy of the final test report directly to the Department of Justice along with a prototype of the weapon to be retained by the department. The department shall notify the manufacturer or importer of its receipt of the final test report and the department's determination as to whether the firearm tested may be sold in this state.

(d)(1) Commencing January 1, 2006, no center-fire semiautomatic pistol may be submitted for testing pursuant to Sections 31900 to 32110, inclusive, if it does not have either a chamber load indicator, or a magazine disconnect mechanism if it has a detachable magazine.

(2) Commencing January 1, 2007, no center-fire semiautomatic pistol may be submitted for testing pursuant to Sections 31900 to 32110, inclusive, if it does not have both a chamber load indicator and a magazine disconnect mechanism.

(3) Commencing January 1, 2006, no rimfire semiautomatic pistol may be submitted for testing pursuant to Sections 31900 to 32110, inclusive, if it has a detachable magazine, and does not have a magazine disconnect mechanism.

## California Penal Code § 32015

Part 6. Control of Deadly Weapons
Title 4. Firearms
Division 10. Special Rules Relating to Particular Types of Firearms or Firearm
Equipment
Chapter 4. Handguns and Firearm Safety
Article 5. Rules Governing Unsafe Handguns
§ 32015. Roster of tested handguns determined not to be unsafe; contents

(a) On and after January 1, 2001, the Department of Justice shall compile, publish, and thereafter maintain a roster listing all of the handguns that have been tested by a certified testing laboratory, have been determined not to be unsafe handguns, and may be sold in this state pursuant to this part. The roster shall list, for each firearm, the manufacturer, model number, and model name.

(b)(1) The department may charge every person in this state who is licensed as a manufacturer of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code, and any person in this state who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, or offers or exposes for sale any handgun in this state, an annual fee not exceeding the costs of preparing, publishing, and maintaining the roster pursuant to subdivision (a) and the costs of research and development, report analysis, firearms storage, and other program infrastructure costs necessary to implement Sections 31900 to 32110, inclusive. Commencing January 1, 2015, the annual fee shall be paid on January 1, or the next business day, of every year.

(2) Any handgun that is manufactured by a manufacturer who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, or offers or exposes for sale any handgun in this state, and who fails to pay any fee required pursuant to paragraph (1), may be excluded from the roster.

(3) If a purchaser has initiated a transfer of a handgun that is listed on the roster as not unsafe, and prior to the completion of the transfer, the handgun is removed from the roster of not unsafe handguns because of failure to pay the fee required to keep that handgun listed on the roster, the handgun shall be deliverable to the purchaser if the purchaser is not otherwise prohibited from purchasing or possessing the handgun. However, if a purchaser has initiated a transfer of a handgun that is listed on the roster as not unsafe, and prior to the completion of the

A15

transfer, the handgun is removed from the roster pursuant to subdivision (d) of Section 32020, the handgun shall not be deliverable to the purchaser.

# California Code of Regulations, Tit. 11, § 4049

Title 11. Law
Division 5. Firearms Regulations
Chapter 5. Laboratory Certification and Handgun Testing
Article 2. Definition of Key Terms
§ 4049. Definition of Key Terms

(a) "ATF" means the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives.

(b) "COE" means a Certificate of Eligibility issued by the California Department of Justice pursuant to Penal Code section 26710, subdivisions (a) through (c) after a check of state and federal files has determined that at the time the check was performed, and based upon available information, the applicant was not a person who was prohibited from possessing firearms pursuant to state and federal laws.

(c) "Completed Application" means a completed Application for DOJ-Certification, Form BOF 019 (Rev. 01/2012); copies of any applicable licenses and/or certificates; any additional sheets used to provide full and complete answers to questions on the application; copies of the laboratory's written procedures relating to security and prohibited persons; and the application fee.

(d) "Compliance Test Report" means a report completed by a DOJ-Certified Laboratory after a handgun model has met the requirements of Penal Code sections 31900 and 31905 and these regulations.

(e) "Corporation" means any entity organized under California Corporations Code section 102, subdivision (a) or similar statute if not a California corporation.

(f) "Day" means a calendar day unless otherwise specified in these regulations.

(g) "DOJ" means the California Department of Justice.

(h) "DOJ-Certification" means the DOJ certificate issued as evidence of compliance with the DOJ laboratory certification requirements as set forth in these regulations.

(i) "DOJ-Certified Laboratory" means a laboratory that has applied for and been granted DOJ-Certification.

A17

(j) "FIN" means the firearm identification number comprised of a unique array of characters that identify the make, model, and serial number of each pistol subject to the microstamping requirement for semiautomatic pistols set forth in Penal Code section 31910, subdivision (b)(6) and which can be used to identify the pistol when it is traced through DOJ's Automated Firearms System (AFS). The FIN shall consist of at least eight, but no more than 12, unique alpha and/or numeric characters that must begin with the manufacturer's NCIC MAK code.

(k) "Firm" means a business unit, enterprise, or partnership of two or more persons, that is not recognized as a legal person distinct from the members comprising the entity.

(l) "Identical magazines" means magazines submitted for, and used during, testing shall not be of a higher functional quality, which might result in improved performance from those provided to retail customers.

(m) "Local license" means any regulatory and/or business license issued by a city, county, and/or other local government agency.

(n) "Manufacturer/Importer" means either a manufacturer of domestically produced handguns or, if one exists, a legal successor in interest or another person with the consent of the manufacturer; and/or a federally licensed importer of foreign manufactured handguns.

(o) "Model" means the manufacturer's/importer's designation which uniquely identifies a specific design of handgun subject to the descriptive limitations imposed by Penal Code section 32030, subdivision (a).

(p) "Pistol" means a handgun in which the chamber is part of the barrel. A pistol can either be semiautomatic or non-semiautomatic, but not fully automatic.

(q) "Reasonable access" means that areas and/or items to be inspected by an authorized DOJ employee are free from physical obstruction and/or other impediments that would make access difficult and/or unsafe.

(r) "Refined or modified" means an improvement applied to the test handguns, that is not made to retail handguns, which may result in improved performance during testing. Refining or modifying a handgun includes, but is not limited to, using

A18

material preparation, assembly techniques, or break-in processes that are different from those used to produce retail models.

(s) "Responsible party" includes, but is not limited to, firearm manufacturers/importers and law enforcement agencies.

(t) "Revolver" means a handgun with a cylinder having several chambers so arranged as to rotate around an axis and be discharged successively by the same firing mechanism through a common barrel.

(u) "Roster of Certified Handguns" means a list of all pistols and revolvers that have been tested by a DOJ-Certified Laboratory, have been determined not to be unsafe handguns, and that may be sold in California pursuant to Penal Code section 32010. The roster will list, for each firearm, the manufacturer, model number, model name, and other information deemed necessary by the DOJ to facilitate identifying that handgun model.

(v) "Similar" means a handgun listed on the Roster of Certified Handguns that was not subject to testing because it satisfied the requirements of Penal Code section 32030.

(w) "Standard ammunition" means commercially produced factory loaded ammunition which is available for purchase at consumer-level retail outlets.

A19

## California Code of Regulations, Tit. 11, § 4060

Title 11. Law
Division 5. Firearms Regulations
Chapter 5. Laboratory Certification and Handgun Testing
Article 4.
Article 4. Operational Requirements: Absence of Conflict of Interest; Security and
Safety Requirements; Licensing/Minimum Standards Compliance; Which
Handguns Must be Tested, Who May Submit Handguns, Submission
Requirements; Testing Procedures; Test Reporting; Required Records, Retention
Periods, Reporting Changes; Off-Site Locations; Inspections
§ 4060. Testing Procedures.

(a) The only persons allowed to conduct handgun testing are authorized staff of the
DOJ-Certified Laboratory. In addition to this staff, representatives of the
manufacturer/importer and/or the DOJ shall be allowed to be present during
testing. Any such representative(s) shall not participate in the testing. However, if
deemed necessary by the staff of the DOJ-Certified Laboratory, representative(s)
of the manufacturer/importer may be asked to provide advice and/or guidance
regarding the characteristics, handling, and/or operation of the handgun.

(b) Prior to beginning the required testing the DOJ-Certified Laboratory shall
determine whether the safety device described in Penal Code section 31910(a)(1)
or (b)(1) is present.

(1) If the DOJ-Certified Laboratory needs guidance in making this determination,
the information required by section 4059, subdivision (d) of these regulations
should be consulted. If the DOJ-Certified Laboratory is still not able to make this
determination, they should contact the manufacturer/importer for additional
information. Any additional information received from the manufacturer/importer
shall be included with the information submitted pursuant to section 4059,
subdivision (d) of these regulations.

(2) If a DOJ-Certified Laboratory is still uncertain whether a positive manually
operated safety device is present on a pistol even after it receives additional
information, the firing and drop tests should be performed. If the pistol passes
these tests, the laboratory should submit the pistol to the DOJ with a letter
explaining the steps taken to determine whether the positive manually operated
safety device is present. The laboratory must indicate its preliminary decision
regarding the positive manually operated safety device. The letter should also

A20

include any information that would support the position taken by the laboratory. This includes a description of the positive manually operated safety device(s) incorporated into the pistol's design and an explanation of how this design replicates the positive manually operated safety device of a pistol design that has already been determined to meet the standards promulgated by the ATF. The DOJ will use this information to determine whether the pistol can be sold in California.

(c) Prior to beginning the required testing, the DOJ-Certified Laboratory shall verify that:

(1) Every centerfire semiautomatic pistol has a functioning chamber load indicator.

(2) Every centerfire or rim-fire semiautomatic pistol which accepts a detachable magazine has a functioning magazine disconnect mechanism.

(3) Every semiautomatic pistol complies with the microstamping requirement for semiautomatic pistols set forth in Penal Code section 31910, subdivision (b)(6) by following the procedures set forth in subdivisions (e),(g), and (h) of this section.

(d)(1) A functioning chamber load indicator must meet all of the following conditions:

(A) Explanatory text and/or graphics either incorporated within the chamber load indicator or adjacent to the chamber load indicator is/are permanently displayed by engraving, stamping, etching, molding, casting, or other means of permanent marking.

(B) Each letter of explanatory text must have a minimum height of 1/16 inch.

(C) The explanatory text and/or graphics shall be of a distinct visual contrast to that of the firearm.

(D) The "loaded" indication, that portion of the chamber load indicator that visually indicates there is a round in the chamber, shall be of a distinct color contrast to the firearm.

(E) Only when there is a round in the chamber, the "loaded" indication is visible on the firearm from a distance of at least twenty-four inches. When there is no round in the chamber, the "loaded" indication must not be visible.

(F) The text and/or graphics and the "loaded" indication together inform a reasonably foreseeable adult user of the pistol, that a round is in the chamber, without requiring the user to refer to a user's manual or any other resource other than the pistol itself.

(2) A functioning magazine disconnect mechanism must prevent the ammunition primer from being struck with a pull of the trigger or attempted pull of the trigger whenever a detachable magazine is not inserted in the pistol.

(e) Prior to conducting the "firing requirements for handguns" test of a semiautomatic pistol required by Penal Code section 31905, the DOJ-Certified Laboratory shall fire each handgun of that make and model of semiautomatic pistol two times. After firing the pistol two times, the DOJ-Certified Laboratory shall collect the two cartridge casings expended from that pistol, store the casings in a container labeled with the FIN of the pistol from which they were expended and indicating that the two cartridges were expended immediately preceding the firing test, and retain the casings for possible later analysis. The cartridge casings shall be analyzed pursuant to the procedures set forth in subdivision (h) of this section only upon successful completion of the "firing requirements for handguns" test of the semiautomatic pistol.

(f) The "firing requirement for handguns" is the first test to be undertaken by the DOJ-Certified Laboratory. The firing test shall be conducted in the manner prescribed in Penal Code section 31905 and in accordance with the following:

(1) For the purposes of determining whether a handgun passes the "firing requirement for handguns," "malfunction" includes any failure to operate as designed including the failure of a pistol's slide to remain open after a manufacturer-approved magazine has been expended, provided that the handgun was designed by the manufacturer to remain open.

(2) If the manufacturer/importer markets and/or recommends that the handgun model is designed to handle multiple cartridges, the standard ammunition used during the firing test shall be the more powerful marketed/recommended cartridge. However, the DOJ-Certified Laboratory shall not use any standard ammunition known to be beyond the design limits of the handgun and/or known not to function in the handgun.

(3) If a pistol has multiple chambers the 600 rounds shall be evenly apportioned between the chambers.

A22

(4) The DOJ-Certified Laboratory shall determine whether there is any crack or breakage of an operating part of the handgun that increases the risk of injury to the user, as set forth in Penal Code section 31905, subdivision (a)(2).

(5) Should a handgun fail the "firing requirements for handguns" test, three handguns of that make and model must be re-submitted for the firing test. Handguns that do not pass the "firing requirements for handguns" test may not be submitted for the "drop safety requirement for handguns" testing.

(g) As soon as possible after successful completion of the "firing requirements for handguns" test of a semiautomatic pistol, the DOJ-Certified Laboratory shall fire each handgun of that make and model of semiautomatic pistol two additional times. After firing the pistol two additional times, the DOJ-Certified Laboratory shall collect the two cartridge casings expended from that pistol and store the cartridges in a container labeled with the FIN of the pistol, indicating that the two cartridges were expended immediately following the firing test, and keeping them separate and apart from the cartridge casings expended and collected from the same pistol prior to conducting the "firing requirements for handguns" test pursuant to subdivision (e) of this section.

(h) In order to verify compliance with the microstamping requirement for semiautomatic pistols set forth in Penal Code section 31910, subdivision (b)(6), the DOJ-Certified Laboratory shall use the following procedures and criteria to examine the cartridge casings collected from each tested semiautomatic pistol (pursuant to subdivisions (e) and (g) of this section) to determine whether a FIN was transferred by imprinting onto each cartridge case when the pistol was fired.

(1) Using a stereo zoom microscope described in section 4052 of these regulations, the DOJ-Certified Laboratory shall examine each of the cartridge casings collected prior to and after the "firing requirements for handguns" test to verify that the pistol has transferred an imprint or etching in at least two places on each cartridge casing. So long as the pistol's complete FIN can be identified from the one or more etchings on each cartridge casing, the pistol will meet the microstamping requirements of Penal Code section 31910, subdivision (b)(6).

(2) The DOJ-Certified Laboratory shall take digital photographs sufficient to adequately document the markings made on the cartridge cases by the microstamp.

A23

(3) The DOJ-Certified Laboratory shall repeat the examination process described above for each set of cartridge casings expended from each tested pistol of that make and model of semiautomatic pistol. If each cartridge casing from each set of expended cartridge casings satisfies paragraph (1) above, then the DOJ-Certified Laboratory shall certify that the model of semiautomatic pistol complies with the microstamping requirement set forth in Penal Code section 31910, subdivision (b)(6).

(i) The "drop safety requirement for handguns" is the last test to be undertaken by the DOJ-Certified Laboratory. The drop tests shall be conducted in the manner prescribed in Penal Code section 31900 and in accordance with the following:

(1) The drop height of 1 m + 1 cm - 0 cm (39.4 in. + 0.4 in. - 0 in.) shall be measured from the lowermost portion of the handgun as situated in the drop fixture to the top surface of the required concrete slab. The required concrete slab shall rest upon a firm surface and the face of the slab shall be perpendicular to the direction of the drop. If a handgun has an exposed hammer, the hammer shall be fully cocked during each drop test. When dropped the handgun shall initially strike the face of the required concrete slab and then come to rest without interference.

(2) The primed cases used during the drop test shall be produced by the ammunition manufacturer of and made from the same cases and primers as the standard ammunition that is used during the firing test as set forth in sections 4059, subdivision (e) and 4060, subdivision (e)(2) of these regulations.

(3) If a pistol has multiple chambers and/or firing pins, the tests shall be conducted as follows. For each of the drop tests a primed case will be placed in each chamber. If the hammer or firing pin alternates between chambers, the pistol will be dropped once for each hammer or firing pin position.

(4) Minimal damage, such as broken grips or sights, can and will occur during the course of the drop testing. Damage and/or breakage that affects the overall dimensions of the handgun shall be repaired prior to continuing the drop tests. After each of the first five drop tests the DOJ-Certified Laboratory shall determine whether the handgun has been rendered incapable of firing a primed case prior to conducting the next drop test. If so, the handgun model shall either be repaired, or the test shall be stopped and three new handguns must be submitted for testing beginning with the "firing requirement for handguns."

A24

(5) After examining the primed case(s) for indentations after each drop test, each primed case shall be fired to determine whether the primer was functional. If not, the drop test shall be repeated with a new primed case(s). A new primed case(s) will be used for the next drop test.

(6) Should a handgun fail the "drop safety requirement for handguns," or be found incapable of firing a primed case, three new handguns of that make and model must be submitted for testing beginning with the "firing requirements for handguns" test.

(j) A DOJ representative may request and shall be provided with spent or unspent rounds of and/or the packaging for the standard ammunition that is being used for firing tests. A DOJ representative may also request and shall be provided with the packaging for and/or used or unused primed cases that are being used for drop tests.

(k) The same three handguns that pass the "firing requirements for handguns" test must also pass the "drop safety requirement for handguns" before that make and model can be considered for certification.

(l) The DOJ-Certified Laboratory shall report a handgun to the DOJ as "not unsafe" only if it has passed the required testing, has been found to comply with the microstamping requirement for semiautomatic pistols pursuant to subdivision (h) of these regulations, if applicable, and the laboratory has confirmed that any chamber load indicator and/or magazine disconnect identified pursuant to subdivisions (c) and (d) of this section continues to function upon completion of the required testing.

A25

# CERTIFICATE OF SERVICE

Case Name: **Boland, Lance, et al. v. Robert Bonta, et al.**          No.   **23-55276**

I hereby certify that on <u>April 28, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**APPELLANT'S OPENING BRIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 28, 2023</u>, at Sacramento, California.

|  |  |
|---|---|
| Eileen A. Ennis | */s/ Eileen A. Ennis* |
| Declarant | Signature |

SA2023301763
37112999.docx