No. 23-55276

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————————

LANCE BOLAND; MARIO SANTELLAN; RENO MAY; JEROME SCHAMMEL; and
CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,

*Defendant-Appellant.*

———————————————————

On Appeal from the United States District Court
for the Central District of California (No. 8:22-cv-01421-CJC-ADS)
(Hon. Cormac J. Carney)

———————————————————

## BRIEF OF EVERYTOWN FOR GUN SAFETY
## AS AMICUS CURIAE IN SUPPORT OF
## DEFENDANT-APPELLANT AND REVERSAL

———————————————————

Janet Carter
William J. Taylor, Jr.
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8179
esa@everytown.org

May 5, 2023

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 2

ARGUMENT ................................................................................. 4

    I.     Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Proposed Conduct ................. 4

    II.    The Proper Focus for Analysis of Historical Regulation Is 1868 ...... 11

    III.   Historical Laws Are "Relevantly Similar" to California's Law ........ 20

    IV.   This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers" .................................................... 23

CONCLUSION .............................................................................. 27

# TABLE OF AUTHORITIES

## *Cases*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) ................................................................. 2

*Davenport v. Wash. Educ. Ass'n*,
  551 U.S. 177 (2007) ........................................................................ 26

*Def. Distributed v. Bonta*,
  No. 2:22-cv-06200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), *adopted*, 2022
  WL 15524983 (C.D. Cal. Oct. 24, 2022) ........................................... 10

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................. passim

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) ................................................................... 27

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) .............................................................. 12

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ..................................................... 12, 17

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) .......................................................... 26

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018) ........................................................... 12

*Gray v. Hudson*,
  28 F.4th 87 (9th Cir. 2022) ............................................................... 7

*Kennedy v. Bremerton School District*,
  142 S. Ct. 2407 (2022) ..................................................................... 5

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ................................................... 9, 17, 21, 26

*Mendiola-Martinez v. Arpaio,*
836 F.3d 1239 (9th Cir. 2016) .................................................................. 7

*Miller v. Gammie,*
335 F.3d 889 (9th Cir. 2003) (en banc) .......................................... 7, 22

*Miranda B. v. Kitzhaber,*
328 F.3d 1181 (9th Cir. 2003) (per curiam) ...................................... 7

*Nat'l Ass'n for Gun Rights v. City of San Jose,*
618 F. Supp. 3d 901 (N.D. Cal. 2022) .................................................. 5

*Nat'l Rifle Ass'n v. Bondi,*
61 F.4th 1317 (11th Cir. 2023), *pet'n for reh'g en banc filed* (Mar. 30, 2023) ........... 12

*New York State Rifle & Pistol Ass'n v. Bruen,*
142 S. Ct. 2111 (2022) ................................................................. passim

*Oakland Tactical Supply, LLC v. Howell Township,*
No. 18-cv-13443, 2023 WL 2074298 (E.D. Mich. Feb. 17, 2023), *appeal docketed,*
No. 23-1179 (6th Cir. Mar. 1, 2023) ...................................................... 9

*Oregon Firearms Fed'n v. Brown,*
No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022), *appeal dismissed,*
No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022) .............................. 5

*Pena v. Lindley,*
898 F.3d 969 (9th Cir. 2018) .......................................................... 7, 22

*Rehaif v. United States,*
139 S. Ct. 2191 (2019) ..................................................................... 2

*Rupp v. Becerra,*
401 F. Supp. 3d 978 (C.D. Cal. 2019) *vacated and remanded,* No. 19-56004, 2022
WL 2382319 (9th Cir. June 28, 2022) ..................................................... 2

*Teixeira v. Cnty. of Alameda,*
873 F.3d 670 (9th Cir. 2017) (en banc) ...................................... 7, 10, 22

*United States v. Greeno,*
679 F.3d 510 (6th Cir. 2012) ............................................................. 12

*United States v. Holton*,
No. 3:21-cr-00482, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) .................. 22

*United States v. Reyna*,
No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ................... 4

*United States v. Rowson*,
No. 1:22-cr-00310, 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) ....................... 23

## Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998)............... 15, 16

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n
v. Bruen*, No. 20-843 (U.S.) .................................................................. 18, 24, 25

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational
Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018)............ 18, 24, 25

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15,
2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ........... 16

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J.
1439 (2022)........................................................................................ 15

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843
(U.S. Nov. 3, 2021) ............................................................................. 18

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 940,000 in California. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 59 California cities and localities are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 60 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and policy research, that might otherwise be overlooked. *See,*

---

[1] No party's counsel authored this brief in whole or part, and, apart from Everytown, no person contributed money intended to fund its preparation or submission. All parties consent to its filing.

*e.g.*, *Granata v. Campbell*, No. 22-1478, Dkt. 00117972457 (1st Cir. Feb. 6, 2023); *Teter v. Shikada*, No. 20-15948, Dkt. 73 (9th Cir. Sept. 26, 2022). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

California's regulations prohibiting the commercial sale of new models of semiautomatic pistols that lack a magazine-disconnect mechanism (MDM), chamber-load indicator (CLI), or microstamping capability are constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons set out in the State's Brief ("State Br.").[2] Everytown submits this amicus brief to expand on four methodological points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have not met their burden to establish that the plain text of the Second Amendment grants them a right to purchase specific models of semiautomatic

---

[2] This amicus brief addresses only aspects of Plaintiffs' Second Amendment claim. The Court should reverse for the reasons the State set out.

handguns. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), both earlier and later history are also relevant. *Third*, *Bruen* makes clear that the government need not produce a "historical *twin*" to a modern law to show that it is consistent with tradition; instead, the government need only show that modern and historical laws are "relevantly similar," and that, in turn, necessitates only a showing that the laws are *comparably* justified—not *identically* justified. *See* 142 S. Ct. at 2132-33. Moreover, in cases, like this one, involving "unprecedented societal concerns or dramatic technological changes," *Bruen* instructs courts to take a "more nuanced approach" to history. *See id.* at 2132. *Fourth*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. Although not directly implicated here, given the State's robust historical record, we highlight that point in case the Court chooses to address it.

3

# ARGUMENT

## I.   Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Proposed Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30.[3] If so, the court then asks whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, weapons, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See, e.g.*, *United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) (dismissing challenge because "§ 922(k)'s regulated conduct [possessing a firearm with an obliterated serial number] is outside [the] scope of the Second Amendment" and that "is enough to decide" the case; declining to reach historical inquiry).

As the State notes, *see* State Br. 20-21, the burden to satisfy the initial, textual inquiry is on the plaintiff challenging a law. *Bruen* makes this clear by indicating

---

[3] *Bruen*'s analysis makes clear that the "people" challenging a gun regulation, the "weapons" they put at issue, and their "proposed course of conduct" must *all* fall within the Second Amendment's plain text. *See id.* at 2134.

that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an unusual departure from ordinary litigation principles—the Court would have said that the presumption exists from the outset. Placing the initial burden on the plaintiff also accords with the Court's approach to other constitutional issues. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the [First Amendment]. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421. Accordingly, multiple courts have read *Bruen* to place the burden on the plaintiff to establish that the Second Amendment's plain text covers their conduct. *See, e.g.*, *Oregon Firearms Fed'n v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829, at *9-12 (D. Or. Dec. 6, 2022), *appeal dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022) (explaining that "if [p]laintiffs demonstrate that their conduct is covered by the text of the Second Amendment, the Constitution presumptively protects that conduct and the burden shifts to the government," and finding that plaintiffs had failed to do so); *Nat'l Ass'n for Gun Rights v. City of San Jose*, 618 F. Supp. 3d 901, 914 (N.D. Cal. 2022) ("If the conduct at issue is covered by the text of the Second Amendment,

the burden then shifts to the government to show why the regulation is consistent with the Nation's historical tradition of firearm regulation[.]").

Plaintiffs have not met their textual burden. As the State explains, *see* State Br. 21-23, the Second Amendment's plain text does not confer a right to purchase the specific semiautomatic pistol models of one's choice. *See Heller*, 554 U.S. at 626 (the right to keep and bear arms is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"); *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*); *cf.* 5-ER-824-25 (alleging individual plaintiffs' desire to purchase the Gen5 Glock 17, Gen5 Glock 19, Sig Sauer P365, Sig Sauer P320 XCompact, Ruger LCP Max, Smith & Wesson Shield Plus, and Staccato P). Plaintiffs do not allege that they are unable to exercise their right to armed self-defense with handguns they already own or can lawfully acquire. *See* 5-ER-824-25. Nor could they, as California law leaves available for purchase over 800 on-roster handguns, including nearly 500 semiautomatic pistols. 3-ER-450. Indeed, one individual plaintiff already owns approximately 60 to 70 firearms, including 30 handguns, 25 of which are semiautomatic pistols; another owns 15 to 20 firearms, including 10 handguns, 6 of which are semiautomatic pistols. 3-ER-313-15; 3-ER-325-29; *see* State Br. 48. And the remaining plaintiffs do not allege that California law prevents from keeping or carrying handguns—only that they would like to purchase certain semiautomatic handguns that are not on the roster. *See* 5-ER-824-

25. But as this Court has already recognized, there is no "constitutional right to purchase a particular handgun." *Pena v. Lindley*, 898 F.3d 969, 973 (9th Cir. 2018).[4] More generally, "the Second Amendment does not elevate convenience and preference over all other considerations." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) (en banc).

 *Bruen* itself reinforces that conclusion. In discussing why its opinion striking down New York's "may-issue" concealed-carry licensing law "should [not] be

---

[4] The district court effectively ignored this Court's directly-on-point opinion in *Pena v. Lindley*, citing it primarily for background facts and disregarding its analysis. *See generally* 1-ER-6-25. That was error. The court was entitled to disregard *Pena* only to the extent that it is "clearly irreconcilable" with *Bruen*. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc); *see id.* at 893 (holding that higher authorities had "effectively overruled [circuit authority] *to the extent its reasoning is inconsistent with them*" (emphasis added)); *see also, e.g.*, *Gray v. Hudson*, 28 F.4th 87, 97 n.5 (9th Cir. 2022) (earlier Ninth Circuit cases "were overruled by [a Ninth Circuit *en banc* decision] only to the extent they suggested that a weaker showing of substantial similarity is required when a high degree of access to a copyrighted work has been shown. These cases otherwise remain binding on us." (citation omitted)); *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1256 n.18 (9th Cir. 2016) ("[An *en banc* decision] overruled *Gibson* only to the extent that *Gibson* suggested a subjective test for showing that a municipality was deliberately indifferent. Therefore, *Gibson*'s holding that certain evidence was sufficient to show subjective intent, a more stringent standard than the objective test we apply here, is still relevant." (citation omitted)). Any part of *Pena*'s analysis dependent on the now-disavowed application of means-end scrutiny—including its result—did not survive *Bruen*. But any aspects of the analysis that are consistent with *Bruen* remain not just persuasive, but binding. That is the case for *Pena*'s discussion of the reach of the Second Amendment right and its assessment of the burdens and justifications of modern-day laws. *See infra* note 11 (discussing burdens and justifications). At the very least, such analysis would have the status of germane, well-reasoned dictum—which is likewise binding in this circuit, *see, e.g.*, *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003) (per curiam).

interpreted to suggest the unconstitutionality of" 43 other states' "shall-issue" regimes, "which often require applicants to undergo a background check or pass a firearms safety course," the Court made no mention of history. *See Bruen*, 142 S. Ct. at 2138 n.9. It explained that because those regimes "do not require applicants to show an atypical need for armed self-defense, *they do not necessarily prevent* 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* (emphasis added). Justice Kavanaugh, joined by the Chief Justice, likewise emphasized that "shall-issue regimes are constitutionally permissible" as a facial matter—and likewise did not mention history in doing so. *Id.* at 2162 (Kavanaugh, J., concurring).

The most straightforward explanation for these observations is that the six Justices in *Bruen*'s majority concluded that shall-issue licensing laws do not implicate the Second Amendment's plain text. Otherwise, the government would need to demonstrate consistency with historical tradition *in every challenge* to such a licensing regime—not just in cases where unusual features like "lengthy wait times in processing applications" could implicate the "right to public carry" of "ordinary citizens." *Id.* at 2138 n.9; *see also id.* at 2162 (Kavanaugh, J., concurring) (contemplating only as-applied challenges to shall-issue regimes).[5] In other words,

---

[5] That makes perfect sense when comparing the proposed conduct of the *Bruen* plaintiffs with that of a hypothetical plaintiff challenging, say, a basic firearms safety course requirement in a shall-issue licensing scheme. The *Bruen* plaintiffs

laws that do not "necessarily prevent" ordinary, law-abiding citizens from keeping and carrying arms for self-defense, 142 S. Ct. at 2138 n.9, do not trigger the historical burden the Supreme Court held New York to in *Bruen*. Here, as in most shall-issue licensing cases, Plaintiffs' constitutional rights remain unencumbered, and this Court need not proceed to a historical analysis.[6]

---

wished to carry handguns publicly but were flatly prevented from doing so. *See* 142 S. Ct. at 2134; *id.* at 2159 (Alito, J., concurring) (law made public carry "virtually impossible for most New Yorkers"). The hypothetical plaintiff, instead, wishes to carry handguns publicly *without passing a safety course*. That conduct is not within the Second Amendment's text, and nor can it be defined at a higher level of generality—for example, as "carrying handguns publicly for self-defense," *id.* at 2134—because nothing prevents the hypothetical plaintiff from engaging in that conduct after simply taking the course. *See Oakland Tactical Supply, LLC v. Howell Township*, No. 2:18-cv-13443, 2023 WL 2074298, at *3 (E.D. Mich. Feb. 17, 2023) ("The proposed conduct could not be simply 'training with firearms' because the zoning ordinance does not prohibit 'training with firearms.'"), *appeal docketed*, No. 23-1179 (6th Cir. Mar. 1, 2023).

[6] Plaintiffs in another handgun roster case argued that such laws were handgun "bans" and therefore akin to the laws struck down in *Bruen*, *Heller*, and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). *See* Plaintiffs-Appellants' Opening Br. at 5, 25-26, *Granata v. Campbell*, No. 22-1478 (1st Cir. Nov. 18, 2023), Dkt. 00117945383. If plaintiffs here raise a similar argument, this Court should reject any attempt to liken the CLI, MDM, and microstamping requirements to the laws at issue in those Supreme Court cases. California's safety measures do not remotely "amount[] to a prohibition of an entire class of 'arms'" chosen by Americans for self-defense. *Heller*, 554 U.S. at 628. As the State explains, *see* State Br. 2, Plaintiffs retain the ability to purchase and carry over 800 on-roster handguns, and they do not allege that they have been prevented from lawfully purchasing or carrying handguns. That is a far cry from the situation of the *Bruen*, *Heller*, and *McDonald* plaintiffs, who were actually prevented from carrying handguns publicly (*Bruen*) or keeping them at home (*Heller* and *McDonald*). This difference also underscores why Plaintiffs have not shown irreparable harm: they are not in fact being prevented from exercising their right to armed self-defense. *See* State Br. 48-50.

The district court held, erroneously, that the plain text inquiry was satisfied because the Second Amendment protects certain "attendant rights," including "the right to acquire state-of-the-art handguns for self-defense." 1-ER-13-14. The Second Amendment's text, of course, says nothing about acquiring state-of-the-art handguns, and the very idea of "attendant rights" is in some tension with *Bruen*'s plain-text approach. *See Def. Distributed v. Bonta*, No. 2:22-cv-06200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022), *adopted*, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) (observing that plaintiff's argument that "certain unarticulated rights are implicit in enumerated guarantees" was "quite-clearly not a 'plain text' analysis, required under *Bruen*"). And although this Court has said that "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense," *Teixeira*, 873 F.3d at 677, no such ancillary right is conceivably implicated here: Plaintiffs' ability to purchase specific models of semiautomatic handguns is not at all "necessary" to the realization of their right to self-defense, *see id.*, when hundreds of others are available. This is therefore a far cry from a case where, say, a law prohibited the purchase of *all* handguns, thereby preventing many ordinary citizens from exercising their right to keep and bear arms.

Consistent with the Second Amendment, states may establish consumer- and public-safety standards for handguns—and prohibit the commercial sale of new

models that fall below those standards—provided that doing so does not prevent law-abiding, responsible adult citizens from exercising their right to armed self-defense.[7] *See Bruen*, 142 S. Ct. at 2138 n.9. Here, it does not. Because Plaintiffs have failed to establish that their proposed conduct is protected by the Second Amendment's text, they have failed to show likelihood of success on the merits and this Court should reverse.

## II. The Proper Focus for Analysis of Historical Regulation Is 1868

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. As the Eleventh Circuit recently explained, "because the Fourteenth Amendment is what *caused* the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth

---

[7] Similarly, as the State explains, states remain free to impose "conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). *See* State Br. 28-31. The Supreme Court has deemed such laws "presumptively lawful." *Heller*, 554 U.S. at 627 n.26.

Amendment—is what matters." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023), *pet'n for reh'g en banc filed* (Mar. 30, 2023).

Several circuits reached that same conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[8] *See Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth*

---

[8] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that Second Amendment analysis should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868). Moreover, although *Bruen* disapproved the second, scrutiny-based step of the predominant framework the lower courts had applied, it declared that "[s]tep one of" that framework "is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

This Court can uphold the challenged ordinance under a historical analysis without deciding whether it should focus on the period around 1791 or the period around 1868. The historical tradition, from the colonial era through the late nineteenth century, is consistent in demonstrating the constitutionality of safety requirements like California's. *See* 2-ER-254-63 (exhibiting relevant laws from before the founding through the Civil War); 2-ER-263-68 (exhibiting relevant laws from the Reconstruction era to 1899); State Br. 33-36 (describing firearms and

ammunition inspection laws), 36-37 (describing firearms and gunpowder safe storage laws), 40-41 (describing laws controlling and tracing the sale of firearms and ammunition). But if this Court prefers to settle the issue the Supreme Court left open, it should conclude that 1868 is the primary focus of the Court's inquiry.

To begin with, in a case involving a state or local law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states or local governments under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state government, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T.

Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id.* But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash,

*Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[9] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: Insisting that the 1791 understanding should apply against states and localities does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the

---

[9] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

16

understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the

19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[10]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. But 1868 is neither a starting-line nor a cutoff. *Heller* and *Bruen* both examined history preceding 1791, *see Heller*, 554 U.S. at 592-

---

[10] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45. The State has identified a long tradition, beginning in the colonial era and persisting throughout the founding and the nineteenth century, of safety standards imposed on the firearms industry to prevent accidental injury and track criminal misuse. *See* State Br. 33-36, 40-41. Accordingly, the earlier history the State submitted in this case remains highly relevant to how the right was understood in 1868. And *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right.

Here, the consistent line of state laws stretching from the period beginning around the founding and through the end of the nineteenth century establishes the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrates the constitutionality of the State's safety measures. *See* 2-ER-263-68.

## III.   Historical Laws Are "Relevantly Similar" to California's Law

The State has identified a robust tradition of firearm restrictions establishing that California's CLI, MDM, and microstamping requirements are "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126. *See* State Br. 31-44; 2-ER-254-68. The district court erred in holding that these laws are inadequate under *Bruen*. *See* 1-ER-15-21.

*Bruen* stressed that, in demonstrating a law's consistency with historical tradition, the government need only identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* Under this analysis, courts must consider whether two regulations are "relevantly similar" rather than identical. *Id.* at 2132. Although the Court did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it explained that "whether modern and historical

20

regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767) (emphasis in original).

Contrary to these principles, the district court effectively insisted on historical twins for California's safety requirements. *See* 1-ER-15-21. For example, in discussing whether modern and historical regulations are "comparably justified," 142 S. Ct at 2133, the court reasoned that historical firearm inspection laws aimed to protect the safety of the user, whereas the CLI and MDM requirements aimed to prevent harm to others. 1-ER-17. That is not even correct—the modern safety requirements protect the user as well, *see* State Br. 37; 6-ER-1264-66—but even if it were, *Bruen*'s analysis does not ask whether modern and historical laws are *identically* justified, only whether they are *comparably* justified. 142 S. Ct at 2133. It is more than enough that the CLI and MDM requirements, like historical firearm inspection and gunpowder storage laws, aim to protect the public from accidental injury and death. Likewise, the microstamping requirement, which seeks to trace the misuse of firearms in criminal activity, is "comparably justified" to historical laws regulating the trade in firearms, requiring the inspection and marking of gunpowder, prohibiting the unlicensed manufacture and transportation of gunpowder, and requiring the proving and marking of gun barrels. *See* State Br. 40-

42; *see also Teixeira*, 873 F.3d at 685; *United States v. Holton*, No. 3:21-cr-00482, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022); Opening Br. for the U.S. at 21-26, *United States v. Price*, No. 22-4609 (4th Cir. Dec. 15, 2022), Dkt. 10.

The district court also downplayed the burdens of historical laws while vastly overstating the burdens of California's requirements. *See* 1-ER-17-21. As this Court has already recognized, "[t]he CLI, MDM, and microstamping requirements place almost no burden on the physical exercise of Second Amendment rights." *Pena*, 898 F.3d at 978.[11] That remains true today. Plaintiffs here, as in *Pena*, "are able to buy an operable handgun suitable for self-defense—just not the exact gun they want." *Id.* If it reaches the historical analysis, this Court should therefore reaffirm its prior conclusion that California's law imposes minimal burdens on the right to self-defense, and further hold that those burdens are comparable to (if not lesser than)

---

[11] *Pena* went on to hold that the challenged requirements passed intermediate scrutiny in the light of the insubstantial burdens they pose and the important interests they advance. 898 F.3d at 979-86. That portion of *Pena*'s analysis is clearly irreconcilable with *Bruen* and has been effectively overruled. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). But it is only the application of intermediate scrutiny in Part I.C of the opinion's analysis that conflicts with *Bruen*. Consideration of the burdens and justifications of modern laws, far from being inconsistent with *Bruen*, is "*central*" to *Bruen*'s historical analysis. 142 S. Ct. at 2133. Accordingly, while the Court's discussion of burdens and justifications in Part I.B of *Pena*'s analysis was building to a conclusion in Part I.C that no longer applies, that earlier discussion is consistent with *Bruen* and should continue to be followed in this circuit. *See supra* note 4.

those imposed by historical firearm and gunpowder laws—making the laws "relevantly similar" for purposes of *Bruen*'s historical analysis.

More generally, this Court should acknowledge that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. *Bruen*, 142 S. Ct. at 2132. If a modern technological development or modern societal concern did not exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period. That is precisely the situation in this case. As the State explains, *see* State Br. 32-33, the CLI and MDM requirements respond to the emergence of semiautomatic weapons that can "chamber" a round of ammunition even when a magazine is not inserted, leading to a risk of accidental discharge, *i.e.*, "dramatic technological changes," *Bruen*, 142 S. Ct. at 2132, while the microstamping requirement addresses the "unprecedented societal concern[]," *id.*, of increased gun violence and homicides. A "more nuanced approach" to history is thus fully warranted here, and the Court should conduct a "a broader search for historical analogies." *United States v. Rowson*, No. 1:22-cr-00310, 2023 WL 431037, at *24 (S.D.N.Y. Jan. 26, 2023).

## IV. This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers"

Challengers in other recent Second Amendment cases have sought to dismiss historical regulations as "outliers" insufficient to satisfy the requirements of *Bruen*.

*See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers"). No such argument is remotely tenable here: the State has presented a robust and extensive record of historical laws. *See* State Br. 31-44; 2-ER-254-68. But to the extent this Court wishes to address the issue here, to guide district courts in cases where a government might present a less extensive record, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[12] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the

---

[12] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

Court referenced were from a single colony, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[13] Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[14]

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states

---

[13] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* pp. 25-27 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

[14] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given *Bruen*'s discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is indisputably no such "overwhelming" evidence of a right to purchase a specific model of handgun.

today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other

states does not warrant any inference that their citizens considered such restrictions unconstitutional.[15]

## CONCLUSION

The Court should reverse the judgment of the district court.

Dated: May 5, 2023                          Respectfully submitted,

                                            /s/ Eleuthera O. Sa
                                            Janet Carter
                                            William J. Taylor, Jr.
                                            Eleuthera O. Sa
                                            Everytown Law
                                            450 Lexington Ave, P.O. Box 4184
                                            New York, NY 10017
                                            Phone: (646) 324-8179
                                            Fax: (917) 410-6932
                                            esa@everytown.org

---

[15] Indeed, any such inference would be untenable in light of the Court's statement the day after *Bruen*—with five of the same Justices in the majority—that "the fact that many States in the late 18th and early 19th century did not criminalize" a category of conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55276

I am the attorney or self-represented party.

**This brief contains** 6,917 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Eleuthera O. Sa | **Date** | May 5, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*