No. 23-55276

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
————————————

LANCE BOLAND, an individual; MARIO SANTELLAN, an individual;
RENO MAY, an individual; JEROME SCHAMMEL, an individual;
CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as Attorney General
of the State of California,

*Defendant-Appellant*,

and

DOES, 1-10,

*Defendant*.

————————————

On Appeal from the United States District Court
for the District of Central California,
No. 8:22-cv-01421-CJC-ADS
————————————

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES
————————————

C. D. MICHEL
ALEXANDER A. FRANK
JOSHUA ROBERT DALE
SEAN ANTHONY BRADY
KONSTADINOS T. MOROS
MICHEL & ASSOCIATES, PC
180 E Ocean Boulevard
Suite 200
Long Beach, CA 90802

PAUL D. CLEMENT
ERIN E. MURPHY
*Counsel of Record*
MARIEL A. BROOKINS*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
*Supervised by principals of the firm who are
members of the Virginia Bar

*Counsel for Plaintiffs-Appellees*

May 26, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the California Rifle & Pistol Association, Inc. certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ............................................................ 3

STATEMENT OF THE ISSUES ................................................................ 3

CONSTITUTIONAL AND STATUTORY PROVISIONS ................................... 4

STATEMENT OF THE CASE ................................................................... 4

    A.    California's Unsafe Handgun Act ...................................................... 4

    B.    Procedural History ........................................................................ 12

STANDARD OF REVIEW ...................................................................... 19

SUMMARY OF ARGUMENT ................................................................. 19

ARGUMENT ...................................................................................... 23

I.    The UHA Likely Violates the Second Amendment ...................................... 23

    A.    The District Court Correctly Concluded That the UHA Restricts Conduct That Is Presumptively Protected by the Plain Text of the Second Amendment ............................................... 24

    B.    The District Court Correctly Concluded That the State Is Unlikely to Meet its Burden of Proving That the Challenged UHA Provisions Are Consistent With Historical Tradition .............. 29

        1.    The state bears the burden of proving that the UHA's features requirements are consistent with a "well-established" historical tradition ................................................. 30

        2.    The state failed to identify any "well-established" historical tradition supporting its CLI and MDM requirements ............................................................................. 33

3.    The state failed to identify any "well-established" historical tradition supporting its novel microstamping requirements ................................................................ 44

II.    The District Court Did Not Abuse Its Discretion In Concluding That The Remaining Factors All Favor Injunctive Relief ..................................... 48

A.    The District Court Correctly Concluded That Plaintiffs Would Suffer Irreparable Harm Without Injunctive Relief ........................... 49

B.    The District Court Acted Well Within Its Broad Discretion in Concluding That the Public Interest and the Balance of the Equities Weigh in Favor of Injunctive Relief..................................... 52

CONCLUSION ..................................................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
　559 F.3d 1046 (9th Cir. 2009) ..................................................... 19, 50

*Antonyuk v. Hochul*,
　2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ............................. 31, 39

*Ashcroft v. Am. Civil Liberties Union*,
　542 U.S. 656 (2004) ............................................................................50

*Caetano v. Massachusetts*,
　577 U.S. 411 (2016) ............................................................................34

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
　29 F.4th 468 (9th Cir. 2022) ...............................................................53

*California v. Azar*,
　911 F.3d 558 (9th Cir. 2018) ..............................................................19

*Christian v. Nigrelli*,
　2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ..................................31

*District of Columbia v. Heller*,
　554 U.S. 570 (2008) ................................................................... *passim*

*Doe v. Harris*,
　772 F.3d 563 (9th Cir. 2014) ..............................................................50

*Doe v. Snyder*,
　28 F.4th 103 (9th Cir. 2022) ...............................................................48

*Drummond v. Robinson Twp.*,
　9 F.4th 217 (3d Cir. 2021) ..................................................................30

*Elrod v. Burns*,
　427 U.S. 347 (1976) ............................................................................49

*Ezell v. City of Chicago*,
　651 F.3d 684 (7th Cir. 2011) ....................................................... 25, 50

iv

*Fiscal v. City & Cnty. of San Francisco*,
  70 Cal.Rptr.3d 324 (Cal. Ct. App. 2008) ...............................................5

*Frein v. Penn. State Police*,
  47 F.4th 247 (3d Cir. 2022)..................................................................51

*Fyock v. City of Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015)................................................................19

*Garcia v. Google, Inc.*,
  786 F.3d 733 (2015)....................................................................... 48, 49

*Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*,
  739 F.2d 466 (9th Cir. 1984)................................................................50

*Jackson v. City & Cnty. of San Francisco*,
  746 F.3d 953 (9th Cir. 2014)................................................................24

*Koons v. Platkin*,
  2023 WL 3478604 (D.N.J. May 16, 2023)...........................................31

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)..............................................................................50

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012)......................................................... 17, 49

*Nat'l Shooting Sports Found., Inc. v. State*,
  420 P.3d 870 (Cal. 2018) ....................................................................... 9

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S.Ct. 2111 (2022) .................................................................. *passim*

*Nken v. Holder*,
  556 U.S. 418 (2009)..............................................................................53

*Pena v. Lindley*,
  898 F.3d 969 (9th Cir. 2018)............................................................7, 13

*Renna v. Bonta*,
  2023 WL 2846937 (S.D. Cal. Apr. 3, 2023) ........................................50

*Renna, et al. v. Bonta, et al.*,
  2023 WL 2756981 (S.D. Cal. Apr. 3, 2023) ................................................. 18, 29

*Saravia for A.H. v. Sessions*,
  905 F.3d 1137 (9th Cir. 2018) ................................................................19

*Teixeira v. Cty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ................................................................25

*United States v. Hinkson*,
  585 F.3d 1247 (9th Cir. 2009) ................................................................47

*United States v. Holton*, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) ................45

*United States v. Marzzarella*,
  614 F.3d 85 (3rd Cir. 2010) ................................................................25

*United States v. Price*,
  2022 WL 6968457 (S.D. W.Va. Oct. 12, 2022) ................................................45

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ................................................................49

*Winter v. Nat'l Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ................................................................17

## Constitutional Provision

  U.S. Const. amend. II ................................................................ 4

## Statutes

11 Cal. Code Regs. §4059(c) ................................................................5

11 Cal. Code Regs. §4070(a)-(b) ................................................................ 5

11 Cal. Code Regs. §4072(b) ................................................................5

Cal. Penal Code §16380 ................................................................6

Cal. Penal Code §16900 ................................................................6

Cal. Penal Code §28050 ................................................................11

Cal. Penal Code §§31610-31670 .................................................................. 7

California Penal Code §§31900-32110 .......................................................... 4

Cal. Penal Code §31910 ............................................................................ 5, 6

Cal. Penal Code §31910(b)(4) ...................................................................... 6

Cal. Penal Code §31910(b)(5) .................................................................... 11

Cal. Penal Code §31910(b)(6) ...................................................................... 7

Cal. Penal Code §31910(b)(7) .................................................................... 11

Cal. Penal Code §32000 ............................................................................... 5

Cal. Penal Code §32000(a) .......................................................................... 5

Cal. Penal Code §32000(b) ........................................................... 10, 35, 44

Cal. Penal Code §32015(a) .......................................................................... 5

Cal. Penal Code §32110(a) ........................................................................ 11

## Other Authorities

Assemb. B. 2847, 2019-2020 Reg. Sess. (Cal. 2020) ...................................... 10, 12

Council of Safety, State of Pennsylvania, *Colonial records of
Pennsylvania* (1852), available at https://bit.ly/3MI2wtn .................................. 41

NSSF, *2021 Firearms Retailer Survey Report*, https://bit.ly/3CXJwC1
(last visited May 26, 2023) ............................................................................ 34

Office of the Attorney General, *De-Certified Handgun Models*,
https://bit.ly/45d1GvJ (last visited May 25, 2023) ........................................ 12

Office of the Attorney General, *Firearm Safety*, https://bit.ly/3Ik3JEC
(last visited May 26, 2023) ............................................................................ 8

Office of the Attorney General, *Handguns Certified for Sale*,
rb.gy/rpe3c (last visited May 26, 2023) .......................................................... 9

vii

*Plan for providing Fire-Arms for the Colony, considered and adopted*,
  N. IL. Univ. Dig. Lib. (Jan. 10, 1776), available at
  https://bit.ly/3InNiHy ............................................................................41

S. 15, Ch. 248, §12126, 1999 Leg. (Cal. 1999) ...........................................6

Samuel Shipley, *List of U.S. states' dates of admission to the union*,
  Britannica Online (Aug. 15, 2018), https://bit.ly/3OnPUZJ ............................39

U.S. Census Bureau, *Census for 1820* (1821), https://bit.ly/3Iqo8rH ....................39

Wright and Miller, Fed. Prac. & Proc. Civ. (3d ed. 2023) ...................................... 50

## INTRODUCTION

For the past decade, California has deemed handguns too "unsafe" to be sold to law-abiding citizens if they lack features that literally no handgun presently has. As a result, California's commercial handgun market has been effectively frozen in time, with law-abiding citizens unable to purchase any of the new handguns developed over the past ten years, even though many of these newer models are "more ergonomic, durable, reliable, affordable, and possibly even safer." 1-ER-21. Meanwhile, California allows myriad of its own employees not only to purchase these purportedly "unsafe" new models, but to sell them to other Californians on a secondary market with a predictably steep markup. And owing to a grandfathering provision that even California recognized the Second Amendment necessitates, the state allows hundreds of purportedly "unsafe" *older* models to be manufactured and sold in unlimited quantities to anyone who may lawfully purchase a firearm; it just does not allow any *new* models onto its list. The result is a regime under which most Californians have extremely limited, if any, access to state-of-the-art handguns that their fellow Americans can buy all throughout the rest of the nation, and are instead confined to older, more expensive, and less ergonomic designs that creep further toward obsolescence each year.

That regime is not remotely compatible with the demanding constitutional scrutiny the Supreme Court set forth in *New York State Rifle & Pistol Association,*

*Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022). The district court was thus eminently correct to conclude that Plaintiffs are likely to succeed on the merits of their claim that this Orwellian regime violates the Second Amendment. As the court explained, the conduct in which Plaintiffs seek to engage—purchasing common handguns that are lawful everywhere else in the nation—"unquestionably" falls within the plain text of the Second Amendment, 1-ER-12, making it "presumptively protect[ed]" under *Bruen*. And while this Court previously upheld this regime under its then-extant two-part test for Second Amendment challenges, *Bruen* emphatically interred that test once and for all. Under *Bruen*, the constitutionality of a restriction on rights presumptively protected by the Second Amendment turns on historical tradition—or, as here, the utter lack thereof—not the strength of the state's policy interests. The district court gave the state considerable leeway to try to come up with a suitable historical analogue to its novel regime, but the state came up far short. And understandably so, as there simply is no historical tradition of prohibiting the sale of common arms that lack features that the average consumer neither expects nor wants, and that few if any commercially available versions even has—let alone of prohibiting their sale to ordinary law-abiding citizens while allowing all manner of state employees to purchase them.

It is little surprise, then, that the state spends the bulk of its brief either trying to evade its historical tradition burden entirely or trying to persuade this Court that

this is the exceedingly rare case in which the district court abused its broad discretion by enjoining a law that it concluded likely violates the Constitution. But the state's evident desire to avoid confronting the historical record cannot obviate the need for this Court to do so—and that record confirms that the district court was correct to conclude that the state failed to identify any historical tradition that would allow it to force law-abiding citizens to select their mode of self-defense from a time capsule. In short, the Unsafe Handgun Act's required features are out of step with the real world and out of line with the Second Amendment. The preliminary injunction should be affirmed.

## STATEMENT OF JURISDICTION

Plaintiffs agree with the state's statement of jurisdiction. State.Br.4.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly concluded that Plaintiffs are likely to succeed on the merits of their claim that the UHA violates the Second Amendment.

2. Whether the district court abused its broad discretion in concluding that the balance of the preliminary-injunction factors favors enjoining enforcement of the UHA.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

All applicable statutes are reproduced in the addendum to the state's brief.

## STATEMENT OF THE CASE

### A. California's Unsafe Handgun Act

The market for handguns is, like any successful consumer product market, quite vibrant. Manufacturers are constantly innovating and introducing new and updated products into a competitive marketplace for civilian, military, and law enforcement customers looking for improvements that make handguns safer, easier, and more effective to use. In most of the nation, these improvements are welcomed with open arms; after all, who would not want the best available technology on the market when it comes to a product where life is literally on the line. As with so many things when it comes to firearms, however, California is an outlier in the extreme: California does not allow the commercial sale to ordinary law-abiding citizens of *any* of the thousands of new models of handguns that have come onto the market over the past decade.

That bizarre state of affairs is owing to the California Unsafe Handgun Act ("UHA"), California Penal Code §§31900-32110, which makes it unlawful to manufacture, import, or sell to most Californians "any pistol, revolver, or other

firearm capable of being concealed upon the person" (in other words, any handgun) that California deems "unsafe." §§31910, 32000. The UHA begins with the presumption that *every* handgun is "unsafe," and therefore unfit for sale to ordinary law-abiding citizens, unless and until the California Department of Justice ("CDOJ") agrees to add it to a roster of handgun models certified as sufficiently "safe" to manufacture and sell. §32015(a). Only the CDOJ or the manufacturer/importer is "authorized to submit" a handgun to a CDOJ-certified laboratory for inspection and testing. 11 Cal. Code Regs. §4059(c). If a manufacturer manages to successfully run that gauntlet, its firearm is added to the roster for only one year; the manufacturer must pay a $200 renewal fee each year to avoid having its certified model removed from the roster. *See* 11 Cal. Code Regs. §§4070(a)-(b), 4072(b). The manufacture or sale of an "unsafe handgun" is punishable by up to one year imprisonment, as well as a civil fine of up to $10,000. Cal. Penal Code §32000(a).

The UHA was originally enacted in response to concerns over certain "low cost, cheaply made handguns known as 'Saturday Night Specials'" that were prone to accidental discharge when dropped. *Fiscal v. City & Cnty. of San Francisco*, 70 Cal.Rptr.3d 324, 336 (Cal. Ct. App. 2008). To that end, the UHA in its original form just required handgun models to have a safety and pass tests that gauged whether they were manufactured reliably, such as a "drop-safety" test to ensure that the firearm would not discharge if dropped. S. 15, Ch. 248, §12126(a)(1-3), (b)(1-3),

1999 Leg. (Cal. 1999). Over time, however, the legislature began to add to the law requirements that handguns possess a variety of features—including things that few, if any handguns, actually have—to avoid the "unsafe" moniker. These restrictions have become so extreme that they have essentially frozen California's handgun market in time: No new firearm has been deemed not "unsafe" since 2013, because no handgun actually has all the features that California demands.

This case concerns the three most recent requirements the California legislature has added to the list of features that a semiautomatic pistol must have to avoid being deemed "unsafe": a chamber load indicator, a magazine disconnect mechanism, and microstamping.[1] A chamber load indicator (or CLI) is a "device that plainly indicates that a cartridge is in the firing chamber." Cal. Penal Code §§16380, 31910(b)(4). A magazine disconnect mechanism (or MDM) prevents a semiautomatic pistol with a detachable magazine from firing the cartridge in the chamber unless the magazine is fully inserted into the firearm. *Id.* §16900. And

---

[1] While all three of these requirements apply only to "centerfire" semiautomatic pistols, virtually all popular modern semiautomatic handguns are chambered in centerfire calibers. And the UHA imposes features requirements on rimfire semiautomatic pistols and revolvers as well. A rimfire semiautomatic pistol must likewise have a magazine disconnect mechanism, which very few have. Cal. Penal Code §31910. And a revolver is deemed "unsafe" if "it does not have a safety device that, either automatically in the case of a double-action firing mechanism, or by manual operation in the case of a single-action firing mechanism, causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge." *Id.* §31910.

microstamping is technology that stamps a microscopic identification mark conveying the "make, model, and serial number of the pistol" on the shell casing of an expended round of ammunition. *Id.* §31910(b)(6). By California's own admission, this final capability (which, it turns out, is largely theoretical) has nothing to do with whether a firearm is "safe" to use. Its sole purpose is to "provide[] law enforcement with identifying information about a handgun fired at a crime scene." *Pena v. Lindley*, 898 F.3d 969, 974 (9th Cir. 2018).

When California added the first two requirements to the UHA in 2007, exceedingly few handguns on the market had either, let alone both. *See* 4-ER-748 (state's counsel explaining that even by 2013 only "four manufacturers" even made roster-compliant handguns). That is unsurprising, as the first increases cost while doing little to improve the safe and effective use of firearms for self-defense for the average firearm user, and the second affirmatively undermines that constitutionally protected interest. As for a chamber load indicator, ordinary law-abiding citizens have shown little interest in the added cost of a visual cue that a firearm is loaded because the average firearm owner knows that it is always the user's responsibility to determine whether a firearm is loaded before handling it. Indeed, California itself teaches in conjunction with the written safety test that all Californians must pass before purchasing a handgun, Cal. Penal Code §§31610-31670, that the first "basic gun safety rule[]" is to "[t]reat *all* guns as if they are loaded." Office of the Attorney

General, *Firearm Safety*, https://bit.ly/3Ik3JEC (last visited May 26, 2023) (emphasis added). Chamber load indicators thus have never found much of a market notwithstanding California's effort to mandate them.

Magazine disconnect mechanisms have proven even less popular, for a rather obvious reason: People generally *want* to be able to fire the round in the chamber in the event they cannot insert a magazine or experience a magazine malfunction in a self-defense situation. After all, magazines are often the weak link in the functionality chain in a firearm, as they are delicate, and even slight defects (e.g., dirt, grime, rust, bent feed lips, or weakened springs) can cause them to malfunction. A firearm that cannot fire unless the magazine is inserted is therefore less effective for self-defense, as it cannot be fired if the magazine malfunctions, or is ejected from the firearm by accident and cannot be quickly recovered, or is otherwise unavailable. That likely explains why virtually no other state in the nation has tried to mandate the disabling of this potentially life-saving functionality.

Those two requirements alone made it exceedingly difficult for new semiautomatic pistols to meet California's novel definition of "safe," as they increase research, design, and manufacturing costs in service of features that the average law-abiding citizen does not find desirable. Indeed, between 2007 and 2013, only 36 of the thousands of new models of semiautomatic pistols that came to market in the rest of the nation made it onto California's roster. And even that low number

is inflated, as the roster treats as a distinct model each firearm with any cosmetic difference, even if the models are otherwise identical. Cal. Penal Code §§32020, 32030. For example, the Armscor Precision EFS Pistol is listed three separate times simply because it comes in three different colors (Blue, Cerakote Gun Metal Grey, and Stainless Steel). *See* Office of the Attorney General, *Handguns Certified for Sale*, rb.gy/rpe3c (last visited May 26, 2023). But even that trickle slowed to a halt when California added the microstamping requirement, as not a single firearm on the market possesses that novel capability.

That is because microstamping technology remains largely science fiction. Although the CDOJ certified in 2013 that it is "available" to some manufacturers, in the sense that it is unencumbered by any *patent* restrictions, the technology did not actually exist then, and it still does not exist today. 1-ER-8; *see also, e.g.*, *Nat'l Shooting Sports Found., Inc. v. State*, 420 P.3d 870, 872 (Cal. 2018) (noting the state's concession that the certification did not confirm "the availability of the technology itself"). "Indeed, to this day, a decade after the requirement took effect, no firearm manufacturer in the world makes a firearm with th[e] capability" to stamp a microscopic identification mark conveying the "make, model, and serial number of the pistol" on every shell casing expended. 1-ER-8-9; *see* State.Br.8-9 (conceding same). Accordingly, since the microstamping requirement went into effect in May

9

2013, ten full years ago, not a single semiautomatic pistol has been added to the roster.[2]

Notably, while California deems any new semiautomatic pistol that does not have these three features "unsafe" for sale to the general public, it does not prohibit the sale of such pistols to *all* Californians. The law exempts from its prohibitions the sale of "unsafe" handguns to all manner of state and federal law enforcement personnel, as well as members of myriad other (at best) quasi-law enforcement state agencies, including the Department of Parks and Recreation, the investigation division of the Department of Consumer Affairs, and Department of Motor Vehicles, to name just a few. Cal. Penal Code §32000(b)(4), (6). And members of a host of other state agencies—ranging from the California Horse Racing Board to the Department of Social Services to the California State Lottery to the Franchise Tax Board—may purchase them so long as they complete an initial training course and a subsequent qualification course every six months. *Id.* §32000(b)(7).

More puzzling still, the state does not prohibit people who may lawfully possess firearms from *possessing* a purportedly "unsafe" handgun. Nor does it prohibit people from purchasing "unsafe" handguns from someone *other* than a

---

[2] As originally passed, the UHA required microstamping in two distinct locations on a firearm. The requirement was changed, effective July 1, 2022, to require only one, *see* Assemb. B. 2847, 2019-2020 Reg. Sess. (Cal. 2020), but no firearm with even single-location microstamping presently exists.

licensed firearms dealer, such an individual who lawfully acquired one in another state before moving to California, or someone on the UHA's long list of exemptions. *See* 1-ER-9; Cal. Penal Code §§28050 & 32110(a). The state thus openly tolerates a (predictably very expensive) secondary market in the same handguns that it deems too "unsafe" for licensed firearms dealers to sell to ordinary law-abiding citizens on the primary market. 1-ER-9.

Further complicating an already-convoluted scheme, the state permits handguns that were certified as "safe" before new requirements took effect to remain on the roster of approved handguns. Cal. Penal Code §31910(b)(5), (7). As a result, all but 32 of the roughly 800 handguns presently on the roster do *not* have a chamber load indicator, a magazine disconnect mechanism, or microstamping capability, and not a single one has all three. 1-ER-9.[3] Thus, there is not a single semiautomatic pistol on the roster (or the market, for that matter) that the California legislature does *not* "deem[] 'unsafe'"; the roster instead consists solely of grandfathered "unsafe" semiautomatic pistols that may continue to be manufactured and sold on the primary market in unlimited quantities. *Id.* But under a recent amendment to the UHA, in

_____

[3] As with the 32 figure, the 800 figure is inflated as well, as it too treats the same handgun as a distinct model any time it has any cosmetic differences. *See* p.9, *supra*. It is also increasingly outdated; for instance, a "significant percentage of the semiautomatic guns on the roster are a[ll] a variant of the 1911," a "firearm that was invented in the year 1911." 4-ER-661.

the (largely theoretical) event that a new model of semiautomatic pistol actually manages to meet all of California's requirements and make it onto the roster, three grandfathered models must be removed in reverse order of addition, thus constantly shrinking (and oddly rendering more outdated) the list of semiautomatic pistol models available to Californians on the primary market. Assemb. B. 2847, 2019-2020 Reg. Sess. (Cal. 2020); Cal. Penal Code §31910(b)(7). California has also removed some 1,520 models from the roster for reasons like a minor change to the model, or because the manufacturer declined to pay the annual fee to keep on the list older models that lack improvements it has since made. *See* Office of the Attorney General, *De-Certified Handgun Models*, https://bit.ly/45d1GvJ (last visited May 25, 2023).

In short, as a result of the UHA, California's primary market for handguns is (at best) essentially frozen in time. While the rest of the nation has benefitted from technological advancements like "fully ambidextrous configuration of critical firearm controls" for left-handed shooters, 1-ER-10, Californians remain largely confined to whatever handguns had made it onto the roster by 2007, and even that list is constantly shrinking.

### B. Procedural History

In 2018, a group of individuals and Second Amendment advocacy organizations brought a lawsuit challenging the UHA's chamber load indicator,

magazine disconnect mechanism, and microstamping capability requirement on (among other things) Second Amendment grounds. This Court upheld the requirements over a partial dissent, applying its then-governing two-step test to hold that all three "pass[] intermediate scrutiny." *Pena*, 898 F.3d at 981, 986. Since then, however, the Supreme Court issued its landmark decision in *Bruen*, which explicitly repudiated the "two-step" framework "for analyzing Second Amendment challenges that combines history with means-end scrutiny." 142 S.Ct. at 2125-26. The Court instead concluded that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the burden shifts to the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126-27. The Court also reiterated that the Second Amendment presumptively protects "all instruments that constitute bearable arms," and that historical tradition does not support banning the keeping or carrying of arms that are "in common use.'" *Id.* at 2132, 2143.

Given that substantial change in the law, as well as the ever-growing unavailability of state-of-the-art handguns owing to the UHA, Plaintiffs brought this lawsuit to revisit the conclusions that *Pena* reached in light of the Supreme Court's intervening instructions. Plaintiff Lance Boland is a California resident and certified firearms trainer who wishes to have state-of-the-art firearms at the ready for his

students to train with, 5-ER-824, and Plaintiffs Mario Santellan, Reno May, and Jerome Schammel are California residents who wish to purchase for self-defense or other lawful purposes handguns that the UHA prohibits a licensed firearms dealer from selling to them, 5-ER-824-25. Plaintiff California Rifle & Pistol Association ("CRPA") is a non-profit membership organization that seeks to defend the fundamental right to acquire and possess commonly owned firearms. 5-ER-825. The CRPA represents tens of thousands of California residents whose Second Amendment rights are burdened by the UHA, including many left-handed shooters who are especially burdened by the UHA because its requirements keep almost all fully ambidextrous handguns off the roster. *See* 1-ER-10; 3-ER-505.

Plaintiffs moved for a preliminary injunction, and after considering extensive briefing, an evidentiary hearing at which both sides presented witnesses, and court-ordered supplemental briefing, the district court granted the motion. 1-ER-4. The court first concluded that Plaintiffs are likely to succeed on the merits of their claim that the UHA's trio of features requirements violates the Second Amendment. 1-ER-12. The court began by concluding that those "provisions unquestionably infringe on the right to keep and bear arms," as they "prevent" Plaintiffs from "purchas[ing] state-of-the-art handguns for self-defense." *Id*. As the court explained, "a law does not have to be a complete ban on possession" of a firearm or even a handgun to implicate the Second Amendment; it is enough that it burdens conduct covered by

the text of the Second Amendment, which "acquiring a state-of-the-art handguns for self-defense" plainly is. 1-ER-13-14. The court accordingly concluded that burden "shifts to the government" to "'demonstrat[e] that [the relevant UHA provisions are] consistent with the Nation's historical tradition of firearm regulation.'" 1-ER-15 (quoting *Bruen*, 142 S. Ct. at 2130; alterations in original).

The court next concluded that the state failed to demonstrate that it was likely to be able to meet that burden. The state offered two principal purported historical analogues for the chamber lock indicator and magazine disconnect mechanism requirements, but the court concluded that "[n]either is sufficiently analogous" those requirements. 1-ER-15.

First, the state invoked so-called "proving" laws, which required inspectors to "'test and inspect, all musket barrels and pistol barrels' before the firearm could be sold" "to ensure it would not fail and that it could carry a shot over a certain distance." 1-ER-16. Whatever relevance such laws may have to the UHA's reliability and drop-safety testing requirements, the court found them not "'analogous enough'" to the CLI and MDM requirements to "'pass constitutional muster.'" 1-ER-16 (quoting *Bruen*, 142 S.Ct. 2133). As it explained, "[t]he differences between how and why these laws burden a law-abiding citizen's right to armed self-defense is evident." 1-ER-17. "Whereas CLI and MDM requirements add additional required features to and alter the operation of an otherwise well-

manufactured handgun, proving laws focused only on confirming the basic operating features of a firearm." *Id*. And "[w]hereas proving laws kept out of the hands of law-abiding citizens only firearms with manufacturing defects, CLI and MDM requirements keep out of their hands virtually all new, state-of-the-art handguns." *Id*. Proving laws thus not only are not analogous in what they required and why, but did not "impose a comparable burden … on the right of armed self-defense." *Id*.

As for the state's proffered gunpowder storage laws, the court once again found the "[h]ow and why" of these laws as compared to the UHA's requirements "too different to pass constitutional." 1-ER-19. As the court explained, "[t]he main goal of the gunpowder storage laws was to prevent fire," which is not at all analogous to "requiring particular safety features in handguns." 1-ER-18-19.

Turning to the microstamping requirement, which the state did not even try to justify as a "safety'" measure, the court concluded that "[h]istorical laws regarding serial numbers, and the historical analogues justifying serial numbers, do not impose anywhere close to the substantial burden on people's Second Amendment right that the UHA's microstamping provision does." 1-ER-19. As the court explained, relying on the record evidence before it, "[t]he microstamping provision requires handguns to have a particular feature that is simply not commercially available or even feasible to implement on a mass scale." *Id*. Thus, "in contrast to the requirement of a serial number, which has been universally and easily implemented

by manufacturers across the globe, not a single manufacturer has implemented microstamping technology." 1-ER-20. As a result, "Californians have not had access to new semiautomatic models of handguns since [2013]," while "[t]he rest of the country … has access to handguns that over the years have become more ergonomic, durable, reliable, affordable, and possibly even safer." 1-ER-21.

"Because Plaintiffs' proposed course of conduct is covered by the plain text of the Second Amendment, and the government has failed to proffer any historical regulation analogous to the UHA's CLI, MDM, or microstamping requirements," the court concluded that "Plaintiffs have shown that they are likely to succeed on the merits of their claim that those requirements are unconstitutional." 1-ER-21.

The court then concluded that the remaining preliminary injunction factors—irreparable harm, the balance of the equities, and the public interest—all weighed in favor of an injunction. 1-ER-21-24; *see Winter v. Nat'l Res. Def. Council, Inc.* 555 U.S. 7, 20 (2008). As the court explained, "[i]t 'is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.'" 1-ER-21 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Turning to the remaining factors, the court concluded that "the government's safety concern rings hollow" because "[e]very single semiautomatic handgun available for sale in California at this time is a grandfathered handgun—one the government ostensibly considers 'unsafe.'" 1-ER-23. The court concluded that "[t]he government cannot

credibly argue that handguns without CLI, MDM, and microstamping features pose unacceptable public safety risks when virtually all of the handguns available on the Roster and sold in California today lack those features." *Id*. The court further noted that if "Off-Roster firearms were truly unsafe, California would not allow law enforcement to use them in the line of duty, when the stakes are highest." *Id*. Yet that is exactly what the state permits, and what law-enforcement officers routinely choose to do. On top of that moreover, the court found "[t]he likelihood that a person will purchase a handgun with a CLI and MDM and that those features will prevent accidental shootings, injuries, or deaths … entirely speculative" given all the other (typically less expensive) models that remain on the market. 1-ER-24.

The district court stayed its injunction for 14 days, during which time the state noticed this appeal and asked this Court to stay the district court's injunction in part pending appeal. ECF No. 2. In particular, the state asked the Court to stay the injunction as to the chamber load indicator and magazine disconnect mechanism requirements, but not as to the (impossible-to-satisfy) microstamping requirement. In the meantime, a second district court enjoined the CLI, MDM, and microstamping requirements after agreeing that they likely violate the Second Amendment, but it stayed enforcement of its injunction pending appeal. *See Renna, et al. v. Bonta, et al.*, 2023 WL 2756981 (S.D. Cal. Apr. 3, 2023), appeal filed Apr. 20, 2023. This Court ultimately granted the state's partial stay motion in this case, and the district

court's injunction subsequently took effect as to the microstamping requirement. Accordingly, at present, no new semiautomatic pistol may be added to the roster unless it contains both a chamber load indicator and magazine disconnect mechanism.

## STANDARD OF REVIEW

This Court reviews "a district court's decision to grant or deny a preliminary injunction for abuse of discretion," which is "highly deferential to the district court." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1141 (9th Cir. 2018). The scope of that review is "narrow"; the Court asks "only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand." *Fyock v. City of Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015). The relevant factors for a preliminary injunction are (1) the movant's likelihood of success on the merits; (2) the movant's likelihood of irreparable harm absent preliminary relief; (3) the balance of the equities; and (4) whether an injunction serves the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). "Likelihood of success on the merits is the most important factor." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).

## SUMMARY OF ARGUMENT

The state identifies no reason to disturb the district court's conclusion—which was validated by a second district court just a few weeks later—that the challenged

provisions of the UHA likely violate the Second Amendment under a straightforward application of *Bruen*, and that Californians hence should be able to purchase the same handguns their fellow citizens across the country may purchase, while this case is litigated to final judgment.

First, the district court was eminently correct to conclude that Plaintiffs are likely to succeed on the merits of their claim that California's prohibition on the commercial sale of handguns lacking decidedly *un*common features likely violates the Second Amendment. As the court explained, the conduct in which Plaintiffs seek to engage—purchasing handguns that are lawful and common everywhere else in the nation—"unquestionably" falls within the plain text of the Second Amendment. 1-ER-12. And while the court gave the state considerable leeway to try to come up with a suitable historical analogue to all or even any of the UHA's novel features requirements, the state did not come close to meeting its burden of demonstrating any historical tradition of prohibiting the sale of common arms that lack features that consumers neither expect nor want and that no available firearms even possess—let alone of prohibiting their sale to ordinary law-abiding citizens while allowing all manner of state employees to purchase them.

The state's efforts to resist those conclusions fall flat. The state first tries to reinvent *Bruen*'s threshold textual inquiry, insisting that the real question is whether the "plain text" of the Second Amendment entitles people to purchase firearms that

lack state-mandated "safety features." But the threshold question under *Bruen* is not whether the plain text empowers the state to *restrict* the right to keep and bear arms; it is whether the conduct in which an individual seeks to engage falls within the plain meaning of "the right to keep and bear arms." Acquiring a handgun easily satisfies that low bar regardless of what "safety" features the desired handgun does or does not have. The state's contrary approach would have the threshold inquiry swallow the rule that *the state* bears the burden of proving that a restriction on Second Amendment rights comports with historical tradition, as the *text* of the Second Amendment does not address how a state may *restrict* the keeping and bearing of arms; that is what the historical tradition inquiry is for.

The state's efforts to prove that it met its historical tradition burden fare no better. To justify its chamber load indicator and magazine disconnect requirements, the state points to laws involving the inspection and safe storage of firearms and gunpowder. As to the former, the district court correctly recognized the obvious difference between laws that merely require inspecting a firearm to ensure that it has been manufactured in accordance with the purchaser's expectations, and a law that forbids the sale of firearms unless they possess highly unusual features that consumers neither expect nor even want. As to the latter, fire-safety and other laws governing how firearms and gunpowder should be stored when *not* in use are again self-evidently different from laws that impact (and, as to one requirement, actually

impede) the functionality of a firearm. Moreover, there is no historical tradition of imposing on the citizenry "safety" features that the government does not impose on its own employees. That striking asymmetry not only suggests that these features have little to do with safety, but reinforces the conclusion that the UHA strays far beyond historical tradition. Finally, as to the novel microstamping requirement, the state identifies not a single instance in all of history in which *any* state or locality has ever prohibited the commercial sale of firearms unless they possess technology that no firearm actually possesses.

The state is thus left quibbling with the district court's findings on the remaining injunction factors. But try as it might, the state comes nowhere close to demonstrating that this is the exceedingly rare case in which a court abused its discretion by enjoining a law that it concluded likely violates the Constitution. And while the state accuses the district court of failing to conduct that requisite analysis, that accusation finds no support in the court's detailed discussion of why the state's public interest arguments fail for reasons having nothing to do with the merits. As the court explained, the state simply cannot credibly argue that temporarily enjoining these novel requirements would materially harm the public interest when it already allows—indeed, as a direct consequence of the peculiarities of the UHA, effectively encourages—the purchase of hundreds of older models of purportedly "unsafe" handguns, and openly tolerates a secondary market in new ones to boot.

Accordingly, this Court should affirm the preliminary injunction in its entirety and bring at least a temporary pause to California's inexplicable effort to preclude its citizens from purchasing handguns that are "more ergonomic, durable, reliable, affordable, and possibly even safer."  1-ER-21.

## ARGUMENT

## I.     The UHA Likely Violates the Second Amendment.

The Second Amendment secures "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  As the Supreme Court made clear last year, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Bruen*, 142 S.Ct. at 2126.  Thus, the threshold in analyzing the constitutionality of the challenged provisions of the UHA is whether the conduct in which Plaintiffs seek to engage—namely, purchasing handguns for self-defense that lack state-mandated features—falls within the plain meaning of "the right to keep and bear arms."  *Id.* at 2132.  If the answer is yes, then the state must "affirmatively prove that its … regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.* at 2127.  After *Bruen*, there is no more room for the kind of interest-balancing that decisions like *Pena* employed.  After faithfully applying the *Bruen* test, the district court concluded that the challenged provisions of the UHA "unquestionably" restrict conduct that falls within the plain text of the Second Amendment, and that the state is unlikely to

meet its burden of proving that those provisions are consistent with our nation's historical tradition. The state identifies no reason to disturb either conclusion.

### A. The District Court Correctly Concluded That the UHA Restricts Conduct That Is Presumptively Protected by the Plain Text of the Second Amendment.

The district court was plainly correct to conclude that the "conduct" in which Plaintiffs seek to engage is "presumptively protect[ed]" by "the Second Amendment's plain text." *Bruen*, 142 S.Ct. at 2126. The district court correctly recognized that this is not a close call. The conduct in which Plaintiffs seek to engage is purchasing handguns lacking certain features—handguns that are legal to purchase in virtually every other state in the nation. That conduct easily satisfies the low threshold textual bar that *Bruen* set.

1. The right to keep and bear arms, like all other constitutional rights, necessarily comes with "attendant rights" that "make the underlying right … meaningful." 1-ER-13-14. And that necessarily includes the right to obtain the arms that the Second Amendment entitles "the people" to "keep and bear." That is not owing to some hidden "penumbra" of atextual rights. State.Br.25. It is a matter of simple common sense. Just as "the right to bear arms would be meaningless" without the bullets necessary to use them, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), the right to keep and bear arms would be downright incoherent if it did not encompass the antecedent right to obtain them.

Purchasing a firearm is therefore obviously "conduct … presumptively protect[ed]" by "the Second Amendment's plain text." *Bruen*, 142 S.Ct. at 2126. Indeed, numerous courts reached that conclusion long before *Bruen*, *see, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3rd Cir. 2010), and this Court assumed it to be correct, *see Teixeira v. Cty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017).

The handguns that Plaintiffs seek to obtain are just as obviously "arms" within the plain meaning of the Second Amendment. To the extent common sense is not enough to confirm that conclusion as well, one need only read the Supreme Court's binding precedent on the meaning of that term. As the Court has held—repeatedly— "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S.Ct. at 2132 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). And *Bruen* and *Heller* leave no doubt about what constitutes "Arms": " '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581. "[T]he Second Amendment's definition of 'arms'" therefore encompasses all "modern instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132.

As the district court correctly recognized, that "unquestionably" includes the handguns that Plaintiffs wish to purchase. 1-ER-12. The Supreme Court in *Heller*

described handguns as the "quintessential self-defense" weapon, explaining that "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 624-25, 629. And a handgun remains every bit as much an instrument of armed self-defense whether or not it possesses a chamber load indicator, a magazine disconnect mechanism, or microstamping technology. That is so regardless of where one lands on the debate about whether those features make handguns more or less "unsafe." *Contra* State.Br.25-26. All that matters for purposes of the threshold textual inquiry is whether handguns lacking those features are still "instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132. Because they unquestionably are, Plaintiffs' proposed conduct of purchasing them to keep and bear for self-defense is unquestionably covered by the plain text of the Second Amendment.

2. Rather than confront what the Supreme Court has said about what the textual inquiry under the Second Amendment entails, the state tries to invent is own test, insisting that "*safety features* do not fall within 'the Second Amendment's plain text.'" State.Br.19 (emphasis added) (quoting *Bruen*, 142 S.Ct. at 2129-30). But *Bruen* does not instruct courts to ask whether the state's proposed regulation falls within the Second Amendment's plain text. It instructs them to ask whether the "individual's conduct" falls within "the Second Amendment's plain text." *Bruen*, 142 S.Ct. at 2126. That is evident from *Bruen* itself. The Court did not bake New

York's regulatory regime into its threshold textual inquiry, asking whether the Second Amendment's plain text guarantees the people a right to carry handguns in public for self-defense without first demonstrating a special need to do so. The Court instead described the conduct in which the plaintiffs sought to engage as simply "carrying handguns publicly for self-defense," which it had "little difficulty concluding" is covered by the plain text of the Second Amendment. *Id.* at 2134.

The state's insistence that "nothing in 'the Second Amendment's plain text' guarantees the commercial availability of firearms without features that" a state deems necessary to "enhance the[i]r safety," State.Br.21, likewise misses the mark. The Second Amendment's plain text *does* provide such a guarantee, because firearms remain "instruments that facilitate armed self-defense," *Bruen*, 142 S.Ct. at 2132, that the people are *presumptively* entitled to keep and bear (and, *a fortiori*, obtain) regardless of whether they possess whatever "safety" features a state may mandate. Whether and to what extent states may mandate such features is therefore a question to be answered by looking to historical tradition, not at the threshold textual inquiry. By the state's logic, virtually no Second Amendment challenge would ever make it out of the gate, as the text of the Second Amendment says nothing about what kinds of restrictions the government may impose on the right to keep and bear arms. That is precisely why the Supreme Court focused the textual inquiry on the "individual's conduct," not the manner in which the state seeks to regulate it. That is for *the state*

to justify by proving that its regulation is "consistent with the Nation's historical tradition of firearm regulation.'" *Id*. at 2126, 2130.

The state strays even further afield in arguing that the UHA does not implicate conduct covered by the text of the Second Amendment because people can still purchase *other* handguns. State.Br.22-23. The textual inquiry does not ask to what degree a law burdens conduct protected by the Second Amendment. It simply asks whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S.Ct. at 2126. If it does, then "how and why [a law] burden[s] a law-abiding citizen's right to armed self-defense" are considerations that come into play under the inquiry into whether that law is consistent with historical tradition. *Id.* at 2133. As the district court correctly recognized, 1-ER-13, the state's contrary argument is just a variation on the argument that the Supreme Court rejected back in *Heller*, holding that "[i]t is no answer to say, as [the government] do[es], that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Heller*, 554 U.S. at 629. *A fortiori*, the state cannot deploy the same faulty logic to insist that a restriction on the ability to obtain handguns does not implicate the Second Amendment at all.

The state's argument that the UHA's restrictions do not actually impede Plaintiffs' ability "to acquire 'state-of-the-art handguns,'" State.Br.25, fails for largely the same reasons. The state cannot seriously dispute that the law precludes

Plaintiffs from purchasing the handguns they wish to purchase; that is its *raison d'être*. The state instead argues only that some of the firearms that are presently *on* the roster are, in its estimation, sufficiently "state-of-the-art" to satisfy Plaintiffs' needs. State.Br.25-26. Once again, as the district courts here and in *Renna* recognized, that is a dispute of no legal consequence at the threshold textual inquiry. *See Renna*, 2023 WL 2756981 at *7 ("the *availability* of handguns … does not address in any way whether Plaintiffs' desire[d conduct] is *covered* by the Second Amendment"). The handguns Plaintiffs wish to purchase are "arms" within the plain text of the Second Amendment whether or not they are "state of the art." Plaintiffs therefore have a presumptive right to acquire them whether or not *other* arms they could purchase are "state of the art." Accordingly, if the state wants to restrict the people's ability to obtain handguns that lack certain state-mandated features, then it must satisfy its burden of proving that historical tradition allows it to do so.

B.      **The District Court Correctly Concluded That the State Is Unlikely to Meet its Burden of Proving That the Challenged UHA Provisions Are Consistent With Historical Tradition.**

Because Plaintiffs' proposed conduct of purchasing handguns that the UHA deems too "unsafe" for the primary market is "presumptively protect[ed]" by the Second Amendment, California must "affirmatively prove that" the UHA's features requirements are "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2126-27. The district court

correctly concluded that the state is unlikely to be able to do so, as it failed to identify any historical tradition that would allow it to deem virtually every new handgun that comes onto the market too "unsafe" for commercial sale—let alone one that would allow it to forbid the sale of these arms to ordinary law-abiding citizens while allowing wide swathes of state employees to purchase them at will.

> **1.** **The state bears the burden of proving that the UHA's features requirements are consistent with a "well-established" historical tradition.**

*Bruen* instructs that the "government [must] identify a well-established and representative historical analogue" to justify a restriction on the right to keep and bear arms. *Bruen*, 142 S.Ct. at 2133. For a historical law to serve as a "proper analogue" to a modern firearm regulation, it must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132-33. Indeed, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id*. at 2133 (emphasis omitted).

Moreover, courts may not uphold a challenged law just because a state manages to locate a few similar laws in the past, for doing so "'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id*. (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). Courts in *Bruen*'s wake have

30

therefore agreed that more than a mere smattering of historical evidence is necessary to prove that a regulation that infringes the right to keep and bear arms is consistent with the Second Amendment. *See, e.g.*, *Antonyuk v. Hochul*, 2022 WL 16744700, at *45 (N.D.N.Y. Nov. 7, 2022) (laws that affected less than 6% of the nation's population were not a sufficiently representative and well-established historical tradition); *Koons v. Platkin*, 2023 WL 3478604, at *62-68 (D.N.J. May 16, 2023) (laws spanning only five states over 250 years insufficient to show historical tradition), *appeal filed*, May 17, 2023; *Christian v. Nigrelli*, 2022 WL 17100631, at *8 (W.D.N.Y. Nov. 22, 2022) ("[T]he notion of a 'tradition' is the opposite of one-offs, outliers, or novel enactments. 'Tradition' requires 'continuity.'"), *appeal filed*, Nov. 23, 2022. In short, the state must "identify" a "historical analogue" that is both "well-established and representative" of the kinds of regulations that were tolerated historically. *Bruen*, 142 S.Ct. at 2133 [4]

---

[4] The state suggests that the "more nuanced" approach for modern laws responding to "unprecedented social concerns or dramatic technological changes" should apply here because "accidental discharge"—by which it means when someone pulls the trigger and discharges a loaded firearm without realizing that it is loaded—is more common with handguns, and most people owned long guns at the founding. State.Br.31-32. To state the obvious, handguns are no "dramatic technological change," and the risk that someone might fire one under the mistaken impression that it is not loaded is nothing new. That said, the district court *did* apply a "more nuanced" approach, as it allowed the state to try to "reason by analogy" to historical laws that were by no stretch of the imagination "dead ringers" for the UHA, *Bruen*, 142 S.Ct. at 2131-33. *See infra* Part I.B.2-3.

Implicitly recognizing the weakness of its historical analogies, the state begins by trying to avoid its historical tradition burden entirely, on the theory that the UHA falls with a purportedly "presumptively lawful category of 'laws imposing conditions and qualifications on the commercial sale of arms.'"  State.Br.28-29 (quoting *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring)).  Nonsense.  *Bruen* nowhere purported to immunize *any* law—let alone *every* law that might be described as "imposing conditions and qualifications on the commercial sale of arms"—from its emphatic requirement that a state must prove that a restriction on conduct covered by the plain text of the Second Amendment is "consistent with the Nation's historical tradition of firearm regulation.'"  *Bruen*, 142 S.Ct. at 2130. Indeed, the words "presumptively lawful" do not appear once in the Court's opinion. To the extent the Court considers such laws "presumptively lawful," then, *Bruen* makes clear that this is simply because the Court presumes that they will typically *survive* historical tradition scrutiny, not because they are entitled to some legal presumption that they need not do so at all.

At any rate, the UHA is no mere "condition" or "qualification" on the commercial sale of firearms.  It is an outright prohibition on the commercial sale of specific types—indeed, large swathes—of firearms.  Whatever may be said of laws that require commercial vendors to obtain a license, or to keep records of their transactions, or to verify the identity of a purchaser, the notion that the Supreme

Court has deemed outright prohibitions on the commercial sale of any and all firearms that a state decides should not be entrusted to law-abiding citizens "presumptively" consistent with the Second Amendment does not pass the straight-face test. The state thus very much bears the burden of proving that the UHA's features requirements are "consistent with our Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.

> **2.    The state failed to identify any "well-established" historical tradition supporting its CLI and MDM requirements.**

The district court was eminently correct to conclude that the state is exceedingly unlikely to meet that burden, as its strained efforts to analogize the UHA's features requirements to various historical regulations do not come close to passing muster under *Bruen*.

1. At the outset, while the practical operation of the UHA is to single out specific types of handguns for special (indeed, near-complete) restrictions on their acquisition by law-abiding citizens, the state has never even tried to defend the UHA as consistent with the historical tradition of restrictions on "dangerous and unusual weapons." *Heller*, 554 U.S. at 627. Nor could it, as the handguns California deems "unsafe" do not satisfy either of those conditions, let alone both.

First, the handguns that California has declared unfit for commercial sale to law-abiding citizens are about the furthest thing imaginable from "highly unusual in society at large." *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). The

UHA deems any centerfire semiautomatic pistol that lacks a chamber load indicator, a magazine disconnect mechanism, and microstamping technology "unsafe." That describes literally every single model of semiautomatic pistol on the market, the vast majority of which can be lawfully sold to law-abiding citizens in every other state in the nation. Whatever the threshold for "in common use," *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627), semiautomatic pistols plainly satisfy it. As the Supreme Court recognized in *Heller*, handguns are "the most popular weapon chosen by Americans for self-defense in the home," *Heller*, 554 U.S. at 629, and semiautomatic pistols account for more than 85% of handguns sold. *See* NSSF, *2021 Firearms Retailer Survey Report* at 9, https://bit.ly/3CXJwC1 (last visited May 26, 2023) (semiautomatic pistols outsell rifles 6 to 1). Simply put, there is no plausible argument that handguns lacking the features California mandates are "highly unusual in society at large." *Bruen*, 142 S.Ct. at 2143.

That alone precludes any argument that the UHA is of a piece with historical restrictions on "dangerous and unusual weapons," *Heller*, 554 U.S. at 627, as "this is a conjunctive test" that covers only weapons that are "*both* dangerous *and* unusual," *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring). But the state could not seriously argue that the handguns it has deemed "unsafe" are abnormally "dangerous" either. Again, virtually no handgun has *any* of the features the state requires for a semiautomatic pistol to be deemed not

"unsafe," and not a single one has all three. To state what should be obvious (at least after *Heller*), "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose," *Heller*, 554 U.S. at 628, cannot plausibly fall within the historical understanding of abnormally "dangerous." Indeed, even California does not seem to consider these arms abnormally dangerous, as it has no problem with law-abiding citizens *possessing* them, or with licensed firearms dealers selling them to everyone from district attorneys to coroners to agencies charged with overseeing public health, social services, housing, and financial innovation. Cal. Penal Code §32000(b)(4), (6), (7).

All of that has real consequences for the state's effort to defend the UHA's features requirements, as "how and why [a law] burden[s] a law-abiding citizen's right to armed self-defense" are "'*central*' considerations" when it comes to analyzing whether it is consistent with our Nation's historical tradition of firearm regulation. *Bruen*, 142 S.Ct. at 2133. A law that unabashedly is designed to preclude law-abiding citizens from obtaining firearms that our Nation's historical tradition entitles them to keep and bear thus starts with a particularly strong presumption against its constitutionality.

2. Instead of identifying anything that would make the arms it has singled out for opprobrium "dangerous and unusual," California attempts to justify the first two of the UHA's three features requirements—a chamber load indicator and a magazine

disconnect mechanism—by analogizing to inspection or "proving" laws. State.Br.34. According to the state, these laws demonstrate that those requirements are part of a "well-established tradition" of "protect[ing] the public from defective or poorly manufactured firearms or gunpowder." State.Br.33-34. The district court correctly rejected that strained analogy, as there is an obvious difference between laws designed to ensure that firearms operate as consumers expect them to operate, and laws that require firearms to have features that consumers do not want.

In the early 1800s, Massachusetts and Maine had in place laws that required the "proving," or inspection, of firearms before they were sold. State.Br.34-36. Massachusetts required a government inspector to test "all musket and pistol barrels" and "gunpowder to ensure it met certain quality standards." State.Br.35-36. Maine had a similar law. *Id.* at 35. Setting aside for the moment whether two laws are sufficient to establish an "enduring American tradition," *Bruen*, 142 S.Ct. at 2155, *see infra* pp.41-43, those laws are plainly insufficient to establish a historical tradition of requiring features like a chamber load indicator or a magazine disconnect mechanism. Proving laws did not prescribe particular features or specifications in order for a firearm to be sold, let alone prescribe features that few, if any, firearms actually had. They required only that the firearm be inspected to "prove" that it operated as intended—that is, that it passed a basic objective firing test.

Proving laws thus were essentially quality-control laws, designed to ensure that the purchaser was actually getting what the manufacturer promised—a functional firearm with no manufacturing defects. By the state's own admission, they "did not impose safety requirements beyond the ones manufacturers voluntarily built into a firearm." State.Br.38. Whatever resemblance (if any) those laws may bear to the UHA's reliability and drop-safety testing requirements, Cal. Penal Code §§31910, 32015, which are not at issue here, they bear no resemblance to the UHA's features requirements. A handgun without a chamber load indicator and a magazine disconnect mechanism is not "defective or poorly manufactured." State.Br.33-34. It is not prone to malfunction, or to explode, or to fire when the trigger has not been pulled. Those are features that California has mandated to try to reduce the risk of someone negligently misusing a firearm by pulling the trigger without first checking whether it is loaded. There is nothing defective about a firearm that fires when someone pulls the trigger; that is what firearms are supposed to do.

Nor are the features California has mandated ones that consumers expect all well-manufactured handguns to have. To the contrary, almost no firearms have them, because most consumers affirmatively do not want them, as they increase cost with little (if any) corresponding benefit, and a magazine disconnect mechanism actually *impedes* the ability to fire a handgun in a self-defense situation. That makes proving laws fundamentally unlike the UHA's requirements, as proving laws did not

37

preclude anyone from purchasing any class of common arms; they simply ensured that the particular arm someone was purchasing was what the purchaser was promised. The UHA, by contrast, outright prohibits the commercial sale to law-abiding citizens of firearms that lack the features the state requires, to the ultimate end of dramatically curtailing Californians' access to handguns available everywhere else in the nation. The district court thus acted well within its discretion in finding "[t]he differences between how and why these laws burden a law-abiding citizen's right to armed self-defense … evident." 1-ER-17.

The state resists that conclusion, insisting that the burdens imposed by proving laws were actually greater because they required inspection of *every* firearm before sale, whereas the UHA allows a firearm to be added to the roster so long as three samples pass CDOJ's certification inspection. State.Br.38. But that misses the critical point: A firearm could pass the inspection required by a proving law so long as it was manufactured to operate in the manner that the manufacturer promised and the consumer expected. The UHA, by contrast, keeps perfectly well-manufactured firearms off the roster entirely, regardless of whether they would pass reliability and drop-safety tests designed to test manufacturing quality. Thus, rather than losing access to a single firearm that failed a quality check, Californians are denied access to state-of-the-art handgun models entirely, even though there is nothing at all shoddy, let alone defective, about how they are manufactured. The state protests that

the UHA does not keep *every* state-of-the-art firearm off the market, because a few models managed to make it onto the roster before the impossible-to-satisfy microstamping requirement came along. State.Br.39-40. But proving laws did not keep *any* models off the commercial market, so the state's quibble does nothing to improve its exceedingly strained historical analogy.

3. Even if proving laws were remotely analogous to laws prohibiting the commercial sale of firearms lacking certain state-mandated features, the state did not even meet its burden of demonstrating these laws were part of a "well-established and representative" tradition of firearms regulations. *Bruen*, 142 S.Ct. at 2133. By 1821, when the Maine law passed, there were 24 states, and only two of them had firearm proving laws. Samuel Shipley, *List of U.S. states' dates of admission to the union*, Britannica Online (Aug. 15, 2018), https://bit.ly/3OnPUZJ. As of the 1820 census, Massachusetts and Maine constituted only 8.5% of the United States' population. U.S. Census Bureau, *Census for 1820* (1821), https://bit.ly/3Iqo8rH (Massachusetts population, 523,287; Maine population, 298,335; national population, 9,625,734). The overwhelming majority of Americans—over 90%— thus were not subject to firearm proving laws. *See Antonyuk*, 2022 WL 16744700, at *45 (rejecting laws that affected under 6% of the population).

Perhaps anticipating this problem, the state emphasizes that Massachusetts was a major manufacturer of firearms in the early 19th century, and thus insists that

it should have outsized importance. *See* State.Br.34-35. But the state offers no evidence that Massachusetts-based manufacturers made a significant portion of firearms sold to individuals throughout the rest of the country. Nor could it, because the expert on which the state relied regarding Massachusetts' historical arms production explained that most people bought guns from gunsmiths within their own communities: "Early America firearms production in the era of the Second Amendment, in contrast, was dominated by artisan production. Local gun smiths, not big box stores such as Walmart, were responsible for selling most firearms." 2-ER-234-37. Thus, no single state, and no single retailer, had outsized importance in the individual marketplace when Massachusetts' proving law was in place.

Massachusetts instead owed its increased firearm production at the time to the Springfield Arsenal, which manufactured firearms for the federal government. 2-ER-233. And as the state neglects to mention, that federal arsenal was "governed by federal law," not the Massachusetts proving law, as two of the state's own experts acknowledged. *See* 2-ER-70; 2-ER-233-34. The Springfield Arsenal's state-law-exempt output accounted for "most of the guns produced in the state." 2-ER-70. Thus, not only was Massachusetts' law not representative of the requirements governing most firearms sold in America; it was not even representative of the requirements governing most firearms sold in Massachusetts.

The state tries to bolster the historical record by pointing to colonial laws from Maryland, Pennsylvania, and New Hampshire that it claims were similar to the Massachusetts and Maine proving laws. State.Br.35. But those colonial laws had nothing to do with inspecting or proving firearms to be sold to ordinary citizens. They were, in essence, purchase orders made by the colonies, likely in anticipation of war with Britain. For example, the state's expert describes one of these laws, Maryland's in 1775, as "[a]pproving purchase of muskets with detailed manufacturing specifications and requiring that they be proved before purchase." 2-ER-255. The New Hampshire law is similarly titled, "Plan for Providing Fire-Arms for the Colony." *See Plan for providing Fire-Arms for the Colony, considered and adopted*, N. IL. Univ. Dig. Lib. (Jan. 10, 1776), available at https://bit.ly/3InNiHy. The Pennsylvania law, for its part, directed an individual, "Mr. Towers," to "prove all the Muskets made in this City for the Provincial Service." *See* 10 Council of Safety, State of Pennsylvania, *Colonial records of Pennsylvania*, 383 (1852), available at https://bit.ly/3MI2wtn. Each of the state's colonial laws was limited to proving firearms purchased by state or local governments—and even then each simply ensured that the firearms those governments purchased operated in the manner that they expected. Once again, that is a far cry from California's effort to prohibit the commercial sale of firearms lacking features that very few firearms have and that consumers neither expect nor want.

4. The state's remaining proffered historical analogues are no more analogous. The state's efforts to analogize to gunpowder inspection laws fail for largely the same reasons as its analogy to firearms inspection laws, as the burdens those quality-control laws imposed on the ability to acquire common arms are likewise similar to neither how nor why the UHA burdens that Second Amendment right. *See* State.Br.35-36. Moreover, these laws did not persist for any significant amount of time, and for good reason: While black powder was exceptionally volatile, the need to inspect it faded as it was supplanted by better and more stable forms of ammunition. If anything, then, the history of these laws undermines the state's effort to freeze California's handgun market in time, for by California's logic its residents might still be using ramrods and muzzle-loading muskets, with all subsequent innovation deemed too "unsafe" to make the roster.

The weapon and gunpowder storage laws California invokes likewise bear no resemblance to the UHA's chamber load indicator and magazine disconnect requirements. The state describes these laws as intended "to reduce the dangers arising from firearms and ammunition that did not function or were not used in line with their intended purpose." State.Br.36. That is revisionist history in the extreme. These laws had nothing to do with the "purpose" for which firearms were used. They were essentially fire-safety laws put into place because of gunpowder's unstable and highly combustible nature—a concern that is no longer prevalent thanks to

technological advancements. *See* p.12, *supra*. As the Supreme Court explained in *Heller* when considering the same laws, they imposed requirements like "that excess gunpowder be kept in a special container or on the top floor of [a] home." 554 U.S. at 632. Laws governing how gunpowder could be stored and transported when not in use—that is, "the bringing in, and conveying out" of gunpowder from cities and localities, 2-ER-239—are not remotely analogous to laws prohibiting the purchase of perfectly stable and operable handguns that the state fears someone will fire without realizing they are loaded.

In all events, even if the state could identify some historical analogue allowing it to prohibit the sale of common arms because they lack features that consumers neither expect nor want, it has not identified *any* historical analogue that would support mandating features that are not even common. Yet that is precisely what the UHA does, as the vast, vast majority of firearms—including almost all new models that have come on the market since those provisions of the UHA took effect—are not equipped with *either* a chamber load indicator *or* a magazine disconnect mechanism, let alone both. Indeed, the few models that exist appear to exist largely because California imposed these requirements, and law-abiding citizens continue to choose models *without* these features in overwhelming numbers.

Making matters worse, the state has not even tried to identify any historical tradition that would allow it to deem too "unsafe" for ordinary law-abiding citizens

the same arms that it is happy for its own law enforcement officers and all manner of other state employees to purchase, possess, and carry. By the state's own tacit admission, these are not "dangerous and unusual arms" suitable only for those with highly specialized training. The state allows myriad state employees with no traditional law-enforcement functions to purchase them so long as they pass a basic firearms safety course, *see* Cal. Penal Code §32000(b)(4), (6), (7), and it allows ordinary law-abiding citizens to *possess* them without any special training at all. There simply is not any historical tradition—let alone a well-established one—in this country of the government picking and choosing to which of "the people" protected by the Second Amendment concededly common firearms may be commercially sold.[5]

### 3. The state failed to identify any "well-established" historical tradition supporting its novel microstamping requirements.

The state does not even try to argue that any of the consumer-protection or safe-storage laws it invokes are analogous to its novel microstamping requirement. Nor could it, as that requirement has nothing to do with the safety of a firearm to

---

[5] Not only does the state fail to identify a sufficiently analogous historical tradition, but California's UHA stands alone even among *current* state regulations. The only other state with anything at all like the UHA is Massachusetts, and even Massachusetts requires *either* a CLI *or* MDM, not both (and has no microstamping requirement). *See* State.Br.21 n.9.

use.  It is a (theoretical) law-enforcement tool, ostensibly designed to help law enforcement determine what firearm was used at a crime scene by imprinting the make, model, and serial number of the pistol on each shell casing that a firearm ejects.  The idea is, if a criminal happens to leave behind shell casing, law enforcement can use them to trace the firearm to the last person to whom it was lawfully transferred.  The potential utility of this tool is debatable at best, as it rests on the highly dubious assumption that criminals frequently use firearms that they lawfully acquired through a recorded transaction.  *See* 2-ER-135-36 (Police Officer Marvel testifying that the UHA has little impact on individuals who commit crimes with firearms, which are usually stolen").  In all events, the utility of this technology remains impossible to measure, because no firearm in the world possesses it.

California nevertheless gamely contends that microstamping is just an "extension" of colonial-era "registration and taxation requirements that applied to gun owners."  State.Br.41 (citing *United States v. Holton*, 2022 WL 16701935, at *4-5 (N.D. Tex. Nov. 3, 2022)).  But even accepting the unlikely proposition that laws designed ensure that people paid taxes on firearms are analogous to laws designed to help police track down those who use firearms to commit crimes, *but see United States v. Price*, 2022 WL 6968457 (S.D. W.Va. Oct. 12, 2022), "how" those laws "burden[ed] a law-abiding citizen's right to armed self-defense" is not remotely similar to how the UHA's microstamping requirement does.

45

There is not and has not ever been any technological impediment to registering a firearm, or to printing a serial number on it, which is why serial number requirements have been "universally and easily implemented by manufacturers across the globe." 1-ER-20. Microstamping, by contrast, "is simply not commercially available or even feasible to implement on a mass scale." 1-ER-19. Indeed, "not a single new model of semiautomatic handgun has been added to the [r]oster since the microstamping requirement was implemented" a full decade ago, because no firearms with that technology exist. 1-ER-20-21. This is thus not a case in which a state is responding to some "dramatic technological change[]," *Bruen*, 142 S.Ct. at 2131-32, by mandating common modern improvements that the founding generation plainly would have preferred had they existed at the time. The state is trying to *effectuate* a dramatic technological change, by mandating that handguns possess a feature that no modern handgun has. The state has failed to identify any other law in all of history that has prohibited ordinary law-abiding citizens from purchasing handguns that lack technology that no firearm has.

The state tries to chalk the absence of handguns with that technology up to "firearms manufacturers' reluctance to adopt microstamping, not the requirement itself." State.Br.42. That is both wrong and irrelevant. After considering extensive briefing, holding an evidentiary hearing, and then requesting more briefing still, the district court found as a matter of fact that it is simply "not feasible to implement

such technology broadly." 1-ER-20. As the court explained, relying on testimony and an extensive study by Plaintiffs' exert Michael Beddow that was thrice peer reviewed, microstamping technology is "'not suitable for mass implementation'" because "it would be very difficult to develop any technology that could work on multiple models of handguns" given "'the vast differences that exist between the mechanical design of the firearms and the differences in metallurgy of the different brands of ammunition.'" 1-ER-20 (quoting Tr.97, 98-99).

The state protests that Beddow conducted his study in 2005. State.Br.42. But Beddow provided live testimony at the preliminary injunction hearing, during which he explained at length why microstamping is still "not practically, as we sit here today, a technology that is capable of being taken by a manufacturer and implemented into their handguns right now, without further development for their specific handgun," 1-ER-20 (quoting Tr.127), which remains cost-prohibitive. The state fails to identify any ground on which this Court could conclude that those factual findings reflect a "clear error of judgment." *See United States v. Hinkson*, 585 F.3d 1247, 1260-61 (9th Cir. 2009) (en banc).

In all events, whatever the reason, the undeniable fact remains that "not a single manufacturer has implemented microstamping technology" on even a single firearm. 1-ER-20. It likewise remains undeniable that the state has yet to identify a single law in all of history that prohibited the commercial sale of firearms to law-

abiding citizens unless they possess technology that not a single firearm presently on the market has.  As the district court correctly concluded, those two facts alone doom the state's effort to affirmatively prove that its lone-in-the-country microstamping requirement is "consistent with the Nation's historical tradition of firearm regulation.'"  1-ER-15 (quoting *Bruen*, 142 S. Ct. at 2130).

## II.     The District Court Did Not Abuse Its Discretion In Concluding That The Remaining Factors All Favor Injunctive Relief.

The district court acted well within its discretion in concluding that the balance of the injunction factors supported granting injunctive relief.  At the outset, the state insists that the court should have held Plaintiffs to a "heightened burden" because the injunction it issued is "akin to a mandatory injunction." State.Br.47-48. The state is mistaken.  A mandatory injunction is "an injunction that not only enjoins Defendant from enforcing the law, but orders Defendant to take an affirmative action."  *Doe v. Snyder*, 28 F.4th 103, 108 (9th Cir. 2022); *see also*, *e.g., Garcia v. Google, Inc.*, 786 F.3d 733, 740 (2015) ("a mandatory injunction … orders a responsible party to 'take action'").  That is not what the district court's injunction does.  The order simply enjoins the state from enforcing the challenged provisions of the UHA.  *See* 1-ER-2-3.  It does not compel the state to add any firearms to the roster or take any other affirmative act.  By the state's telling, virtually every injunction involving an unconstitutional law would be "mandatory," as such injunctions almost always "requir[e] Defendant[s] to permit" conduct that the

challenged law would otherwise prohibit.  State.Br.47.  That is not the law.  In all events, the district court concluded that this was *not* a "doubtful case[]," *Garcia*, 786 F.3d at 740, finding that the "challenged UHA provisions *unquestionably* infringe" Plaintiffs' Second Amendment rights.  1-ER-12 (emphasis added).

The state also accuses the district court of "collapsing the equitable *Winter* factors into the likelihood of success on the merits factor," State.Br.45, but that is patently not what the court did.  The court methodically walked through all of the remaining factors and explained why each one favored Plaintiffs, including for reasons independent of the merits.  *See* 1-ER-21-24.  The state identifies no error in the court's legal conclusions or clear error in its findings of fact, and it certainly does not demonstrate that this is the exceedingly rare case in which a court abused its broad discretion by enjoining the enforcement of provisions that it concluded likely violate the Constitution.

### A.     The District Court Correctly Concluded That Plaintiffs Would Suffer Irreparable Harm Without Injunctive Relief.

The state first dismissively complains that the "sole harm" in this case is a "constitutional violation."  State.Br.45.  But as the district court correctly explained, it is "well established" that any "deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005); *Goldie's Bookstore, Inc. v.*

*Superior Ct. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984). Indeed, in *Doe v. Harris*, to which the state points, *see* State.Br.46, this Court "conclude[d]" that even a "colorable First Amendment claim" suffices to constitute irreparable injury. 772 F.3d 563 (9th Cir. 2014) (citing *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664-65 (2004)). And the Ninth Circuit is in good company. "When an alleged deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable injury is necessary." 11A Wright and Miller, Fed. Prac. & Proc. Civ. §2948.1 (3d ed. 2023).

Contrary to the state's suggestions, State.Br.49, there is no exception to that settled rule for Second Amendment rights. *See, e.g.*, *Ezell*, 651 F.3d at 700 (deprivation of Second Amendment rights is "irreparable" injury); *Renna v. Bonta*, 2023 WL 2846937, at *14 (S.D. Cal. Apr. 3, 2023) (infringements on Second Amendment rights "caus[e] irreparable harm" because constitutional violations "'cannot be adequately remedied through damages'") (citing *Am. Trucking*, 559 F.3d at 1059). Any other conclusion would impermissibly convert the Second Amendment into "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S.Ct. at 2156 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)). Accordingly, the district court was undoubtedly correct to conclude that the UHA's

features requirements work an immediate and irreparable injury as to all citizens to whom they deny Second Amendment rights.

That is so regardless of whether Plaintiffs have or could obtain other firearms. As the Third Circuit put it aptly: "We would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as worshipers may pray elsewhere." *Frein v. Penn. State Police*, 47 F.4th 247, 256 (3d Cir. 2022) (rejecting government's argument that the Second Amendment protects only "a general right to buy guns" but not specific firearms). The state can hardly use an argument that the Supreme Court has already rejected *on the merits* to insist that Plaintiffs are not suffering any injury at all. *See Heller*, 554 U.S. at 629 ("It is no answer to say, as [the government] do[es], that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed.").

In all events, the state ignores the district court's finding that there are perfectly good reasons why people would prefer one of the newer models of firearms that California prohibits law-abiding citizens from purchasing. Left-handed Californians, for example, are disadvantaged by the UHA's requirements because there are very few "handgun[s] well-suited for a left-handed shooter on the Roster." 1-ER-10. Indeed, "only one semiautomatic handgun on the Roster is completely ambidextrous, and not only is it expensive, but its sub-compact size means it is

harder to grip and has a sharp recoil impulse." *Id.*[6]  Several newer models, by contrast, "allow fully ambidextrous configuration of critical firearm controls— including the slide stop and release, magazine release, and any manual safety— allowing left-handed shooters to handle the handgun more easily, more quickly, and more safely." *Id.*  Yet left-handed shooters in California are stuck with handguns not designed for them, putting them in a dangerous position in a self-defense scenario where "seconds or micro-seconds of time can be the difference between being able to use your firearm successfully, defensively, [or] potentially losing your life." *Id.* (quoting Tr.35-36).  Even if it mattered, then, Plaintiffs *did* demonstrate that the challenged provisions interfere with the self-defense needs of the many left-handed Californians whose interests they represent, which readily constitutes an injury that is constitutional, concrete, and irreparable.

### B.   The District Court Acted Well Within Its Broad Discretion in Concluding That the Public Interest and the Balance of the Equities Weigh in Favor of Injunctive Relief.

Far from "collapsing" the remaining factors into "the likelihood of success on the merits factor," State.Br.45, the district court explained precisely why it concluded that they weighed in favor of injunctive relief.  The court first began with the settled

---

[6] While the roster technically has 21 listed variants of this handgun, they are all just the same firearm—the Heckler & Koch P2000—with minor cosmetic differences, and it costs $300 to $400 more than other post-2013 ambidextrous models that California refuses to certify as safe to sell.  *See* D.Ct.Dkt.1 at 9; D.Ct.Dkt.57 at 20, n.12.

rule that the equities and the public interest factors "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009).  *See* 1-ER-22.  It then identified several reasons why they "weigh in favor of granting an injunction." 1-ER-22-24.  And while the court correctly explained that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," 1-ER-22 (quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022), it did not end there.  The court instead went on to identify specific reasons why it found that "the government's safety concern rings hollow."  1-ER-23.

For one thing, the court noted that "[t]he government cannot credibly argue that handguns without CLI, MDM, and microstamping features pose unacceptable public safety risks when virtually all of the handguns available on the Roster and sold in California today lack those features."  1-ER-23.  The state protests that "that is only because the Legislature elected to apply those requirements on a prospective basis in recognition of the need to ensure that additional pistols remained available to consumers while pistols with these safety features came on the market." State.Br.51-52.  But whatever the reason, the point remains that it is already the case that virtually all handguns sold in California have neither of these features.  It is hard to see how the public interest would be harmed in the slightest by simply adding some more models to the list for the duration of this litigation—especially when

those newer models are "more ergonomic, durable, reliable, affordable, and possibly even safer." 1-Er-21.

The district court further noted that "if Off-Roster firearms were truly unsafe, California would not allow law enforcement to use them in the line of duty, when the stakes are highest." 1-ER-23. Yet "the substantial majority of California's law enforcement officers use Off-Roster handguns in the line of duty," including "the government's own witness." 1-ER-23-24. "If CLIs and MDMs truly increased the overall safety of a firearm," the court explained, then "law enforcement surely would use them." 1-ER-24. "Instead, they choose to use 'newer, improved and safer generations of handguns'" that the state refuses to let ordinary law-abiding citizens purchase. *Id*. The state's only response to this point is to note in a footnote that "[l]aw enforcement officers receive far more training in the handling and safe storage of firearms than the average civilian." State.Br.54 n.20. But it does not take any specialized training to know that one should not pull the trigger on a firearm without first checking whether it was loaded. The state thus does not begin to show either that the district court clearly erred in its findings as to the preferences of law-enforcement or that the court abused its discretion by finding that fact to weigh in Plaintiffs' favor.

Finally, the state accuses the district court of dismissing its various studies regarding the potential benefits of chamber load indicators and magazine disconnect

mechanisms by finding "the idea that these devices prevent accidental shootings to be 'entirely speculative.'" State.Br.55 (quoting 1-ER-24). That is not what the district court said. The real reason the court found the state's studies "unhelpful" to its cause is because "[t]he likelihood that a person will *purchase* a handgun with a CLI and MDM … is entirely speculative" given that the vast majority of handguns sold in California do not have them. 1-ER-24 (emphasis added). Accordingly, while Plaintiffs very much take issue with the state's bald assertions that "it cannot be seriously disputed that chamber load indicators and magazine disconnect mechanisms improve the safety of firearms," State.Br.52, there is no need for this Court to wade into that debate, as the district court assumed for the sake of argument that they do. The court simply concluded that the peculiarities of the state's rather convoluted statutory regime, under which purportedly "unsafe" handguns may be sold in the multitudes and seemingly everyone *but* ordinary law-abiding citizens remains free to purchase the most state-of-the-art handguns, forecloses any credible argument that allowing the temporary sale of newer models of handguns that are, if anything, likely *safer* than those presently on the market would cause significant harm to the public interest. The state identifies no reason to disturb that eminently sensible conclusion.

## CONCLUSION

For the reasons set forth above, this Court should affirm.

Respectfully submitted,

s/Erin E. Murphy

C. D. MICHEL
ALEXANDER A. FRANK
JOSHUA ROBERT DALE
SEAN ANTHONY BRADY
KONSTADINOS T. MOROS
MICHEL & ASSOCIATES, PC
180 E Ocean Boulevard
Suite 200
Long Beach, CA 90802

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MARIEL A. BROOKINS*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
*Supervised by principals of the firm who are
members of the Virginia Bar

*Counsel for Plaintiffs-Appellees*

May 26, 2023

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit R. 32-1 because this brief contains 13,464 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

May 26, 2023

<u>s/Erin E. Murphy</u>
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy