No. 23-55276

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

LANCE BOLAND; MARIO SANTELLAN; RENO MAY; JEROME SCHAMMEL; AND CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,

*Plaintiffs-Appellees*,

V.

ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant-Appellant.*

**On Appeal from the United States District Court
for the Central District of California**
No. 22-cv-1421-CJC-ADS
The Honorable Cormac J. Carney, Judge

**BRIEF OF *AMICUS CURIAE* PEACE OFFICERS RESEARCH ASSOCIATION OF CALIFORNIA, THE CALIFORNIA STATE SHERIFFS' ASSOCIATION, THE CALIFORNIA POLICE CHIEFS ASSOCIATION, THE CALIFORNIA ASSOCIATION OF HIGHWAY PATROLMEN, AND THE CALIFORNIA RESERVE PEACE OFFICERS ASSOCIATION IN SUPPORT OF APPELLEES AND AFFIRMANCE OF PRELIMINARY INJUNCTION**
All Parties have agreed to the filing of this Amicus Curiae brief.
(Fed. R. App. P. 29(a); Circuit Rule 29-2(a))

David E. Mastagni, Bar No. 204244
Email: davidm@mastagni.com
Taylor Davies-Mahaffey, Bar No. 327673
MASTAGNI HOLSTEDT, APC
1912 I Street
Sacramento, CA 95811
Telephone: (916) 446-4692
Fax: (916) 447-4614
*Attorneys for Amici Curiae*

Timothy K. Talbot, Bar No. 173456
Email: ttalbot@RLSlawyers.com
RAINS LUCIA STERN
ST. PHALLE & SILVER, PC
2300 Contra Costa Blvd Ste 500
Pleasant Hill, CA 94523
Telephone: (916) 646-2860
Fax: 925-609-1690
*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure, Rule 26.1, *Amici Curiae* the Peace Officers Research Association of California, the California State Sheriffs' Association, the California Police Chiefs Association, the California Association of Highway Patrolmen, and the California Reserve Peace Officers Association state that each has no parent corporation and no publicly held corporation has an ownership interest of 10% or more.

Dated: June 2, 2023          _s/ David E. Mastagni_
                                  David E. Mastagni
                                  *Attorney for Amici Curiae*

# TABLE OF CONTENTS

STATEMENT OF IDENTITY, INTEREST AND AUTHORITY TO FILE ........... 1

ARGUMENT .................................................................................................... 6

   I.    Plaintiffs Are Likely to Succeed on The Merits. ......................................... 6

     1.    Access to Modern Handguns is Presumptively Protected Under the Second Amendment. ......................................................................................... 8

     2.    Appellant Has Failed to Identify Any Relevant Historic Analogues Which Limited Access to Modern Weapons. ................................................... 9

        a.    Gunpowder Storage Regulations Are Not an Analogue. ........................ 10

        b.    Barrel Testing Regulations Are Not an Analogue. ................................ 11

           i.    Comparably Justified (Why): .............................................. 11

           ii.    Comparable Burden (How): ............................................... 12

           iii.    The Nonsensical Safety Requirements of California Penal Code Section 31910 Are Unconstitutional. ................................... 14

           iv.    The Legislature Possesses Less Restrictive and More Effective Means of Reducing Gun Violence. .................................... 18

   II.    BALANCING OF HARMS AND THE PUBLIC INTEREST ................. 20

CONCLUSION ............................................................................................ 21

SIGNATURE ATTESTATION .................................................................... 22

CERTIFICATE OF COMPLIANCE ......................................................... 23

CERTIFICATE OF SERVICE ................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Cottrell*
  632 F.3d 1127 (9th Cir. 2011) ................................................................20

*Barnett v. Raoul*
  2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ......................................20

*Boland v. Bonta*
  No. SACV2201421CJCADSX, 2023 WL 2588565 (C.D. Cal. Mar. 20, 2023)..11

*Caetano v. Massachusetts*
  577 U.S. 411 (2016) ..........................................................................9

*District of Columbia v. Heller*
  554 U.S. 570 (2008) ................................................................. passim

*Dobbs v. Jackson Women's Health Org.*
  142 S. Ct. 2228 (June 24, 2022) .......................................................17

*Elrod v. Burns*
  427 U.S. 347 (1976)..........................................................................20

*Jackson v. City & Cnty. of San Francisco*
  746 F.3d 953 (9th Cir. 2014) .............................................................11

*June Med. Services L. L. C. v. Russo*
  140 S. Ct. 2103 (June 29, 2020) .......................................................17

*McDonald v. City of Chicago, Ill.*
  561 U.S. 742 (2010)..........................................................................21

*Melendres v. Arpaio*
  695 F.3d 990 (9th Cir. 2012) .............................................................20

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
  142 S. Ct. 2111 (2022)............................................................. passim

*Pena v. Lindley*
  898 F.3d 969 (9th Cir. 2018) ..........................................................6, 9

*People v. McDonnell*
  32 Cal.App. 694 (1917) ........................................................................5

*Renna v. Bonta*
  No. 20-CV-2190-DMS-DEB, 2023 WL 2846937 (S.D. Cal. Apr. 3, 2023)..12, 14

*United States v. Torres*
  911 F.3d 1253 (9th Cir. 2019) ...............................................................5

*Whole Woman's Health v. Hellerstedt*
  579 U.S. 582 (2016)............................................................................17

**Constitution**

Cal. Const. Art. 1, § 1 ...........................................................................5

**Statutes**

California Penal Code § 12022.5 ...........................................................18

California Penal Code § 12022.53(h) ....................................................18

California Penal Code § 1385 ...............................................................19

California Penal Code § 31910 .............................................................14

California Penal Code § 31910(b)(7)......................................................13

## STATEMENT OF IDENTITY, INTEREST AND AUTHORITY TO FILE

Pursuant to Rule 29(c)(2) of the Federal Rules of Appellate Procedure, *Amici Curiae* the Peace Officers Research Association of California (PORAC), the California State Sheriffs' Association (CSSA), the California Police Chiefs Association (CPCA), the California Association of Highway Patrolmen (CAHP), and the California Reserve Peace Officers Association (CRPOA) respectfully submit this *Amici Curiae* brief, with the consent of all parties, in support of Plaintiffs/Appellees Lance Boland, Mario Santellan, Reno May, Jerome Schammel, and California Rifle & Pistol Association, Inc. No counsel for a party authored this brief in whole or in part, and no party or party's counsel contributed money to fund this brief. No person other than *Amici Curiae* made any monetary contribution to fund the preparation or submission of this brief.

PORAC was incorporated in 1953 as a professional federation of local, state, and federal law enforcement agencies, and represents over 78,000 law enforcement and public safety professionals in California. It is the largest law enforcement organization in California and the largest statewide association in the nation. PORAC's mission is to maintain a leadership role in organizing, empowering, and representing the interest of rank-and-file peace officers. It seeks to identify the needs of the law enforcement community and provide programs to meet those needs through conducting research, providing education and training, and defining

1

and enhancing standards for professionalism. Its goal is to protect the rights and benefits of officers while creating an environment in which the law enforcement community and the communities they serve can interact and work toward achieving common goals and objectives.

CSSA was formed in 1894 for the purpose of giving California sheriffs a single effective voice. CSSA is a nonprofit professional organization that represents each of the 58 California sheriffs. It was formed to allow the sharing of information and resources between the sheriffs and department personnel, in order to allow for the general improvement of law-enforcement throughout the State of California. California sheriffs work diligently with fellow sheriffs through CSSA to improve the profession and elevate the law enforcement system through cooperation with other law enforcement agencies. As the sheriffs are Constitutionally elected officials, the California legislature regulates their duties and responsibilities.

CPCA was established in 1966 to represent municipal, school and transportation police chiefs and their agencies in California. Association members provide public safety to more than 30 million Californians. CPCA advocates to improve the law enforcement profession, promote public safety, and to bring forward the concerns of 332 Municipal Police Departments in California. CPCA is

2

dedicated to advancing California law enforcement leadership and shaping the future of policing.

CAHP was founded in 1920 to advocate on behalf of uniformed California Highway Patrol officers in matters related to pay, benefits and working conditions. CAHP holds a philosophy deeply rooted in collaborative-based initiatives. CAHP often partners with the California Highway Patrol to ensure the CHP's historically high level of trust from the public is never taken for granted and, where possible, is improved upon. CAHP aspires to be an example for all law enforcement officers and to provide the public the highest level of service.

CRPOA is an organization dedicated to raising the professional, educational and employment standards of reserve peace officers affiliated with local law-enforcement agencies and training facilities throughout California. CRPOA membership includes reserve peace officers, full-time regular peace officers, law-enforcement administrators, volunteers in law-enforcement, search and rescue members, and citizens who feel it is important to support their volunteers.

*Amici* all have a significant presence in Sacramento, where they lobby on behalf of their memberships, advocate for the proposal and refinement of new legislation, or amendment to existing laws and regulations, and assist lawmakers in analyzing the merits of ideas by providing history, context, and perspective on key issues unique to law enforcement professionals. As part of their activities, *Amici*

3

also file *amicus curiae* briefs in litigation impacting law enforcement professionals and agencies.

As further described in this brief, from a practical perspective, the Unsafe Handgun Act's ("UHA") required safety "features" do not noticeably improve the overall safety of firearms, otherwise *Amici* would demand law enforcement agencies issue their members firearms with those features. *Amici* consistently advocate for their members to be issued the newest, safest, and best equipment, including handguns. While the UHA purports to ban unsafe handguns, it actually bars members of the public from obtaining newer, improved, and safer generations of handguns already approved through California's Roster of Certified Handguns ("Roster"). Law enforcement agencies routinely upgrade their choice of duty-issued handguns to ensure officers have the best and safest tools for the job; and they are permitted to acquire handguns *not* on the Roster.

However, the UHA limits the handguns available to law abiding citizens and relegates them to older generations or models that lack advancements made to safety, storage and handling. Ironically, while officers are issued improved and safer generations of certain pistols, which are off-Roster and lack magazine safety disconnects, chamber load indicators, and microstamping, the size and functionality of the different generation models are essentially the same as older models already on the Roster and to which law-abiding citizens are limited. Lastly,

4

the UHA's microstamping requirement has little impact on deterring individuals who commit crimes with firearms, as they typically use stolen firearms.

In this regard, the UHA does not align with *Amici's* shared values: *Amici* believe the relationship between law enforcement and society is critical, and laws that unjustifiably privilege law enforcement over the average citizen are bad for the relationship between law enforcement and the communities they police. Private citizens have a Constitutional right to be armed for self-defense. In California "[t]he right to defend life is one of the inalienable rights guaranteed by the constitution of the state." (*People v. McDonnell*, 32 Cal.App. 694, 704 (1917); Cal. Const. Art. 1, sec. 1.) Similarly, "[c]entral to the rights guaranteed by the Second Amendment is 'the inherent right of self-defense.'" (*United States v. Torres*, 911 F.3d 1253, 1257 (9th Cir. 2019) (citing *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008)). Armed citizens do for themselves what law enforcement cannot always be there to do. There is no principled reason law-abiding citizens, including off-duty and retired peace officers, should be limited in their choice of handgun to older models designated as obsolete by agencies employing approximately 78,000 peace officers. The UHA arbitrarily deems as "unsafe" the handguns that tens of thousands of peace officers throughout the state use daily to protect themselves and society. If these weapons were truly unsafe, *Amici* would never permit their issuance to their members.

5

## ARGUMENT

### I.   Plaintiffs Are Likely to Succeed on The Merits.

The injunction issued by the district court should be affirmed because the UHA's 2006, 2007 and 2013 amendments violate the Second and Fourteenth Amendments to the United States Constitution. The United States Supreme Court recently reaffirmed the appropriate standard for Second Amendment analysis in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) stating as follows:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Id*. at 2129-30.

The *Bruen* Court further explained that the government has the burden of proving that the challenged regulation is consistent with the "Nation's historical tradition of firearm regulation" by analogy to historic regulations which imposed a "comparable burden on the right of armed self-defense and [ ] that [the] burden is comparably justified." *Id*. at 2133. In reaffirming the standard set forth in *Heller*, the Court rejected "interest-balancing inquiries" as inappropriate for Second Amendment analysis. *Id*. at 2129. Consequently, the State's reliance on *Pena v. Lindley*, 898 F.3d 969, 986 (9th Cir. 2018) applying intermediate scrutiny in

6

holding the UHA was "reasonably tailored to address [a] substantial problem" is misplaced in light of *Bruen*. (Opening Brief at pp. 10, 24.) Appellant has failed to sufficiently prove a history of prohibiting retail access to firearms not equipped with specific safety features aimed at reducing user error.

To be sure, the handgun features required by the UHA may prevent an accidental discharge through its "dumbing-down" of responsible gun ownership, reducing the need for vigilant safety practices inherent in possessing, using, and maintaining a lethal weapon. Perhaps such features should be available to those who wish to have them so as not to be burdened by the cardinal rule of treating every gun as loaded; maybe they would rather rely on an indicator that, if functioning as intended, presumably assures them there is no round in the chamber. But in terms of the Second Amendment, there is no relevant historical analogue for regulations limiting gun ownership, and thus availability, to what today the Legislature may consider to be the most advanced features in safety.

If the UHA is sanctioned by this Court, the State of California will continue its gradual impairment of the Second Amendment by imposing incremental and ever-increasing "safety feature" requirements that are unnecessary and unrelated to the proper functioning of a handgun when maintained and used responsibly. Even if manufacturers began creating handguns that satisfy the UHA's onerous requirements today, there will always be tomorrow's advancements such as biometric fingerprint

technology. If the UHA's infringement of self-defense rights is condoned, the State
will surely continue to conjure new safety requirements to further constrict access to
arms protected by the Second Amendment.

> **1.** **Access to Modern Handguns is Presumptively Protected Under the
> Second Amendment.**

*Bruen* and *Heller* leave no doubt regarding the meaning of "Arms": "The
18th-century meaning is no different from the meaning today.... '[A]rms' [means]
'any thing that a man wears for his defence, or takes into his hands, or useth in
wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581. "[T]he Second
Amendment's definition of 'arms'" thus presumptively covers all "modern
instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132. Modern
semiautomatic handguns without chamber load indicators, magazine detachment
mechanisms and microstamping technology, like the ones prohibited under the
UHA, fit squarely within "the Second Amendment's definition of 'arms.'" *Id.* at
2132. "Just as the First Amendment protects modern forms of communications, and
the Fourth Amendment applies to modern forms of search, the Second Amendment
extends, prima facie, to all instruments that constitute bearable arms, even those that
were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. "Thus,
even though the Second Amendment's definition of 'arms' is fixed according to its
historical understanding, that general definition covers modern instruments that

facilitate armed self-defense." *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016).

As *Bruen* made clear, the Second Amendment covers all "modern instruments that *facilitate* armed self-defense," not just what is necessary for self-defense. *Bruen*, 142 S.Ct. at 2132 (italics added). Appellant disputes this point citing to *Pena,* thereby impermissibly urging this Circuit to ignore binding precedent. (Opening Brief at pp. 24-25.) *Heller* acknowledges that the Second Amendment does not convey the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. However, *Heller* states that the Second Amendment protects those weapons "in common use at the time." *Id*. at 627. *Heller* also acknowledged that "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Id*. at 629. Therefore, the UHA implicates the "plain text" of the Second Amendment; the individual right of "ordinary, law-abiding, adult citizens" to *keep* and *bear* the nation's "quintessential" self-defense weapon. [citations omitted] *Bruen*, 142 S. Ct. at 2119, 2122. Thus, the State must prove a historic tradition of limiting access to these most common arms.

**2.      Appellant Has Failed to Identify Any Relevant Historic Analogues Which Limited Access to Modern Weapons.**

The State has failed to meet its burden to establish the existence of

"relevantly similar" regulations dating back to the Founding. See *Bruen*, 142 S. Ct. at 2132. *Bruen* established two guideposts for the historical analysis. First, not all historical data is equally important. "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id*. at 2136. Additionally, the government must produce evidence of a "well-established and representative historical analogue" and not an unrepresentative "outlier that our ancestors would never have accepted." *Id*. at 2133. Here, the inquiry is "fairly straightforward" because the UHA purports to "address[] a general societal problem that has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2132. Thus the "lack of a distinctly similar historical regulation addressing that problem [prohibitions on the sale of handguns without specified safety features] is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131.

        a.    <u>Gunpowder Storage Regulations Are Not an Analogue.</u>

Appellant's regurgitation of previously rejected analogies to fire prevention statutes regulating the storage of gun powder are woefully inadequate to justify the restrictions of the UHA. This Circuit and the Supreme Court have unequivocally rejected this argument. These gunpowder storage laws did not prohibit any type of weapon, "but required only that excess gunpowder be kept in a special container or

on the top floor of the home." *Heller*, 554 U.S. at 632. "Because *Heller* rejected the probative value of this evidence," this Circuit held these historical precedents do not establish longstanding regulations of handgun possession. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014). Indeed, safety regulations relating to the storage of gunpowder is in the nature of a fire regulation, independent of its intended use or its use as a component of ammunition. These regulations had no connection to the operation of gun or the safety features of a gun. On the other hand, the UHA purports to prevent the unintentional discharge of handguns, not regulate one of the component parts of gun ammunition.

> b.      Barrel Testing Regulations Are Not an Analogue.

Similarly, Appellant's analogizes to product safety statutes passed in Massachusetts in 1805 and Maine in 1821 are not relevant analogues to the UHA's requirement that handguns sold in California have certain safety features.

> i.      Comparably Justified (Why):

The product safety regulations were enacted to ensure "that each firearm's basic features were adequately manufactured for safe operation." *Boland v. Bonta*, No. SACV2201421CJCADSX, 2023 WL 2588565, at *7 (C.D. Cal. Mar. 20, 2023). Conversely, as mentioned in the gunpowder analysis, the UHA was enacted as a way to reduce unintentional discharges. As stated by the court in *Renna v. Bonta*, No. 20-CV-2190-DMS-DEB, 2023 WL 2846937, at *11 (S.D. Cal. Apr. 3,

2023), "[r]equiring the testing of firearms to ensure they fired safely without malfunctioning is significantly different from requiring manufacturers to add mechanical safety features to arms in common use that are indisputably safe and operate as designed for self-defense." *Id*. at 11. The "why" is somewhat different in that these statutes were passed to fire test all guns manufactured in response to concerns over poor manufacturing resulting in malfunction and injury when intentionally fired. In contrast, the UHA seeks to address accidental discharge of a gun carelessly treated as unloaded.[1]

ii.    Comparable Burden (How):

Because the UHA purports to address a societal concern that existed since the 18th century, gun safety, the analogized regulations must be distinctly similar. They are not. The analogized product safety statutes required small manufactures to have their rifle and pistol barrels fire tested to ensure that the weapon could be safely discharged without malfunctioning. These statutes did not require the inclusion of particular features that had no direct effect on an individual's right to purchase or choose a firearm.

The UHA is an attempt by the California Legislature to alter the handgun

---

[1] Under the California Attorney General's "six basic gun safety rules," the very first rule for responsible owners to understand and practice is to "treat all guns as if they are loaded."
https://oag.ca.gov/firearms/tips#:~:text=There%20are%20six%20basic%20gun,see%20that%20it%20is%20unloaded.

market in California by artificially creating a demand for handguns that are equipped with a particular set of safety features. However, the practical effect of the requirements under California's definition has been to label nearly every semiautomatic handgun in the United States unsafe and to either immediately or eventually impose a ban. By its plain terms, the statute requires the Department of Justice to remove three grandfathered semiautomatic handguns per every one semiautomatic admitted that satisfies all its operative technological feature requirements. This provision is without limit, and contemplates the eventual removal of all currently on-roster semiautomatic handguns. California Penal Code section 31910(b)(7). Counterintuitively, the UHA requires the removal of the grandfathered, non-compliant guns from the Roster in reverse order from their inclusion, meaning the most modern and presumably safest guns are removed first, including guns with some but not all of the safety features required.

As manufacturers of handguns continue to produce more of the newer models, the total supply of handguns on the Roster becomes increasingly smaller. Furthermore, the squeezing of the supply of "not unsafe" handguns increases the cost of these obsolete models.

Nothing in the product safety regulations analogized by the Appellant had anything to do with limiting the types of weapons that could be sold or mandated a list of specific features. These laws required only that all other muskets and pistols

13

be "proved" to ensure they fired and discharged safely without malfunctioning, in which case the prover would stamp the firearm and approve it for commercial sale. *Renna,* 2023 WL 2846937, at *11. The provisions of the UHA do not involve any safety testing whatsoever, and the UHA has never required the testing of individual guns or gun parts prior to that gun's sale. Considering all the above, the burden under the product safety regulations is completely different in kind, and insignificant in effect, compared to the burden caused by the UHA.

    iii. The Nonsensical Safety Requirements of California Penal Code Section 31910 Are Unconstitutional.

  Even should this Circuit recognize a historical analogue, the provisions of California Penal Code section 31910 enjoined by the district court cannot withstand any level of scrutiny.  Our Supreme Court held "the Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S. Ct. at 2131.

  The inherently subjective definition of unsafe handguns in California Penal Code section 31910 is illogical, given that nearly every California peace officer "bears" a purportedly "unsafe" handgun while on duty, when they are most likely to use the gun for self-defense and defense of others.  Because officers must handle, check and ensure their handguns are loaded each shift, their safety needs exceed that

of the general population. Yet, the UHA specifically permits officers to carry and use handguns the State has labeled "unsafe" due to the absence of chamber load indicators, magazine disconnect mechanisms and microstamping technology. A pending Bill, California Senate Bill 377, further calls into question the Legislative motives of the UHA. This Bill would prohibit California peace officers from purchasing or personally owning off-Roster handguns while expressly permitting their employing agencies to purchase and issue off-Roster handguns for use on-duty.

Law enforcement agencies routinely upgrade their choice of duty-issued handguns to ensure that officers have the best tools for the job. The overwhelming majority of law enforcement agencies issue officers the latest models of either Glock or Sig Sauer handguns, which lack magazine safety disconnects, chamber load indicators, and microstamping.

*Amici* have a strong interest in ensuring their members are issued and carry safe handguns that are not prone to accidental discharges. Their lives and the lives of those they protect are at stake. *Amici* also actively ensure that California peace officers are issued the most modern, effective and safe handguns available, but the required safety features add no appreciable difference to the overall safety of a firearm. These handguns do not become unsafe at the end of an officer's shift or career. If they did, *Amici* would be demanding firearms with the UHA safety

15

features. Similarly, these commonly owned handguns are not unsafe in the hands of law-abiding Americans.

Throughout their history, *Amici* have consistently advocated for the newest, safest and best equipment, including handguns, for law enforcement officers. The practical effect of the amendments to the UHA has been a de-facto ban on newer, improved and safer versions of handguns already on the roster. For example, many officers are issued 4th or 5th-generation Glock pistols, which are off-roster and lack magazine safety disconnects, chamber load indicators, and microstamping. Earlier generations of the same model pistols are on Roster because they were added before the Roster was effectively frozen. These older generation handguns are difficult to obtain because, as with any industry, the manufacturer is only producing the newer, improved versions. The newest generations of Glock handguns are arbitrarily deemed unsafe and banned from civilians, while older generations temporarily remain on the roster.

*Amici* believe in the legitimacy of the entire Constitution, and that means the right of the people to keep and bear arms under the Second Amendment for self-defense. Rather than blindly adhere to legislative findings, this Court should closely examine the government's actions which contradict its claims. *See, Bruen*, 142 S. Ct. at 2161, fn 3 (*holding* deference is not appropriate when a constitutional right is at issue). The UHA restricted the handgun market in California to a trickle

16

in 2007 and effectively froze the handguns available for self-defense to those on the roster in 2013. The state claims this fact is of no consequence and openly advocates for this Circuit to endorse the impairment of the people's Constitutional rights because "[i]t is firearm manufacturers' choice not to comply with the microstamping requirement." Opening Brief at p. 27.

These requirements are a thinly veiled effort to unnecessarily deem the entire semiautomatic handgun market in the nation as unsafe in order to severely constrict Californian's access to handguns. Even under a lower level of scrutiny, the pre-*Dobbs* Supreme Court twice invalidated unnecessary health and safety regulations on abortion services that posed a substantial obstacle to women seeking abortions, and constituted an "undue burden" on their constitutional right to do so. *June Med. Services L. L. C. v. Russo*, 140 S. Ct. 2103 (June 29, 2020), abrogated by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (June 24, 2022)(citing *Whole Woman's Health v. Hellerstedt,* 579 U.S. 582 (2016)). The UHA imposes analogous and unnecessary obstacles.

The UHA arbitrarily deems as "unsafe" the handguns that thousands of police officers in the state use to protect society and to protect themselves on a daily basis. Because these weapons are not truly unsafe, and are merely deemed unsafe for dubious reasons, the UHA should be declared unconstitutional.

///

17

      iv.    The Legislature Possesses Less Restrictive and More Effective Means of Reducing Gun Violence.

The California Legislature has a myriad of options to enhance public safety and reduce gun violence without insisting on symbolic handgun bans which are simply not Constitutional options under *Bruen*. *Amici* are dedicated to advocating for public safety, victims' rights and a fair criminal justice system. The UHA provisions at issue do not advance these interests.

Even the crime solving justifications for microstamping are specious. Given that the overwhelming majority of gun violence is committed with stolen guns and no criminal would use a gun directly linking him or her to a crime, microstamping—even if actually in existence—would provide little assistance to law enforcement. Moreover, even if a handgun with microstamping were used in a crime of passion, the markings would not likely be needed to solve the crime.

If California sincerely desired to reduce gun violence and promote public safety, the Legislature could enact laws and fund enforcement to keep guns out of the hands of prohibited persons and to impose meaningful consequences when guns are used in violent crime. Unfortunately, the Legislature instead targets the self-defense rights of all Californians while reducing or eliminating sentencing enhancements for committing gun crimes.

For example, in 2017, California enacted Senate Bill 620 which amended California Penal Code sections 12022.5 and 12022.53(h) and eliminated the

18

prohibition on striking allegations or findings relating to gun enhancements and expanded the grounds to strike or dismiss gun enhancements at the time of sentencing. Then in 2021, California Senate Bill 81 was enacted to amend California Penal Code Section 1385 to further expand the grounds to dismiss firearm enhancements in sentencing.

To improve safety regarding firearms, the State should ensure the Department of Justice has the necessary resources and directives to remove firearms from the approximately 24,000 individuals on the list of prohibited persons in possession of a firearm. Declaration Brian R. Marvel, ECF No. 57-2, at ¶16. As over one hundred (100) gun laws exist in California, the State could mandate that District Attorneys fully enforce gun violations and the Attorney General should intervene when prosecutors refuse to do so. This inaction on prohibited persons imperils the public and officers on the streets.

Sadly, on June 14, 2022, two El Monte peace officers were murdered by a gang member who should have been in prison after being arrested for unlawful possession of a firearm. *Id*. Due to the Los Angeles District Attorney's failure to enforce prohibited persons laws, these two officers were murdered. At least one court has echoed the public safety concerns raised by *Amici*:

> There is a wide array of civil and criminal laws that permit the commitment and prosecution of those who use or may use firearms to commit crimes. Law enforcement and prosecutors should take their obligations to enforce these laws seriously. Families and the public at

> large should report concerning behavior. Judges should exercise their prudent judgment in committing individuals that pose a threat to the public and imposing sentences that punish, not just lightly inconvenience, those guilty of firearm-related crimes.

*Barnett v. Raoul*, 2023 WL 3160285, at \*12 (S.D. Ill. Apr. 28, 2023).

It is critical to the safety of the public that we keep guns out of the hands of prohibited persons and disincentivize the unlawful use of firearms through both enforcement and criminal enhancements. The provisions of the UHA presented in this appeal do not further these common-sense goals.

## II.    BALANCING OF HARMS AND THE PUBLIC INTEREST

The trial court correctly conducted a balancing of harms in granting the injunction. This Circuit employs a "sliding scale" approach to preliminary injunctions wherein, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Second Amendment standard accords with how we protect other constitutional rights, including the First Amendment. *Bruen,*

142 S. Ct. at 2130.

It is uncontroverted that law-abiding members of society, including the elderly, infirm, and disabled, have the constitutional right to arm themselves for self-defense. Handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 629).

## CONCLUSION

*Amici* respectfully requests this Court of Appeal affirm the trial court's granting of Plaintiffs' motion for a preliminary injunction.

Dated: June 2, 2023                    **MASTAGNI HOLSTEDT, APC**

       s/ David E. Mastagni

David E. Mastagni, CASBN # 204244
1912 I Street
Sacramento, CA 95811
davidm@mastagni.com
*Attorneys for Amici Curiae*

**RAINS LUCIA STERN
ST. PHALLE & SILVER, PC**

       s/ Timothy K. Talbot

Timothy K. Talbot, CASBN # 173456
2300 Contra Costa Blvd Ste 500
Pleasant Hill, CA 94523
ttalbot@RLSlawyers.com
*Attorneys for Amici Curiae*

## SIGNATURE ATTESTATION

I hereby attest that I have obtained the authorization from signatories to this e-filed document and have been authorized to indicate their consent by a conformed signature (s/) within this e-filed document.

By: __s/ David E. Mastagni__
David E. Mastagni
*Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I am counsel for *Amici* curiae. The brief contains 4,612 words, excluding the items exempt by Federal Rule of Appellate Procedure 32(f). The brief's size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6). I certify that this brief is an amicus brief and complies with the 6,500 word limit of the Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i).

Dated: June 2, 2023            _____s/ David E. Mastagni_____
                                     David E. Mastagni
                                     *Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2023, I electronically filed the forgoing document with the Clerk of the Court by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: June 2, 2023                                s/ David E. Mastagni
                                                   _____
                                                   David E. Mastagni
                                                   *Attorney for Amici Curiae*