No. 23-55276

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————

LANCE BOLAND, MARIO SANTELLAN, RENO MAY, JEROME SCHAMMEL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,

*Defendant-Appellant.*

DOES 1-10,

*Defendant.*

———————

On Appeal from the United States District Court
for the Central District of California
No. 8:22-cv-01421-CJC-ADS

———————

**APPELLEES' SUPPLEMENTAL BRIEF**

———————

| | |
|---|---|
| C.D. MICHEL | PAUL D. CLEMENT |
| ALEXANDER A. FRANK | ERIN E. MURPHY |
| JOSHUA R. DALE | *Counsel of Record* |
| SEAN A. BRADY | MATTHEW D. ROWEN |
| KONSTADINOS T. MOROS | NICHOLAS A. AQUART |
| MICHEL & ASSOCIATES, PC | CLEMENT & MURPHY, PLLC |
| 180 E Ocean Boulevard, Ste 200 | 706 Duke Street |
| Long Beach, CA 90802 | Alexandria, VA 22314 |
| | erin.murphy@clementmurphy.com |

*Counsel for Appellees*

April 17, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 4

I. *Duncan* Confirms That The Challenged Provisions Regulate Conduct Covered By The Second Amendment's Plain Text .......................... 4

II. *Duncan* Confirms That The Challenged Provisions Are Inconsistent With This Nation's Historical Tradition Of Firearm Regulation ..................... 7

CONCLUSION ....................................................................................................... 13

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Cases**

*Decker v. Nw. Env't Def. Ctr.*,
    568 U.S. 597 (2013) ................................................................................ 11

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .......................................................................... 2, 4, 10

*Duncan v. Bonta*,
    2025 WL 867583 (9th Cir. Mar. 20, 2025) ................................... *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) ........................................................................... 2, 4, 9, 11

*Ne. Fla. Chapter of Associated Gen. Contractors of Am.
    v. City of Jacksonville*,
    508 U.S. 656 (1993) ................................................................................ 11

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ..................................................................... 6

*United States v. Rahimi*,
    602 U.S. 680 (2024) ............................................................................. 4, 9

*Yukutake v. Lopez*,
    130 F.4th 1077 (9th Cir. 2025) ................................................................. 6

**Statutes**

Cal. Penal Code §28050 ................................................................................ 6

Cal. Penal Code §32000(b) ........................................................................... 8

Cal. Penal Code §32110 ................................................................................ 6

## INTRODUCTION

Shortly after the Supreme Court made clear in *Bruen* that the right to keep and bear arms is not second-class, Plaintiffs filed this lawsuit challenging the most recent amendments to California's now-inaptly named Unsafe Handgun Act ("UHA"), which forecloses the sale of most handgun models that have come on the market over the past decade-plus. After extensive briefing and an evidentiary hearing with live witness testimony, the district court granted a preliminary injunction, concluding that the UHA's prohibition on the manufacture, import, and sale of any new handgun without a chamber load indicator ("CLI"), magazine disconnect mechanism ("MDM"), and "microstamping" technology—features no commercially available handgun currently has all of, and few have any of—likely violates the Second Amendment. California then appealed, and the parties briefed and argued the case, after which this Court held the appeal in abeyance pending *Duncan v. Bonta*, No. 23-55805.

One year later, a divided en banc panel issued its decision in *Duncan*. As relevant here, the en banc panel held that, while the Second Amendment protects a "broad range of arms," "large-capacity magazines" do not come within the coverage of the plain text of the Amendment because they are "accoutrements," not "arms." 2025 WL 867583, at *7-10 (9th Cir. Mar. 20, 2025). *Duncan* further held, after "assum[ing]" that the plaintiffs' proposed conduct of possessing and using such

magazines falls within the plain text of the Second Amendment, that banning "large-capacity magazines" is consistent with a purported tradition of "protecting innocent persons by restricting a component necessary to the firing of a firearm and by restricting especially dangerous uses of weapons" by criminals. *Id.* at *7, 10-22.

To the extent *Duncan* is relevant here, it supports affirming the district court's well-reasoned decision. First and foremost, handguns are obviously "'Arms' within the meaning of the Second Amendment," not mere "accoutrements." *Contra id.* at *7-8. *Duncan* held that "[a] large-capacity magazine … cannot reasonably be described" either "as an item that a person 'takes into his hands, or useth in wrath to cast at or strike another'" or "as a 'weapon[]'" "by itself." *Id.* at *9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008)). But the Supreme Court has been explicit that handguns are *exactly* that—indeed, that "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629; *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 32 (2022) ("handguns are weapons 'in common use' today for self-defense"). And *Duncan* was clear that "we must respect the Founders' choice to protect the right to bear a broad range of arms." 2025 WL 867583, at *10. Neither *Duncan*'s threshold-textual holding about "large capacity magazines" nor its discussion of "[t]he proper inquiry for an item that is *not* an arm itself," *id.* (emphasis added), alters the conclusion that the conduct restricted by California's Unsafe Handgun Act—which regulates

2

handguns alone, and has had the effect of rendering unlawful *virtually every handgun released on the commercial market since 2013*—"fall[s] within the plain text of the Second Amendment." *Id.* at *9.

*Duncan* likewise provides no basis to disturb the district court's conclusion that the UHA is likely inconsistent with historical tradition. *Duncan* "discern[ed] two distinct traditions" relevant to its analysis: "laws seeking to protect innocent persons from infrequent but devastating harm by regulating a component necessary to the firing of a firearm"; and "laws [enacted] to protect innocent persons from especially dangerous uses of weapons once those perils have become clear." *Id.* at *17. The UHA does not fit within either. It does not attack some discrete feature of handguns associated with "infrequent but devastating harm." It instead restricts the sale of most new handguns, on the theory that handguns are too "unsafe" unless modified to contain a combination of features virtually no handgun has. *Duncan* does not purport to identify any tradition that would justify banning handguns writ large. As for the second "tradition[]" *Duncan* "discern[ed]," the CLI and MDM requirements operate to "keep out of [the people's] hands virtually all new, state-of-the-art handguns," thereby *undermining* public safety. 1-ER-17. And the state has never argued that the microstamping requirement can be justified as a "safety" measure. 1-ER-19. Nor has the state ever identified any other historical tradition

3

that would allow it to deem virtually every new handgun too "unsafe" (at least for ordinary citizens; most state employees are free to buy these handguns at will).

In short, after *Duncan* as before it, the district court's conclusion remains correct: The UHA likely violates the Second Amendment. This Court should affirm.

## ARGUMENT

### I. *Duncan* Confirms That The Challenged Provisions Regulate Conduct Covered By The Second Amendment's Plain Text.

Under *Heller*, *Bruen*, *Rahimi*, and now *Duncan*, the threshold inquiry here is straightforward. The Second Amendment "'extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence'" "at the founding." *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (alteration in original) (quoting *Heller*, 554 U.S. at 582); *accord Bruen*, 597 U.S. at 28. The challenged provisions generally prohibit Californians from acquiring state-of-the-art handguns. And, to state the obvious, handguns are "'Arms' within the meaning of the Second Amendment," not mere "accoutrements." *See Duncan*, 2025 WL 867583, at *7-8.

Neither *Duncan*'s holding that "large-capacity magazines" are not "arms themselves," *id.* at *7, nor its discussion of "[t]he proper inquiry for an item that is not an arm itself," *id.* at *10, undermines the conclusion that the conduct the UHA restricts "fall[s] within the plain text of the Second Amendment," *id.* at *9. After all, handguns are not "accessories to firearms"; they *are* firearms, i.e., "weapons themselves, referred to as 'arms.'" *Id.* at *7-8; *see also Heller*, 554 U.S. at 629

4

("[T]he handgun [is] the quintessential self-defense weapon[.]"). And as *Duncan* went out of its way to underscore, "we must respect the Founders' choice to protect the right to bear a broad range of arms." 2025 WL 867583, at *10; *see also id.* at *8 ("The meaning of 'Arms' thus broadly includes nearly all weapons used for armed self-defense."). That should be the end of the threshold-textual inquiry.

It makes no difference that the challenged UHA provisions focus on whether handguns contain particular features. The state has never argued that a handgun that lacks the bespoke features the UHA demands somehow ceases to be a handgun—nor could it, when the UHA itself still refers to them as "handguns." Nor, unlike the law in *Duncan*, does the UHA target a component for which there is a readily available commercial alternative. The law instead operates to "keep out of [the people's] hands virtually all new, state-of-the-art handguns." 1-ER-17. In fact, despite what its name might suggest, the Unsafe Handgun Act has operated to *prevent* Californians from acquiring the safest handguns available in the rest of the country, including most "fully ambidextrous configuration of critical firearm controls" that make firearms safer for left-handed shooters. 1-ER-10. To hold that a law that prevents people from having the safest handguns does not implicate the Second Amendment would render the right to keep and bear arms a dead letter. And to hold that a state may *require* people to have arms equipped with things they do

5

not want (and, in the case of microstamping, do not even exist)[1] would transform a right belonging to the governed into a prerogative of the government.

To be sure, the UHA does not prohibit *possessing* a purportedly "unsafe" handgun; it prohibits only their manufacture and sale by a licensed firearms dealer. *See* Cal. Penal Code §§28050, 32110; 1-ER-9. But as this Court made clear in *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc), "a general regulation of firearms purchasing … restrict[s] conduct covered by the plain text of the Second Amendment." *Yukutake v. Lopez*, 130 F.4th 1077, 1091 (9th Cir. 2025) (emphasis omitted); *see Teixeira*, 873 F.3d at 678. *Duncan* re-affirmed that holding, explaining that "[t]he scope of the Second Amendment is broad in [this] sense as well": In addition to the explicit rights to keep and bear arms, "the Amendment's text … carr[ies] an implicit, corollary right" "to acquire" them. 2025 WL 867583, at *8; *see also Yukutake*, 130 F.4th at 1090 ("[T]he right to 'possess' a firearm—which *Bruen* recognized is protected by the plain text of the Second Amendment—includes within it the right to *take possession* of a firearm, *i.e.*, to acquire one.").

*Duncan* also confirms that—besides being unrealistic—the state's parade of horribles, Reply.4-9, is not a plain-text consideration. Zoning laws that restrict the right to keep and bear arms certainly implicate the Second Amendment, but they will

---

[1] After oral argument, California (again) amended the UHA, this time to postpone the microstamping requirement's effective date to January 1, 2028. *See* Dkt.76.

6

often (though not always) be rooted in this Nation's history of firearm regulation and so pass constitutional muster. The same is true of quality-control or product-liability laws that prohibit the sale of products that frequently "melt" or "explode" owing to no user error, or "a standard sales tax" on firearms. *See* Reply.5-6.

In all events, *Duncan* ultimately "assume[d]" that the plaintiffs' "proposed conduct" there "[fell] within the plain text of the Second Amendment," and proceeded to resolve the case based on historical tradition. 2025 WL 867583, at \*10. *Duncan* thus provides no basis to disturb the district court's textual analysis (or, worse still, to send the case back down for still more consideration of an issue that has already been exhaustively explored). To the contrary, *Duncan* provides ample reason to affirm that analysis.

## II. *Duncan* Confirms That The Challenged Provisions Are Inconsistent With This Nation's Historical Tradition Of Firearm Regulation.

*Duncan* likewise provides no basis to disturb the district court's conclusion that the challenged UHA amendments are likely inconsistent with historical tradition. *Duncan* "discern[ed] two distinct traditions": (1) "laws seeking to protect innocent persons from infrequent but devastating harm by regulating a component necessary to the firing of a firearm"; and (2) "laws [enacted] to protect innocent persons from especially dangerous uses of weapons once those perils have become clear." *Id.* at \*17. The UHA does not fit within either. Again, handguns are not merely "a component necessary to the firing of a firearm"; they are firearms. As for

7

the second "tradition[]" the Court "discern[ed]," far from protecting people from "especially dangerous uses" of handguns, the district court found as a matter of fact that the CLI and MDM requirements operate to "keep out of [the people's] hands virtually all new, state-of-the-art handguns," and the state has never argued that the (now-postponed) microstamping requirement can be justified as a "safety" measure. 1-ER-17, 19. Nor has the state identified any other historical tradition that would allow it to deem most new handguns too "unsafe" for commercial sale—let alone one that would allow a state to ban the sale of these arms to ordinary citizens while allowing most state employees to buy them at will, *see* Cal. Penal Code §32000(b). And there is no reason to remand for still more historical investigation. California has had ample opportunity to come up with historical analogues for its novel regime. It has failed because none exist, as the district court correctly concluded.

*Duncan*'s references to *Rahimi*, which was decided after briefing closed, also support the district court's analysis. *See Duncan*, 2025 WL 867583, at *11-12. When analyzing whether 18 U.S.C. §922(g)(8) is consistent with historical tradition, *Rahimi* did not start, as the state has here, by slotting the law into a broad or sweeping abstract category focused only on the law's aim at the highest level of generality (e.g., public safety). It examined how the challenged law actually works—i.e., by authorizing state actors to disarm someone only after a "judicial determination[]" that the person "likely would threaten or had threatened another with a weapon," and

even then only for a "limited duration"—and compared that to how the government's proffered historical analogues worked. 602 U.S. at 699. That makes sense, since the whole point of embracing a historical-tradition mode of analysis is to get courts out of the business of making subjective assessments about how burdensome they think a law is. And under that kind of analysis, the UHA is out on a regulatory island.

Consider first the state's proffered justifications for its CLI and MDM requirements. For support, the state highlights two firearm inspection laws (i.e., "proving laws") from Massachusetts and Maine. AG.Br.34-38. At the outset, *Bruen* makes clear that two laws do not establish an "enduring American tradition," 597 U.S. at 67, and *Duncan* says nothing to contradict that. Moreover, proving laws were just quality-control regulations that, *by the state's own admission*, "did not impose safety requirements" that (as the UHA does) go "beyond" what "manufacturers voluntarily buil[d] into a firearm." AG.Br.38. To boot, the proving laws precluded no one from buying any firearm; unlike the challenged UHA provisions, they simply ensured that the particular arm being purchased would function as expected and intended. As the district court put it, then, "[t]he difference[] between how and why these laws burden a law-abiding citizen's right to armed self-defense is evident." 1-ER-17. Nothing in *Duncan* suggests otherwise.

To be sure, *Duncan* found the historical gunpowder storage laws California invokes in the alternative, *see* AG.Br.36-38, to be analogous to California's ban on

9

"large-capacity magazines." *Duncan*, 2025 WL 867583, at *17. But it did so only after emphasizing that such laws provide support for regulating a particular "component necessary to the firing of a firearm" that can easily be replaced with another commercially available component—not, as the state now seeks to employ those storage laws, to justify a broad prohibition on the manufacture, importation, and sale of handguns themselves. And *Duncan* does not (and could not) abrogate the Supreme Court's guidance on colonial gunpowder storage laws in *Heller*, which explains that those laws "required only that excess gunpowder be kept in a special container or on the top floor of the home," and so did "not remotely burden the right of self-defense" as compared to a law that, like the UHA, is effectively "an absolute ban on handguns." *Heller*, 554 U.S. at 632.

As for the microstamping requirement, *Duncan* in no way supports the state's contention that microstamping and colonial-era gun-owner "registration and taxation requirements" are one and the same. AG.Br.41. Unlike registration and taxation requirements, which are easily adoptable and ubiquitous, microstamping is *still* a theoretical technology that is not commercially available and has not been adopted by a single manufacturer, much less en masse. Resp.Br.46. Accordingly, it burdens the right to keep and bear arms by effectively prohibiting the manufacture, importation, and sale of all modern handguns. Not even the state claims that the colonial-era laws it invokes did that. Nor could it claim that *Duncan* endorses any

10

such law, or that *Duncan* provides room for this panel to question the district court's factual finding, after a full hearing, that it is simply "not feasible to implement [microstamping] technology broadly." 1-ER-20; Resp.Br.46.[2]

On top of all that, *Duncan* specifically disclaimed reliance on the "more nuanced" approach that the state has claimed "is appropriate here." AG.Br.32; *see Duncan*, 2025 WL 867583, at *15 ("[W]e emphasize that the result in this case does not hinge on this categorization."). Of course, the state is wrong that this case implicates the "more nuanced" approach *Bruen* discussed. As the state admits, firearms have always had safety problems, *see* AG.Br.34, so there is nothing novel here. Handguns are no "dramatic technological change," and the risk that someone might fire one under the mistaken impression that it is not loaded is nothing new. But in all events, the district court *did* apply a "more nuanced" approach: It allowed the state to try to "reason by analogy" to historical laws that are by no stretch of the imagination "dead ringer[s]" for the UHA, *Bruen*, 597 U.S. at 30. *See* Resp.Br.31 n.4; *id.* at 33-47.

---

[2] As noted *supra*, the microstamping requirement will not take effect now until January 1, 2028, at the earliest. But that brief reprieve does not moot this case. *See, e.g., Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 607-10 (2013); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). Notably, the state's 28(j) letter informing the Court of the post-argument amendment did not argue otherwise.

To be sure, the district court did not lower the historical bar to the point of blessing California's prohibition on the manufacture, importation, and sale of all modern handguns that lack the bespoke features the UHA requires. But nothing in *Duncan* requires courts to do so. Nor could *Duncan* impose such a requirement consistent with Supreme Court precedent. When *Bruen* referred to "dramatic technological changes" or "societal concerns" that might require a "more nuanced approach," it was not concerned with technological developments that would improve the accuracy, capacity, and functionality of modern handguns. On the contrary, those are the types of technological changes law-abiding citizens *want*, as they increase the chances of safely hitting one's target and decrease the risk of causing collateral or accidental damage. And yet, they are the very thing California bans. *See* 1-ER-21 (noting that the handguns banned from California's roster are "more ergonomic, durable, reliable, affordable, and possibly even safer"). Moreover, all firearms, regardless of their modernity, can cause accidents if not used with the appropriate care. So if the government could ban any arm that might "accidental[ly] discharge" due to *user* error, then it is hard to see what firearms it could not ban. Tellingly, the problems California has with the myriad handguns it labels "unsafe" could be said equally of the "quintessential self-defense weapon." But even the state cannot deny that handguns are protected by the Second

12

Amendment, which suffices to foreclose its effort to ban all modern ones indirectly via the UHA's feature-specific restrictions.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

s/Erin E. Murphy

| | |
|---|---|
| C.D. MICHEL | PAUL D. CLEMENT |
| ALEXANDER A. FRANK | ERIN E. MURPHY |
| JOSHUA R. DALE | *Counsel of Record* |
| SEAN A. BRADY | MATTHEW D. ROWEN |
| KONSTADINOS T. MOROS | NICHOLAS A. AQUART |
| MICHEL & ASSOCIATES, PC | CLEMENT & MURPHY, PLLC |
| 180 E Ocean Boulevard, Ste 200 | 706 Duke Street |
| Long Beach, CA 90802 | Alexandria, VA 22314 |
| | erin.murphy@clementmurphy.com |

*Counsel for Appellees*

April 17, 2025

13

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with this Court's March 27 Order (Dkt.78) because it contains 2,903 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

April 17, 2025

s/Erin E. Murphy  
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy
